**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>      Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>      Plaintiff,<br>v.<br><br>STATE OF NEW MEXICO, ex rel. HECTOR H. BALDERAS, Attorney General, and STATE OF MISSISSIPPI, ex rel. JIM HOOD, Attorney General,<br><br>      Defendants. | Adv. Proc. No. 22-_____ (MBK) |

---

[1]  The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**DEBTOR'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF
(I) PRELIMINARILY ENJOINING THE PROSECUTION OF THE
NEW MEXICO AND MISSISSIPPI STATE ACTIONS AND (II) GRANTING
A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING**

Plaintiff LTL Management LLC, a North Carolina limited liability company and

the debtor in the above-captioned Chapter 11 Case ("LTL" or the "Debtor"), incorporates the

statements contained in the following documents filed in the Debtor's Chapter 11 Case

(No. 21-30589) or adversary proceeding (Adv. Pro. No. 21-03032):  (a) the *Informational Brief

of LTL Management LLC*, No. 21-30589, ECF No. 3 (the "Informational Brief"); (b) the

*Declaration of John K. Kim in Support of First Day Pleadings*, No. 21-30589, ECF No. 5

(the "First Day Declaration"); (c) the *Complaint for Declaratory and Injunctive Relief (I)

Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or, (II)

Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order

Pending a Final Hearing*, Adv. Pro. No. 21-03032, ECF No. 1; (d) the *Supplemental Declaration

of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and

Related Motions*, Adv. Pro. No. 21-03032, ECF No. 3 (the "Supplemental Kim Declaration"); (e)

the *Declaration of John K. Kim in Support of Debtor's Complaint for Injunctive Relief and

Related Motion With Respect to the New Mexico and Mississippi State Actions* (the "Kim

Declaration"), filed contemporaneously herewith; and (f) the *Declaration of Dan B. Prieto in

Support of Debtor's Complaint for Injunctive Relief and Related Motion With Respect to the New

Mexico and Mississippi State Actions* and the exhibits attached thereto (the "Prieto Declaration"),

filed contemporaneously herewith, and further states as follows:

## INTRODUCTION

1.      The Debtor commenced this Chapter 11 Case to equitably and

permanently resolve all current and future talc-related claims against it through the

-2-

consummation of a plan of reorganization that includes the establishment of a trust.  The relief

sought by this adversary proceeding is critical to the Debtor's ability to achieve that purpose.

2.      In this regard, the Debtor brings this adversary proceeding pursuant to

Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and seeks an

order of the Court temporarily enjoining the continued prosecution of *State of New Mexico ex*

*rel. Balderas v. Johnson & Johnson, et al.*, No. D-101-CV-2020-00013, pending in the First

Judicial District Court for the County of Santa Fe, New Mexico (the "NM State Action") and

*State of Mississippi ex rel. Hood v. Johnson & Johnson, et al.*, No. G2014-0001207, pending in

the First Judicial District Court for the County of Hinds, Mississippi (the "MS State Action" and

together with the NM State Action, the "State Actions") against the Debtor and certain non-

debtor entities while the Chapter 11 Case remains pending.[2]  The Debtor seeks this relief to

preserve its ability to resolve these claims, including the overlapping issues underlying them and

the talc-related claims, through mediation or otherwise in this Court and, ultimately, to

successfully reorganize.

3.      A fundamental dispute in the Chapter 11 Case relates to the alleged merits

of the talc-related claims against the Debtor (collectively, the "Talc Claims").[3]  The Debtor and

the defendants in the State Actions maintain that cosmetic talc products manufactured or

distributed by the Debtor's predecessors or Johnson & Johnson ("J&J"), including Johnson's

---

[2]      The Debtor recognizes that the Court has determined to review the existing preliminary injunction
(described below) periodically and would not oppose a similar periodic review of any preliminary
injunction issued with respect to the State Actions.

[3]      Talc Claims include all claims relating in any way to talc or talc-containing materials that formerly were
asserted (or that could have been asserted) against Old JJCI on any theory of liability (whether direct,
derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or
conveyance, alter ego or otherwise).

-3-

Baby Powder and Shower to Shower (collectively, the "Talc Products") are safe, did not contain asbestos, and do not cause disease (and that public statements to that effect were truthful). By contrast, the talc claimants allege that such talc products contained asbestos and cause mesothelioma or ovarian cancer. This dispute about the safety of cosmetic talc products is also central to the claims asserted in the State Actions. In fact, the State Actions rely on the same underlying allegations and evidence relied upon by the talc claimants, and the plaintiffs in those actions are represented by the same counsel that represents talc claimants in this chapter 11 case, including some claimants on the Official Committee of Talc Claimants.[4] Thus, if the State Actions are permitted to continue, a key issue in the Chapter 11 Case will be adjudicated outside of this Court at the same time that parties in the Chapter 11 Case are attempting to resolve the exact same issue in this Court and formulate a consensual plan of reorganization. Moreover, the pursuit of the State Actions would undermine the ongoing mediation with an ad hoc group of states that are attempting consensually to resolve consumer protection claims virtually identical to those asserted in the State Actions.

    4.  The defendants in this adversary proceeding are the State of New Mexico ("New Mexico") and the State of Mississippi ("Mississippi"). The named defendants in the State Actions are: (a) the former Johnson & Johnson Consumer Inc. ("Old JJCI")[5]; (b) Johnson & Johnson ("J&J"); and (c) Bausch Health Companies Inc. f/k/a Valeant Pharmaceuticals International, Incorporated; Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals

---

[4] New Mexico is represented by Fears Nachawati Law Firm and Ashcraft & Gerel LLP, which also represent two members of the Official Committee of Talc Claimants (the "Talc Committee"). In the MS State Action, Mississippi is represented by The Smith Law Firm, P.L.L.C. and Porter & Malouf, P.A., which also represent talc claimants (but do not represent members of the Talc Committee).

[5] In the NM State Action, New Mexico incorrectly identifies Old JJCI as "Johnson & Johnson Consumer Companies Inc." In the MS State Action, the complaint likewise incorrectly identifies Old JJCI as "Johnson & Johnson Consumer Companies, Inc."

International; and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC

f/k/a Valeant Pharmaceuticals North America, all three of which the Debtor is contractually

obligated to indemnify (the "Bausch Defendants" and, collectively with Old JJCI and J&J,

the "State Protected Parties").[6]

5.      The State Actions are brought by New Mexico and Mississippi (together,

the "States"), by and through their respective attorneys general.  In the NM State Action, New

Mexico alleges that the State Protected Parties deceptively marketed and sold talcum powder

products by making misrepresentations about the safety of the products and the presence of

carcinogens, including asbestos.  *See* App. A, New Mexico First Amended Complaint.

Specifically, New Mexico alleges that the State Protected Parties are liable for violations of the

New Mexico Unfair Practices Act, NMSA 1978, Section 57-12-21, and of the New Mexico False

Advertising Act, NMSA 1978, Section 57-15-1, fraud and negligent misrepresentation,

negligence, unjust enrichment, and punitive damages (collectively, the "NM Claims").[7]

Similarly, in the MS Action, Mississippi alleges that J&J and Old JJCI violated the Mississippi

Consumer Protection Act, Miss. Code § 75-24-5, by failing to disclose alleged health risks

associated with female consumers' use of talc contained in talc products and seeks injunctive and

monetary relief (collectively, the "MS Claims" and collectively with the NM Claims, the "State

Claims").[8]  *See* App. B, Mississippi Complaint.

---

[6]     The two Bausch Defendants named in the MS State Action (Valeant Pharmaceuticals International, Inc. and Valeant Pharmaceuticals North America, Inc.) settled the claims against them in the MS State Action and accordingly are no longer parties to that action.

[7]     New Mexico also asserted claims for violations of the New Mexico Medicaid Fraud Act, NMSA 1978, Section 30-44-7, and of the New Mexico Fraud Against the Taxpayers Act, NMSA 1978, Section 44-9-3. These claims were dismissed on September 22, 2020.

[8]     Mississippi also alleges that J&J and Old JJCI the alter egos of one another and acted in concert and/or aided and abetted each other and conspired to engage in the common course of misconduct alleged in the MS State Action.

6.      All of the State Claims are based ultimately on the disputed allegation that

talc products manufactured and/or distributed by the Debtor's predecessors or J&J were

contaminated with asbestos or otherwise may cause injury.  These allegations create substantial

factual overlap with the Talc Claims.  Proving these allegations in the State Actions will thus

directly implicate the Debtor's ability to resolve the Talc Claims in the Chapter 11 Case.  Indeed,

the continued prosecution of the State Actions would interfere with or impact the valuation of the

Talc Claims in the ongoing mediation, in any separate settlement discussions and in any claims

estimation proceedings.

7.      In addition, permitting the State Actions to proceed would undermine and

disrupt the ongoing mediation with over forty states that seeks to consensually resolve the

consumer protection claims alleged by those states.  The claims of these states are based on the

very same allegations as the State Claims at issue in the adversary proceeding.

8.      The relief requested in this adversary proceeding has not been necessary

until recently.  Mississippi was part of a group of forty-one states and the District of Columbia

that formed an ad hoc committee (the "Ad Hoc Committee") for purposes of engaging in

mediation with the Debtor to attempt to resolve the consumer protection claims asserted or

alleged by the states.  To facilitate mediation with the member states, the Debtor entered into a

reimbursement agreement with the Ad Hoc Committee pursuant to which the Debtor agreed to

reimburse certain costs of the Ad Hoc Committee's professionals in connection with settlement

efforts.  In turn, the Ad Hoc Committee agreed to participate in mediation and, while the

reimbursement agreement is in effect, the members of the Ad Hoc Committee, including

Mississippi, agreed to stay and not commence actions against the Debtor or its affiliates related

to talc products.  Although New Mexico was not a member of the Ad Hoc Committee, it

separately agreed to stay prosecution of the NM State Action for a period of sixty days.

       9.     However, Mississippi recently elected to resign from the Ad Hoc

Committee and has resumed prosecuting the MS State Action.  It insists that the Debtor move

forward with a proposed scheduling order that contemplates a trial date in February 2023 and

extensive expert and fact discovery in the upcoming months.  Likewise, New Mexico has

resumed its prosecution of the NM State Action and has refused to agree to a further stay of the

action.  It has insisted on a trial setting in April 2023, with numerous deadlines and extensive

discovery to be conducted in the near term.  In fact, the deposition of J&J's and Old JJCI's

corporate representative is set for July 26, 2022.

       10.    Given these recent developments, the Debtor requests that the Court issue

a preliminary injunction under section 105(a) of the Bankruptcy Code temporarily enjoining the

States from prosecuting the State Actions against the State Protected Parties and the Debtor

because they are inextricably intertwined with the Talc Claims that the Debtor seeks to globally

and equitably resolve in the Chapter 11 Case.  The State Actions should also be enjoined as to

the State Protected Parties because continued prosecution of the claims against those parties

would amount to continued prosecution against the Debtor for the reasons set forth by the Debtor

in support of the current preliminary injunction.  In particular, the Debtor would be responsible

for any judgment in the State Actions against Old JJCI or J&J.  *See* Adv. Pro. No. 21-03032,

ECF No. 128 at 19–22, 41–42; *In re LTL Mgmt., LLC*, No. 21-30589, Adv. Pro. No. 21-03032

(MBK), 638 B.R. 291, 303–06 (Bankr. D.N.J. 2022) ("N.J. Mem. Op.").  The Debtor also has

indemnity obligations to the Bausch Defendants in the NM State Action.

11.    Because the States now are vigorously pursuing the State Actions, including by insisting that scheduling orders be entered setting trial dates for early 2023 in their respective cases and that extensive discovery be conducted in the near term (including J&J's and Old JJCI's corporate representative deposition, scheduled for **July 26, 2022** in the NM State Action), the Debtor additionally seeks a temporary restraining order following an expedited, emergency hearing to promptly effectuate the requested relief on an interim basis pending a further hearing on its motion for preliminary injunction.

12.    In sum, allowing the State Actions to proceed against the State Protected Parties or the Debtor outside of this Court would run contrary to and seriously conflict with the Bankruptcy Code's purpose of facilitating an effective reorganization.  As a result, the State Actions should be enjoined.

13.    Contemporaneous with the filing of this Complaint, the Debtor filed a motion (the "Preliminary Injunction Motion") seeking the same relief requested in this Complaint and setting forth additional grounds why the relief requested herein is warranted.[9]

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of final orders or a final judgment by this Court in this adversary proceeding.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1409.

---

[9]    The Debtor fully incorporates the arguments and authority contained in the Preliminary Injunction Motion as if fully set forth herein.

NAI-1532147016

## BASIS FOR RELIEF

16.     The statutory basis for the relief requested herein is section 105(a) of the Bankruptcy Code.

17.     The Debtor has commenced this adversary proceeding pursuant to Bankruptcy Rules 7001(7) and 7065.

18.     The Debtor has made no prior request for the relief requested herein to this or any other court.

## GENERAL BACKGROUND

19.     On October 14, 2021 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina ("N.C. Bankruptcy Court").  The Debtor is continuing to be in possession of its property and is managing its business, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## THE PARTIES

20.     The Debtor is a North Carolina limited liability company.

21.     The defendants in this adversary proceeding are the State of New Mexico (by and through its Attorney General, Hector H. Balderas) and the State of Mississippi (by and through its Attorney General, Jim Hood).

22.     The defendants in the NM State Action are: (a) Old JJCI; (b) J&J; and (c) the Bausch Defendants (Bausch Health Companies Inc. f/k/a Valeant Pharmaceuticals International, Incorporated; Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International; and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America).

-9-

23.     The defendants in the MS State Action are: (a) Old JJCI; and (b) J&J.  The
two Bausch Defendants originally named in the MS State Action (Valeant Pharmaceuticals
International, Inc. and Valeant Pharmaceuticals North America, Inc.) settled the claims against
them in the MS State Action and were dismissed from the case on January 8, 2020.

## **FACTUAL BACKGROUND**

### *The 2021 Corporate Restructuring*

24.     On October 12, 2021, Old JJCI implemented the corporate restructuring
described in detail in the First Day Declaration (the "2021 Corporate Restructuring").  First Day
Decl. ¶ 16.  The 2021 Corporate Restructuring was implemented to enable the Debtor to fully
resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old
JJCI enterprise to a bankruptcy proceeding.  *Id.* ¶ 21.

25.     As a result of the 2021 Corporate Restructuring, which is described in
greater detail in the First Day Declaration:

a.     Old JJCI ceased to exist;

b.     The Debtor and Johnson & Johnson Consumer Inc., a New Jersey
company ("New JJCI"), were formed;

c.     The Debtor received certain of Old JJCI's assets, as set forth
below, and became solely responsible for certain of its liabilities,
including the Talc Claims;

d.     New JJCI was allocated all other assets of Old JJCI and became
solely responsible for all other liabilities of Old JJCI;

e.     A funding agreement (the "Funding Agreement") was established
between New JJCI, J&J and the Debtor for the purpose of ensuring
that the Debtor has at least the same, if not greater, ability to pay

NAI-1532147016

the Talc Claims as Old JJCI had before the 2021 Corporate Restructuring;[10] and

f.      The Debtor agreed to indemnify New JJCI and its affiliates for any losses it might suffer related to the Talc Claims.

*Id.* ¶¶ 22–23.

26.      At the time of the 2021 Corporate Restructuring, the Debtor received the following assets:

a.      Old JJCI's rights and interests as payee under the Funding Agreement;

b.      A bank account and approximately $6 million in cash;

c.      All contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, insurance coverage rights, service contracts and engagement and retention contracts, if any;

d.      All equity interests in Royalty A&M LLC ("Royalty A&M"), which owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of certain products, a business that is projected to generate approximately $50 million in revenue per year over the next five years and has the ability to borrow up to $50 million from J&J on terms consistent to those provided to other J&J affiliates;

e.      Causes of action that relate to the assets and liabilities allocated to the Debtor;

f.      Privileges that relate to the assets and liabilities allocated to the Debtor; and

---

[10]      Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses.  First Day Decl. ¶ 27.  In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.  *Id.*

g.    Records that relate to the assets and liabilities allocated to the Debtor.

*Id.* ¶¶ 24, 26, 30.

27.    In total, the Debtor's value is approximately $373.1 million, without taking into account the Funding Agreement with New JJCI and J&J or insurance.  *Id.* ¶ 26.

***The Talc Claims***

28.    Cosmetic talc litigation against the Debtor has focused primarily on JOHNSON'S® Baby Powder and Shower to Shower product (hereinafter, "Johnson's Baby Powder")[11] as a purported cause of ovarian cancer and mesothelioma.  First Day Decl. ¶ 32.  For over 125 years, Johnson's Baby Powder has been used by hundreds of millions of consumers worldwide.  *Id.*

29.    J&J, a New Jersey company incorporated in 1887, first began selling Johnson's Baby Powder in 1894, launching its baby-care line of products.  *Id.* ¶ 10.  In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder.  *Id.*  In 1979, J&J transferred all its assets and liabilities associated with the baby products division to Old JJCI.  *Id.*  Following this transaction, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder, and instead, Old JJCI manufactured and sold Johnson's Baby Powder.  *Id.* ¶¶ 10, 33.  Old JJCI is responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other disease.  *Id.* ¶¶ 9–15.

---

[11]    While Talc Claims generally focus on Johnson's Baby Power, certain Talc Claims have also identified Shower to Shower, a talc-based deodorizing product that was previously produced by J&J/Old JJCI before being sold to a competitor in 2012.  *See Debtor's Informational Brief*, No. 21-30589, ECF No. 3 at 10 n.24; *see also* Supp. Kim Decl. ¶ 12 ("In 2012, Old JJCI sold the assets and liabilities relating to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc.," one of the Bausch Defendants).  In general, when referenced by claimants, Shower to Shower is treated interchangeably with Johnson's Baby Powder because both are cosmetic products that contain talc as a primary or major ingredient.  *See Debtor's Informational Brief*, No. 21-30589, ECF No. 3 at 10 n.24.

NAI-1532147016

30.    On May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada. *Id.* ¶ 33.  The decision was based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder. *Id.*  As set forth in the Informational Brief, the Debtor stands behind the safety of the Talc Products and maintains, based on decades of internal and third-party studies and testing, that it is not a cause of either ovarian cancer or mesothelioma.

31.    As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in a federal multi-district litigation in New Jersey, and approximately 3,300 cases in multiple state court jurisdictions across the country. *Id.* ¶ 42.  In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio. *Id.* ¶ 44.

32.    Even though J&J has not manufactured or sold talc-containing products since prior to 1979, in virtually every lawsuit asserting a Talc Claim, the Talc Claim is asserted against both Old JJCI and J&J.  In many jurisdictions, the plaintiffs seek to hold Old JJCI and J&J jointly and severally liable for such talc claims.  The plaintiffs rarely, if ever, attempt to differentiate between talc-containing products sold by J&J and talc-containing products sold by Old JJCI.  Supp. Kim Decl. ¶ 6.

***Indemnity of J&J***

33.    In 1979, J&J transferred all its assets associated with the Baby Products division to Johnson & Johnson Baby Products ("J&J Baby Products").  First Day Decl. ¶¶ 10–14. In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division.  Supp. Kim Decl. ¶ 5.  The assumption included all liabilities, including

-13-

contingent and future product liability claims.  Over the next few decades, nearly all assets[12] of

the Baby Products division were transferred in a series of transactions and mergers, ultimately

resting with Old JJCI.  First Day Decl. ¶¶ 10–14.  Following these intercompany transactions,

Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing baby powder

caused ovarian cancer and mesothelioma.  *Id*. ¶¶ 15, 32.  In addition, through a series of transfers

and indemnification agreements, Old JJCI also assumed responsibility for all claims alleging that

"Shower to Shower" caused cancer or other diseases.  Thus, in 1979, J&J Baby Products became

the real party in interest for all actions suits or proceedings relating to the talc previously sold by

J&J or in any way arising out of the talc business being transferred.  And, as a result of a series

of transactions culminating in the 2021 Corporate Restructuring, Debtor assumed that liability

and substituted in as the real party in interest.

### *Indemnity of the Bausch Defendants (NM State Action)*

34.    Old JJCI also agreed to indemnify certain transaction counterparties for

liability arising from sale of the Talc Products, including the Bausch Defendants in the NM State

Action.  Supp. Kim Decl. ¶ 11; Adv. Pro. No. 21-03032, ECF No. 2, App. B.  For example, in

2012, Old JJCI sold the assets and liabilities relating to certain products to Valeant

Pharmaceuticals International, Inc. ("Valeant").  Supp. Kim Decl. ¶ 12.  Thereafter, in 2019, Old

JJCI and Valeant (now known as Bausch Health Companies Inc., one of the Bausch Defendants

in the NM State Action) entered into an indemnification agreement.  *Id*.  Pursuant to that

indemnification agreement, Old JJCI agreed to indemnify Valeant and its affiliates (which

includes the two other Bausch Defendants: Bausch Health Americas, Inc. f/k/a Valeant

Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North

---

[12]    The only exception was assets allocated to the diaper program.

America LLC f/k/a Valeant Pharmaceuticals North America) for, among other things, consumer

protection actions commenced by state attorneys general for conduct through September 9, 2012.

***Claims Identical as to J&J, Old JJCI, and the Bausch Defendants (NM State Action)***

35.    New Mexico's claims against the Bausch Defendants in the NM State

Action are generally the same as its claims against Old JJCI and J&J.  New Mexico alleges that

all the defendants in the NM State Action are liable in connection with the sale, promotion, and

marketing of the Talc Products, and it has asserted the same causes of actions collectively against

all defendants, with the exception of the claim under the New Mexico False Advertising Act,

which is only brought against Old JJCI and J&J.

***The Debtor's Decision to File for Chapter 11 Reorganization***

36.    Old JJCI and J&J asserted that there was no scientific or other support that

Johnson's Baby Powder was either contaminated with asbestos, or was a cause of ovarian cancer

or mesothelioma.  Based on these arguments, Old JJCI and J&J had various successes in

cosmetic talc litigation, including dismissing roughly 1,300 ovarian cancer and over

250 mesothelioma cases without payment and achieving 16 key defense verdicts.  First Day

Decl. ¶ 38.  Old JJCI also succeeded in obtaining reversal of many plaintiff verdicts on appeal.

*Id.*  Despite these results—and the lack of any real proof that its product was unsafe—Old JJCI

was also subject to a number of verdicts involving unpredictable and wildly divergent

compensatory and punitive damages awards.  *Id.*  In addition, prior to the commencement of this

case, Old JJCI had incurred nearly $1 billion in defending a flood of personal-injury lawsuits

relating to alleged talc exposure, nearly all of which was spent in only the last five years.  *Id.* ¶

40.  In the months prior to the Petition Date, Old JJCI was paying anywhere from $10 million to

$20 million monthly in defense costs.  *Id.*  And cosmetic talc litigation against the Debtor was

NAI-1532147016

anticipated to grow for decades more, as were the extraordinary costs of resolving tens of thousands of expected claims. *Id.* ¶ 41.

37.    The status quo was untenable given the cost, burden, uncertainty and anticipated duration of the cosmetic talc litigation.  The only available option to appropriately assess, resolve, and administer the current and future talc-related claims in an efficient and equitable manner is the Chapter 11 Case. *Id.* ¶ 58.

38.    As a result, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the N.C. Bankruptcy Court on October 14, 2021.

***The Talc Claims Temporary Restraining Order and Preliminary Injunction***

39.    On October 21, 2021, the Debtor commenced an adversary proceeding in the Chapter 11 Case and filed a motion, Adv. Pro. No. 21-03032, ECF No. 2 (the "First PI Motion"), seeking (i) a declaration that the automatic stay under section 362(a) of the Bankruptcy Code applies to prohibit the commencement or continuation of the Talc Claims against the Protected Parties (including J&J, Old JJCI, New JJCI, third-party retailers who sold Old JJCI's talc-containing products, indemnified parties, and others) while its Chapter 11 Case remains pending; and (ii) a preliminary injunction under section 105(a) of the Bankruptcy Code to enjoin the commencement or prosecution of actions outside of the Chapter 11 Case.  Various parties filed objections to the First PI Motion, Adv. Pro. No. 21-03032, ECF Nos. 49–50, and the Debtor filed a reply, Adv. Pro. No. 21-03032, ECF No. 58.

40.    The N.C. Bankruptcy Court granted a temporary restraining order prohibiting and enjoining the prosecution of Talc Claims against the Debtor and Old JJCI and scheduled a further hearing on the First PI Motion, following discovery.  Adv. Pro. No. 21-03032, ECF No. 28.  Thereafter, on November 15, 2021, the N.C. Bankruptcy Court entered an order preliminarily determining that the automatic stay prohibited the commencement or

-16-

continuation of the Talc Claims against the non-debtor parties and preliminarily enjoining the same for a period of 60 days.  Adv. Pro. No. 21-03032, ECF No. 102 (the "W.D.N.C. Prelim. Inj. Order" or "Initial PI Order"), ¶ 2.

41.    By an order entered on November 16, 2021, the N.C. Bankruptcy Court transferred the Chapter 11 Case and the adversary proceeding to the United States District Court for the District of New Jersey, including the decision of whether to extend the relief granted by the Initial PI Order, and the Chapter 11 Case was automatically referred to this Court. *See* No. 21-30589, ECF No. 416.

42.    Following additional briefing and discovery in connection with the relief requested in the First PI Motion, the Court held an evidentiary hearing on extending the relief granted by the Initial PI Order on February 18, 2022.  On February 25, 2022, the Court issued its Memorandum Opinion, providing that it would extend the relief granted under the Initial PI Order, including the issuance of a preliminary injunction with respect to the Talc Claims, for the duration of the Chapter 11 Case, subject to the Court revisiting continuation of the automatic stay and the preliminary injunction on June 29, 2022, and every four months thereafter.  N.J. Mem. Op. at 301–02, 322–24.  The corresponding preliminary injunction order (Adv. Pro. 21-03032, ECF No. 187, the "PI Order"), does not expressly address the claims of governmental entities because such entities were not parties to the adversary proceeding.

43.    On July 1, 2022, the Court adjourned the hearing on the continuation of the preliminary injunction and automatic stay against third parties to July 6, 2022.  At the request of the Talc Committee, the Court subsequently further adjourned the hearing to July 26, 2022.

44.    From the outset of the Chapter 11 Case, the Debtor has repeatedly expressed its desire to engage in mediation with the holders of Talc Claims to facilitate the

NAI-1532147016

establishment and funding of a trust to resolve the Chapter 11 Case and provide equitable

recoveries to creditors.  Although any mediation process was delayed pending the Court's ruling

on the Motions to Dismiss filed in the Chapter 11 Case, promptly following the denial of those

motions, the Debtor renewed its request for mediation.  On March 18, 2022, the Bankruptcy

Court entered the Order Establishing Mediation Protocol.  On May 27, 2022, the Court appointed

a separate mediator to assist with mediation with respect to, among other things, the states'

consumer protection claims.  ECF No. 2370.  Mediation efforts are ongoing.

***The New Mexico State Action***

45.      New Mexico initiated the NM State Action on January 2, 2020 and filed

its First Amended Complaint on March 3, 2020.  New Mexico asserted the following claims in

connection with the marketing, sale, and promotion of the Talc Products: (1) violation of the

New Mexico Unfair Practices Act, NMSA 1978, Section 57-12-21; (2) violation of the New

Mexico Medicaid Fraud Act, NMSA 1978, Section 30-44-7; (3) violation of the New Mexico

Fraud Against the Taxpayers Act, NMSA 1978, Section 44-9-3; (4) violation of the New Mexico

False Advertising Act, NMSA 1978, Section 57-15-1[13]; (5) fraud and negligent

misrepresentation; (6) negligence; and (7) unjust enrichment.  Based on these claims, New

Mexico sought damages, restitution, civil penalties, punitive damages, attorneys' fees and costs,

and declaratory and injunctive relief.  On September 22, 2020, the First Judicial District Court

for the County of Santa Fe, New Mexico (the "New Mexico Court") granted the State Protected

Parties' motions to dismiss the claims under the New Mexico Medicaid Fraud Act and the New

Mexico Fraud Against the Taxpayers Act.

---

[13]      New Mexico did not assert a claim under the New Mexico False Advertising Act against the Bausch
Defendants.

46.      On April 8, 2022, New Mexico agreed to stay the NM State Action for

sixty days, to allow the Debtor to engage in mediation efforts with states that had agreed to stay

or not commence actions against the Debtor or its affiliates related to talc products (the

"Mediating States") and the Talc Claimants.  That agreed stay expired, and New Mexico now

insists on moving forward with litigation.  To that end, on June 17, 2022, New Mexico filed a

motion requesting a scheduling order that sets trial for April 2023 and numerous discovery and

motion deadlines in the upcoming months.  Under New Mexico's proposed scheduling order, the

parties would be required, among other things, to mediate by August 29, 2022, to exchange non-

expert witness lists by September 1, 2022, and to complete all discovery by November 30, 2022.

Moreover, the corporate representative deposition of J&J and Old JJCI is set for July 26, 2022.

47.      Thus, in addition to the burdens of discovery, the NM State Action

requires the Debtor and the State Protected Parties to devote increasing amounts of time and

resources for trial preparation.

### The Mississippi State Action

48.      Mississippi initiated the MS State Action on August 22, 2014.[14]

Mississippi alleges J&J and Old JJCI[15] committed unfair and deceptive trade practices in

violation of the Mississippi Consumer Protection Act related to the manufacturing, sale, and

marketing of the Talc Products by failing to warn and failing to disclose a causal link between

these talc products and ovarian cancer.  Mississippi also contends that J&J and Old JJCI share

such a unity of interest in ownership that they are the alter egos of one another.  Mississippi

---

[14]      On October 29, 2018, Mississippi filed a motion for leave to amend its complaint, but the motion remains
pending.

[15]      The two Bausch Defendants originally named in the MS State Action (Valeant Pharmaceuticals
International, Inc. and Valeant Pharmaceuticals North America, Inc.) settled the claims against them in the
MS State Action and were dismissed from the case on January 8, 2020.

-19-

further claims that J&J and Old JJCI acted as the agent of one another and acted within the

course and scope of the agency, and that they acted in concert and/or aided and abetted each

other and conspired to engage in the violations of the Mississippi Consumer Protection Act.

Mississippi seeks damages, civil penalties, punitive damages, an accounting and disgorgement of

ill-gotten revenues, injunctive relief, attorneys' fees, investigative and other costs, and

prejudgment interest.

49.    On December 18, 2018, the Chancery Court of the First Judicial District of

Hinds County, Mississippi (the "Mississippi Court") denied J&J's and Old JJCI's motion for

summary judgment.  On January 7, 2019, J&J and Old JJCI filed a petition for an interlocutory

appeal to the Mississippi Supreme Court, arguing that Mississippi's claims based on the labeling

of the talc products are outside the scope of the Mississippi Consumer Protection Act and/or are

preempted by the FDA's denial of a Citizen Petition seeking to require ovarian cancer warnings

on the labels of all talc products.  The Mississippi Supreme Court granted the petition on October

3, 2019.  On April 1, 2021, the Mississippi Supreme Court affirmed the trial court's denial of

summary judgment.  Thereafter, J&J and Old JJCI filed a petition for writ of certiorari with the

United States Supreme Court challenging the Mississippi Supreme Court's ruling on preemption,

which was denied on December 12, 2021.

50.    On June 15, 2021 (after the case returned to the Mississippi Court),

Mississippi moved for a trial setting.  J&J and Old JJCI objected to any trial setting due to

Mississippi's pending motion for leave to amend its complaint, which left uncertainty as to the

scope of the case.  On October 18, 2021, J&J & Old JJCI filed a notice of the Debtor's

bankruptcy filing and stay of proceedings.  Mississippi opposed the stay, contending that the

police power exception prevents the automatic stay of the MS State Action.

51.     On January 18, 2022, the Mississippi Court ruled that the W.D.N.C. Preliminary Injunction and bankruptcy stay did not apply to the MS State Action and ordered the parties to obtain a trial setting.  On February 10, 2022, the Mississippi Court allowed the parties a brief stay and set the case for trial from February 17, 2023 to March 10, 2023.  Mississippi subsequently joined the Ad Hoc Committee and in that regard agreed to temporarily stay its litigation.  Now, a short time after the Court approved the Debtor's reimbursement agreement with the Ad Hoc Committee and appointed a third mediator to assist with mediation of the states' claims, Mississippi determined to resign from the Ad Hoc Committee.  Mississippi has demanded that a scheduling order be entered as soon as possible based on a February 17, 2023 trial date (which would require extensive fact and expert discovery to be completed in the near term).  Under the proposed scheduling order, Mississippi's expert disclosures would be due August 19, 2022, and the Debtor's and J&J's expert disclosures would be due October 13, 2022. This proposed schedule, if entered by the Mississippi Court, would require significant expert discovery on an expedited basis and would force the Debtor to dedicate increasing amounts of time and resources to comply with other pretrial deadlines and prepare for trial.  In addition, the Debtor anticipates receiving extensive discovery requests and deposition notices in the near term.

52.     Thus, in addition to the burdens of discovery, the MS State Action requires the Debtor and the State Protected Parties to devote increasing amounts of time and resources for trial preparation.

### *Other State Attorney General Actions and Ad Hoc Committee*

53.     In addition to New Mexico and Mississippi, the attorneys general of several other states have also initiated investigations in their respective states against Old JJCI and J&J related to the marketing, promotion, and sale of the Talc Products, all based on allegations of unfair business practices and consumer protection violations similar to those at

-21-

issue in the State Actions.  Specifically, the attorneys general for the states of Arizona, North

Carolina, Texas, and Washington have issued civil investigative demands, and the Maryland

attorney general has issued an Administrative Subpoena for Consumer Protection.

54.     Like the State Actions, the investigations initiated by the attorneys general

for Arizona, Maryland, North Carolina, Texas, and Washington relate to talc's safety and alleged

impact on consumers, and they substantially overlap with the State Claims as well as the Talc

Claims.  Each of these states agreed to join the Ad Hoc Committee and stay their respective

investigations and engage in mediation efforts with the Debtor.  As set forth above, New Mexico,

too, initially agreed to stay the NM State Action for a period of 60 days to allow the Debtor to

engage in mediation efforts, although it declined to join the Ad Hoc Committee.

55.     The Debtor and the Mediating States are continuing to engage in

mediation.  As set forth above, on May 27, 2022, the Court appointed a separate mediator to

assist with mediation, and on June 24, 2022, the Court authorized the Debtor's entry into an

agreement pursuant to which the Debtor would reimburse certain of the Ad Hoc Committee's

costs.

56.     In addition to the progress made with the Mediating States, the Debtor

also has begun negotiations with representatives of talc claimants and settlement efforts are

ongoing.

## THE NEED FOR THE REQUESTED RELIEF

57.     The Debtor commenced the Chapter 11 Case to equitably and permanently

resolve all current and future talc-related claims against it through the consummation of a plan of

reorganization that includes the establishment of a trust.  The injunctive relief sought by this

adversary proceeding (and the related Preliminary Injunction Motion) is critical to the Debtor's

NAI-1532147016

ability to achieve that purpose.  Without the injunction, the purpose and protections envisioned

by the Bankruptcy Code will be thwarted.

58.    The State Claims asserted against the State Protected Parties allegedly

arose from the manufacture and/or sale of talc products by Old JJCI or J&J.  As discussed in the

First Day Declaration, in 1979, Old JJCI assumed all of J&J's liabilities associated with baby

products, including Johnson's Baby Powder.  First Day Decl. ¶ 10.  Now, the Debtor is

responsible for all of these potential liabilities.  *Id.* ¶ 24.  Moreover, because Old JJCI no longer

exists and the Debtor is solely responsible for its talc-related claims, a judgment against Old JJCI

in the State Actions would necessarily constitute a judgment against the Debtor.  Additionally,

the Debtor has contractual indemnification obligations with, or other obligations to, the Bausch

Defendants in the NM State Action relating to products formerly sold by or otherwise associated

with the Debtor.  Supp. Kim Decl. ¶ 11; Adv. Pro. No. 21-03032, ECF No. 2, App. B.  These

obligations render the Debtor the real-party defendant in the State Actions.

59.    Accordingly, all claims against the State Protected Parties are either

claims against the Debtor or claims that are tantamount to claims against the Debtor.  Permitting

New Mexico and Mississippi to continue prosecuting the State Claims while the Debtor

simultaneously works to reorganize by resolving the same claims in the Chapter 11 Case

pursuant to the Bankruptcy Code would (a) defeat the purpose of the Chapter 11 Case; (b) result

in irreparable harm to the Debtor's estate; (c) undermine and circumvent the purposes and spirit

of the automatic stay; and (d) divert the Debtor from its reorganization efforts.

60.    In addition, due to the significant factual overlap between the Talc Claims

and the State Claims and the fact that the same evidence will be at issue in the two sets of claims,

allowing the States to continue litigating the State Actions will result in the risk of collateral estoppel and evidentiary record taint.

61.     Moreover, the continued prosecution of the State Actions also threatens the Debtor's current and anticipated settlement efforts with talc claimants and the Mediating States.  Proving the allegations in the State Actions will directly implicate the Debtor's ability to resolve the Talc Claims (as well as the claims of the Mediating States) in the Chapter 11 Case. And, continued prosecution of the State Actions against the Debtor and the State Protected Parties outside of this Court will interfere with or impact the valuation of the Talc Claims in settlement negotiations and in any claims estimation proceeding.  Additionally, any resolution of the Talc Claims may likewise have a material impact on the State Actions, thereby hindering the Debtor's effort to resolve all claims in an equitable and consistent manner.

## <u>NATURE OF RELIEF REQUESTED</u>

62.     To guard against the severe and irreparable harm that the Debtor would suffer in the event that the States are permitted to continue prosecution of the State Actions during the Debtor's Chapter 11 Case, the Debtor seeks a preliminary injunction prohibiting the States from continuing to prosecute the State Actions against the State Protected Parties or the Debtor while the Chapter 11 Case remains pending.[16]  The Debtor also seeks a temporary restraining order following an expedited, emergency summary hearing to promptly effectuate the requested relief on an interim basis pending a further hearing.

---

[16]     This injunction would include, without limitation:  (i) the pursuit of discovery from the State Protected Parties, the Debtor, or their officers, directors, employees, or agents; (ii) the enforcement of any discovery order against the State Protected Parties or the Debtor; (iii) further motion practice related to the foregoing; and (iv) any collection activity on account of the State Claims against the State Protected Parties, the Debtor, or their officers, directors, employees, or agents, or its respective assets.

NAI-1532147016

## Count I:  Preliminary Injunctive Relief,
## Pursuant to Section 105 of the Bankruptcy Code

63.     The Debtor incorporates by reference paragraphs 1 through 63 as if fully

set forth herein.

64.     Section 105(a) of the Bankruptcy Code authorizes and empowers this

Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist

in the orderly and effective administration of the Chapter 11 Case, aid in the preservation of

the assets of the Debtor's estate, and aid in the formulation and confirmation of a chapter 11 plan

that maximizes recovery to all of the Debtor's creditors.[17]  Relief under section 105 is

particularly appropriate in a Chapter 11 case, such as this, where it is necessary to protect the

Debtors' ability to effectively confirm a plan of reorganization and to preserve the property of

the Debtors' estates.  A bankruptcy court may, therefore, in its discretion, enjoin actions under

Section 105, even where the case may otherwise be exempt from the automatic stay, including

under the police power exemption pursuant to section 362(b)(4).

65.     Pursuant to section 105(a) of the Bankruptcy Code, this Court may enjoin

creditor actions against third parties where necessary to prevent an adverse impact on the

Debtor's estate or to assure the orderly administration of the Debtor's chapter 11 estate and

proceedings.  An injunction is appropriate in this case to prohibit the States from continuing to

prosecute the State Actions against the State Protected Parties or the Debtor while the Chapter 11

Case remains pending.  Further, such an injunction is critical to the Debtor's ability to achieve

the purposes for which it commenced its reorganization case.

---

[17]     Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order,
process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."
11 U.S.C. § 105(a).

66.    In the Third Circuit, courts considering the propriety of an injunction
under section 105(a) apply the traditional four-factor test for injunctions, as tailored to the unique
circumstances of bankruptcy.  In bankruptcy, these four factors are:  (a) the debtor's reasonable
likelihood of successful reorganization; (b) the imminent risk of irreparable harm to the debtor's
estate in the absence of an injunction; (c) the balance of harms between the debtor and the
nonmoving party; and (d) whether the public interest weighs in favor of an injunction.  The
application of these factors does not change when considering whether to enjoin actions brought
by government entities, like the State Actions.

67.    First, the Debtor is likely to prevail on the merits.  As this court previously
determined, the Debtor's prospects for a successful reorganization are strong.  The Debtor has
entered bankruptcy in good faith and in an effort to permanently, fully, and equitably resolve
current and future Talc Claims through the establishment of a trust.  The Debtor also has
sufficient assets to fund the Chapter 11 Case and a trust in the amount required by a confirmed
plan of reorganization.

68.    Second, the failure to grant the requested injunction would irreparably
harm the Debtor's reorganization efforts and defeat the purpose of the Chapter 11 Case.  Absent
the requested injunction, the States would continue to prosecute talc-related claims against the
State Protected Parties that substantially overlap with the Talc Claims in this Chapter 11 Case.
Permitting the States to seek to indirectly establish claims against the Debtor through actions
against the State Protected Parties would prevent the Debtor from establishing a trust to
consolidate and collectively resolve all talc claims against the Debtor—current and future—
through the Chapter 11 Case.  The State Actions, if not stayed, would undermine (or eliminate)

NAI-1532147016

the parties' and the Court's ability to achieve confirmation of a plan that treats all talc claimants fairly and equitably.

69.      Moreover, continuing to litigate the State Claims could create a record that would materially prejudice the Debtor's interests and interfere with this restructuring due to the extensive factual overlap between the Talc Claims and the State Claims.  The Talc Claims and the State Claims are intimately intertwined.  The States cannot prove their claims without first proving that the Talc Products were contaminated with asbestos or were otherwise harmful—the essence of the Talc Claims.  Both sets of claims involve the same products, the same entities, the same witnesses, the same alleged conduct, and the same general time periods.  The State Claims have substantial potential to generate an evidentiary record that impacts the Talc Claims and disrupts the Debtor's reorganization.  Thus, the State Actions, if not stayed, would undermine the parties' and the Court's ability to successfully negotiate, formulate, and confirm a chapter 11 plan.

70.      An additional risk of continued litigation of the State Claims against the State Protected Parties or the Debtor is that the resolution of claims and issues in such litigation could bind the Debtor under the doctrine of collateral estoppel.  Litigation of the State Claims creates a substantial risk that the States will use statements, testimony and other evidence generated in the State Actions to try to establish the Talc Claims against the Debtor.  Supp. Kim Decl. ¶ 17.  This would undermine the automatic stay and conflict with the goals of the Bankruptcy Code.

71.      The continued prosecution of the State Actions would also undermine the Debtor's settlement efforts with respect to the Talc Claims and with the Mediating States.  This

NAI-1532147016

would harm not only the Debtor's reorganization efforts, but also the talc claimants and the

Mediating States' attempts to resolve their claims on behalf of their citizens.

72.     Third, the balance of the harms weighs heavily in favor of an injunction

because the continued prosecution of the State Actions against the State Protected Parties would

cause irreparable harm to the Debtor and its estate.  Prosecution of the State Claims outside of

this Court may bind the Debtor with respect to rulings and evidentiary records established in

those cases.  It would also compromise the protections of the automatic stay.  At the very least,

should the State Claims proceed, the Debtor would face the substantial harm of an evidentiary

record that potentially influences its talc liability and the value of its estate, and disrupts this

Chapter 11 Case.  In short, the entire purpose of the Chapter 11 Case would be thwarted.

73.     On the other hand, the harm that issuing an injunction might cause the

States is minimal, to the extent it would exist at all.  There is no continued alleged harm here:

the Talc Products sold in the U.S. and Canada no longer contain talc.  As a result, all that would

be accomplished by permitting the State Actions to proceed would be the liquidation of the

States' claims ahead of the claims of other similarly situated parties.

74.     While a preliminary injunction would spare the Debtor significant harm, it

would only temporarily delay resolution of the State Actions, which involve complex consumer

protection claims.  The issuance of an injunction will not permanently deprive the States of an

opportunity to pursue the State Claims.  Instead, it will merely halt those alleged claims, giving

the Debtor time to reach consensus on a plan of reorganization.

75.     Finally, the public interest weighs in favor of an injunction.  There is

a strong public interest in a successful chapter 11 reorganization, and injunctive relief is critical

to the Debtor's reorganization efforts.  The Court has already found that the Debtor filed this

NAI-1532147016

Chapter 11 Case in good faith and with the valid reorganizational purpose of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value.  For that reason, a successful reorganization under chapter 11—and an injunction that makes such reorganization possible—particularly serve the public interest in the talc context because they allow for the resolution of thousands of claims in a uniform and equitable manner.  And as this Court previously stated, it "holds no doubts that claim resolution through the bankruptcy process is in the public interest."  N.J. Mem. Op. at 322.

76.    Accordingly, an injunction barring the States from continuing to prosecute the State Actions while the Chapter 11 Case remains pending is necessary and appropriate to ensure the orderly and effective administration of the Debtor's estate.  Issuing a preliminary injunction would not permit the State Protected Parties or the Debtor to escape their alleged liability under consumer protection laws, should they be found to have any.  Rather, an injunction would merely give the Debtor a "breathing spell" to successfully restructure and pursue mediation efforts, and ensure a uniform treatment of the claims asserted against the Debtor.  That is decidedly in the public interest, and good cause exists for the entry of injunctive relief pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

WHEREFORE, the Debtor respectfully requests that this Court:  (a) after notice and a hearing, issue a preliminary injunction pursuant to section 105 of the Bankruptcy Code prohibiting the continued prosecution of the State Actions against the State Protected Parties and the Debtor while the Chapter 11 Case remains pending; and (b) grant such other and further relief as the Court may deem proper.

### Count II:  Application for Temporary Restraining Order

77.    The Debtor incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

78.    The Debtor requests that, following an expedited, emergency summary

hearing, the Court issue a temporary restraining order prohibiting and enjoining the States from

continuing to prosecute the State Actions against the State Protected Parties and the Debtor until

this Court has issued a final ruling on the merits.  A temporary restraining order will preserve the

status quo until this Court has the opportunity to hold a final hearing on the Debtor's request for

injunctive relief, and it will prevent the harmful effects upon the Debtor's estate described herein

and in the Preliminary Injunction Motion.

79.    Absent immediate injunctive relief through a temporary restraining order,

the Debtor's reorganization efforts may be impeded.  New Mexico and Mississippi had

previously agreed to stay their respective lawsuits, but they now have determined to proceed

with the State Actions, and they seek to do so at an accelerated pace.  They are also rapidly

increasing the burdens on the Debtor by seeking various forms of discovery and compliance with

pretrial deadlines in the near term.

80.    A temporary restraining order is necessary given the resumption of

litigation with respect to the State Actions.  On June 17, 2022, New Mexico filed a motion

requesting a scheduling order that sets trial for April 2023 and numerous discovery and motion

deadlines in the upcoming months.  Under New Mexico's proposed scheduling order, the parties

would be required to, among other things, mediate by August 29, 2022, to exchange non-expert

witness lists by September 1, 2022, and to complete all discovery by November 30, 2022.

Crucially, the corporate representative deposition of J&J and Old JJCI is set for **July 26, 2022**.

81.    Mississippi similarly insists on various pretrial deadlines in the near term

for the MS State Action.  It demands that a scheduling order be entered as soon as possible based

on a February 17, 2023 trial date (which would require extensive fact and expert discovery to be

NAI-1532147016

completed in the near term).  Under the proposed scheduling order, Mississippi's expert disclosures would be due August 19, 2022, and the Debtor's and J&J's expert disclosures would be due October 13, 2022.  In addition, the Debtor anticipates receiving extensive discovery requests and deposition notices in the near term.  A scheduling order based on a February 17, 2023 trial date thus would require the Debtor to dedicate increasing amounts of time and resources to comply with discovery obligations and other pretrial deadlines and to prepare for trial.

82.     The trial preparation demands that New Mexico and Mississippi seek to impose on the State Protected Parties and the Debtor will trigger the risks of collateral estoppel and record taint noted above.  And, the involvement of the Debtor in the State Actions would divert resources away from reorganization efforts.

83.     In addition, the continued prosecution of the State Claims risks significant, immediate, and irreversible harm to the Debtor and its estate.  The Chapter 11 Case is at a critical juncture, where there is significant opportunity for the Debtor and its stakeholders to continue pursuing mediation with a view to achieving a consensual and equitable resolution of this case for the benefit of all and where the Court and parties are focused on determining the appropriate next steps for this Chapter 11 Case in the event that a resolution does not occur in the near term.  Allowing the States to proceed with their efforts to establish in other jurisdictions the same disputed facts with respect to the State Claims that are at the heart of the Talc Claims, and to liquidate their claims ahead of the Mediating States, which have each agreed to stand down, would jeopardize the Debtor's attempts to achieve a global and equitable resolution of this Chapter 11 Case.  Thus, the Court should enter a temporary restraining order bringing a halt to all proceedings in the State Actions to avoid immediate harm to this Chapter 11 Case.

84.    The N.C. Bankruptcy Court previously issued a temporary restraining order enjoining litigation as to third parties to avoid any immediate and irreparable harm to the Debtor and its estate.  Order (Oct. 26, 2021), Adv. Pro. No. 21-03032, ECF No. 28.  Similarly, under the circumstances here, immediate temporary injunctive relief is appropriate and required to safeguard the Debtor's prospects for a successful reorganization.

85.    The issuance of a temporary restraining order is warranted for the reasons already set forth herein and as more fully described in the Preliminary Injunction Motion.  Upon filing, the Debtor will have provided notice to the States orally and through service of this Complaint and the related Preliminary Injunction Motion.  The Debtor thus requests that the Court schedule a summary hearing for a temporary restraining order on an expedited, emergency basis.

WHEREFORE, the Debtor respectfully requests that this Court enter a temporary restraining order:  (a) prohibiting New Mexico and Mississippi from continuing to prosecute the State Actions against the State Protected Parties and the Debtor until the Court decides whether to grant the Debtor's request in this Complaint and the Preliminary Injunction Motion; and (b) granting such other and further relief as the Court may deem just and proper.

NAI-1532147016

Dated: July 14, 2022

Respectfully submitted,

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Lyndon M. Tretter, Esq. (pro *hac vice*)
Joseph F. Pacelli, Esq. (pro *hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
ltretter@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*