**Appendix B**

**IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY, MISSISSIPPI**

THE STATE OF MISSISSIPPI,
Ex rel. JIM HOOD, ATTORNEY GENERAL,

Civil Action No.: G2014-1207 0/3

**PLAINTFF**

FILED
AUG 22 2014
EDDIE JEAN CARR, CHANCERY CLERK
BY K. Howard D.C.

v.

JOHNSON & JOHNSON;
JOHNSON & JOHNSON CONSUMER COMPANIES, INC.; VALEANT PHARMACEUTICALS INTERNATIONAL, INC.; VALEANT PHARMACEUTICALS NORTH AMERICA, LLC;

**DEFENDANTS.**

---

**COMPLAINT**

---

**COMES NOW**, the Honorable Jim Hood, Attorney General for the State of Mississippi, on behalf of the State of Mississippi, by and through the undersigned counsel (hereinafter the "State" or "Mississippi"), and files this suit in *parens patriae* against Defendants Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc., Valeant Pharmaceuticals International, Inc., and Valeant Pharmaceuticals North America, LLC., and in support thereof, would show unto the Court the following:

## I. INTRODUCTION

1. This action is brought in the public interest for and on behalf of the People of the State of Mississippi, by the Honorable Jim Hood, Mississippi Attorney General, pursuant to the Mississippi Regulation of Business for Consumer Protection Act, and the common-law authority of the Attorney General to represent the People of the State of Mississippi.

2. The Attorney General brings this action on the State's behalf pursuant to the positive, statutory, common and decisional law of the State, including his *parens patriae* authority which vests him with the right to bring all suits necessary for the enforcement of the laws of the State and the protection of public rights.

3. This action seeks redress from Defendants Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc., Valeant Pharmaceuticals International, Inc., and Valeant Pharmaceuticals North America, LLC. (collectively "Defendants" unless specifically stated otherwise) as a result of Defendants' unlawful, unfair, and deceptive business practices related to the manufacturing, sale, and marketing of their talc-containing products, namely Johnson's Baby Power® and Shower to Shower® (hereinafter the "Talc Products") in violation of Miss. Code Ann. § 75-24-5. Defendants put the health and well-being of the residents of Mississippi at risk by failing to warn of a dangerous and potentially lethal health risk associated with the use of their Talc Products, namely that women using these products on their genital area (also known as perineal use) are at an increased risk of ovarian cancer.

4. All the funds generated by this conduct were the result of the deceptive and false labeling and marketing of the Talc Products in violation of Miss. Code Ann. § 75-24-5. The ill-gotten revenue derived from Defendants' misconduct in Mississippi should, therefore, be disgorged.

5. Defendants engaged in misrepresentations and omissions in connection with the labeling, advertisements, promotion, marketing, and sale of their Talc Products. Defendants disseminated these misrepresentations and omissions in every manner possible – including on their websites, in advertisements, by mail and e-mail, and through their labeling. Defendants intentionally disseminated these misrepresentations and omissions to consumers throughout

Mississippi, and intentionally targeted minority communities. Defendants intended that Mississippi consumers would view these misrepresentations and omissions and thereby, would be induced to buy Defendants' Talc Products.

6. Pursuant to Miss. Code Ann. § 75-24-19, the Attorney General seeks civil penalties in an amount up to but not to exceed Ten Thousand Dollars ($10,000.00) for each violation of Miss. Code Ann. § 75-24-5; an injunction against future deceptive conduct pursuant to Miss. Code Ann. § 75-24-9; and, disgorgement of ill-gotten revenue pursuant to Miss. Code Ann. § 75-24-9, Miss. Code Ann. § 75-24-11, and this Court's broad equitable powers, for violations of Miss. Code Ann. § 75-24-5.

7. The claims asserted herein are brought solely by the State and are wholly independent of any claims that individual users of the Talc Products may have against Defendants.

8. The Attorney General disclaims any federal remedies and does not assert any claim for relief or seek any remedy arising out of a federal statute, federal regulation or provision of federal common law.

## II. PARTIES

9. Plaintiff, the State of Mississippi, brings this action by and through the Attorney General for the State of Mississippi. The State of Mississippi has quasi-sovereign interests in the health, both physical and economic, and well-being of its citizenry. The State alleges that Defendants engaged in false and deceptive practices in which Defendants failed to warn the residents of Mississippi of a significant health risk associated with the Talc Products. Defendants further specifically targeted minority communities in marketing these products. The State has a quasi-sovereign interest in ensuring that companies do not violate the State's laws, endanger the health of its citizenry, or engage in discriminatory marketing putting a specific

portion of the population at greater risk. The State further has a quasi-sovereign interest in preventing the adverse direct and indirect effects of the Defendants' violations of state law on the State's economy and the citizens' economic condition.

10. The health, safety, and welfare of Mississippi's citizens have been and continue to be seriously jeopardized by the ongoing fraudulent, unfair, deceptive, and false advertisements, assurances, acts and/or practices occurring throughout the State by the Defendants. "This is a matter of grave public concern in which the State, as representative of the public, has an interest apart from that of the individuals affected. It is not merely a remote or ethical interest, but one which is immediate and recognized by law."[1] Pursuant to the established quasi-sovereign interest in protecting its citizens' health, safety, and welfare, the State, by and through its Attorney General, brings this suit in *parens patriae*.

11. Defendant Johnson & Johnson ("J&J") is a New Jersey corporation engaged in the business of manufacturing and selling consumer products. J&J's principal place of business is located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J actively engaged in the manufacture, promotion and sale of the Johnson's Baby Powder® and Shower to Shower® during the relevant time period. J&J continues to manufacture, sell and market Johnson's Baby Powder®.

12. Defendant Johnson & Johnson Consumer Companies, Inc. ("JJCC") is a New Jersey corporation engaged in the business of manufacturing, selling and marketing consumer products including the Talc Products, namely Johnson's Baby Powder® and Shower to Shower®, during the relevant time period. JJCC continues to manufacture, sell and market Johnson's Baby

[1] *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 605 (1982) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 663 (1923)).

Powder®. JJCC's principal place of business is located at 199 Grandview Road, Skillman, New Jersey 08933. J&J and JJCC are hereinafter referred to collectively as the J&J Defendants.

13. Defendant Valeant Pharmaceuticals International, Inc. ("Valeant International") is a Canadian corporation with offices, manufacturing facilities and operations worldwide, including in the United States in the State of Delaware. Defendant Valeant International is the parent corporation of Defendant Valeant Pharmaceuticals North America, LLC.

14. Defendant Valeant Pharmaceuticals North America, LLC ("Valeant Pharmaceuticals"), is a corporation and is a wholly-owned subsidiary of Defendant Valeant International. Defendant Valeant Pharmaceuticals North America LLC is headquartered in North Carolina and incorporated in Delaware. Valeant Pharmaceuticals purchased Shower to Shower® from JJCC in or about September of 2012 and continues to manufacture, promote and sell Shower to Shower® to the residents of Mississippi.

15. Defendants are directly and jointly and severally liable to the State for the penalties and recovery sought herein.

16. There exists, and at various times mentioned herein there existed, a unity of interest in ownership between and among all Defendants such that any individuality and separateness between and among them ceased. Because Defendants are the alter egos of one another and exert control over each other, adherence to the fiction of the separate existence of these Defendants as entities distinct from one another will permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

17. At various times relevant to the matters alleged in this Complaint, each Defendant acted as the agent of other Defendants and acted within the course and scope of the agency, regarding the acts and omissions alleged. Together, Defendants acted in concert and/or aided

and abetted each other and conspired to engage in the common course of misconduct alleged herein for the purpose of enriching themselves at the expense of the citizens of Mississippi and the State of Mississippi.

18. Upon information and belief, Defendants generated revenue derived from Mississippi during all time periods relevant to this Complaint.

## III. JURISDICTION AND VENUE

19. The conspiratorial agreements, sale of the Talc Products, and other overt and/or unlawful acts complained of herein are in violation of Mississippi law, causing substantial harmful effects within the State of Mississippi. The State has suffered and will continue to suffer immediate and irreparable harm. Therefore, under Miss. Code Ann. § 75-24-9, this Court has subject matter jurisdiction over this action.

20. Jurisdiction and venue are proper in this Court pursuant to Miss. Code Ann. §§ 11-11-3, 11-5-1, 75-24-9, and 9-5-81 and Section 159 of the Mississippi Constitution. In addition, all the claims asserted herein arise exclusively under Mississippi statutory and/or common law.

21. This Court has personal jurisdiction over each Defendant under Miss. Code Ann. § 13-3-57, because each Defendant: (1) does business in Mississippi, and/or purposefully directs or directed its actions towards Mississippi; (2) committed torts in part in Mississippi against Mississippi residents; (3) solicited and continues to solicit business, and performed and continues to perform business services, such as marketing, advertising, promoting, and distributing its products in Mississippi; and, (4) has the requisite minimum contacts with Mississippi necessary to constitutionally permit the Court to exercise jurisdiction.

## IV. FACTUAL ALLEGATIONS

22. Talc is a hydrous magnesium silicate, an inorganic mineral that is mined from the earth. Talc is used to manufacture many goods, such as paper making, plastic, paint and coatings, rubber, electric cable, ceramics, and cosmetics. In its loose form, and as used in the Defendants' Talc Products identified above, talc is known as "talcum powder."

23. Imerys Talc America, Inc., f/k/a/ Luzenac America, Inc. ("Imerys") and Rio Tinto Minerals Inc. ("Rio Tinto") mined the talc at issue in this case. The Defendants manufactured the Talc Products at issue in this case. The Talc Products contain substantial amounts of talc.

24. Defendants promote and market the Talc Products as a means to maintain freshness and cleanliness, eliminate friction on the skin, and absorb moisture, while keeping skin cool and comfortable. However, numerous studies over the last several decades have revealed a significant link between the use of talcum powders with an increased risk of ovarian cancer. The studies conducted over the last 30 years confirm that women who repeatedly used talc-based powders in the genital area have an increased risk of ovarian cancer compared to those women who do not.

25. Despite the potential catastrophic health consequences, Defendants have hidden and failed to warn consumers about the dangers associated with their Talc Products. Instead, Defendants intend for women to use their Talc Products in the manner most likely to result in an increased risk of ovarian cancer. Indeed, Defendants specifically marketed the products to minority communities expected to be more likely to use the Talc Products.

26. During the relevant time period, Defendants implemented a marketing strategy that specifically targeted African-American and Hispanic women within the State of Mississippi. In an August 5, 1992 document entitled "Johnson's Baby Powder...Major Opportunities," the J&J Defendants recognized and discussed its Baby Powder® sales were in decline. In an effort to

"grow the franchise," the company implemented a strategy of targeting African-American and Hispanic women since its internal studies showed these two ethnicities used Baby Powder® at higher rates than other ethnicities of women. In the same document, J&J Defendants acknowledged that: "Negative publicity from health community on talc continues . . . cancer linkage". The racially targeted strategy implemented by J&J Defendants and the other Defendants has and continues to disproportionately affect the citizens of Mississippi since approximately forty (40%) of Mississippi's population is comprised of African-American and Hispanic individuals.

27. Meanwhile, Defendants expressly and impliedly represented to these communities and the public at large that the Talc Products were safe. As a result of Defendants' omissions regarding the safety of their Talc Products, the State's residents have used the Talc Products in a potentially lethal way without any knowledge of the danger.

**A. DEFENDANTS' MARKETING IS UNFAIR AND DECEPTIVE**

28. For decades, Defendants have marketed their Talc Products for cosmetic use – as daily use powders safe for human use that are intended to maintain freshness and cleanliness, eliminate friction on the skin, and to absorb unwanted excess moisture for women. Nowhere have the Defendants warned of the increased risk of ovarian cancer linked to the perineal use of the Defendants' Talc Products.

29. However, as detailed below, for over 30 years, Defendants were aware of studies demonstrating that women who use talc-based baby powder in the genital area had a significant increased risk of ovarian cancer. Defendants were also informed by their talc supplier, consultants, employees, and through industry and governmental agencies that talc is unsafe and that there is a significant link between the use of talcum powders and an increased risk of ovarian cancer.

30. Despite this information, Defendants have not and do not warn or inform the Public anywhere, including on the product labeling or in their marketing or advertising for the products, that the use of their Talc Products in the genital area increases the risk of contracting ovarian cancer or even that there are certain studies that demonstrate the association between the use of talc powders and ovarian cancer.

31. To the contrary, Defendants have marketed their products as safe for human use. Historically, Johnson's Baby Powder® was marketed as a symbol of freshness, cleanliness, and purity. During the time in question, Defendants advertised and marketed their product as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild." Defendants persuaded women through advertisements to dust themselves with their product to mask odors. The bottle of Johnson's Baby Powder® specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

32. During the time in question, Defendants advertised and marketed their product Shower to Shower® as safe for use by women as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisements such as: "Your body perspires in more places than just under your arms. Use SHOWER to SHOWER to feel, dry, fresh and comfortable throughout the day" and "SHOWER to SHOWER can be used all over your body."

33. As a result of Defendants' advertising, marketing, and labeling of the Talc Products, dusting the perineum for feminine hygiene was an intended and foreseeable use of Defendants' products. However, Defendants never warned or informed the residents of Mississippi anywhere that the Talc Products were unsafe for human use.

## B. DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE TALC PRODUCTS WERE UNSAFE

34. Defendants publicly and internally recognized the numerous studies linking the use of their products to ovarian cancer. Since the 1960s, study after study has shown that particles similar to talc can translocate from exterior genital areas to the ovaries with perineal use. With such translocation, researchers found the products containing talc, like Defendants' Talc Products, caused the growth of epithelial tissue. Finally, in 1982, a study funded by the National Institutes of Health and conducted by Dr. Daniel Cramer of Brigham and Women's Hospital was published that concluded women were three (3) times more likely to contract ovarian cancer after daily use of talcum powder in the genital area. Cramer, D.W.; Welch, W.R.; Scully, R.E.; Wojciechowski, C.A., "Ovarian cancer and talc: a case control study." Cancer 1982; 50: 372-376, 1982.

35. Defendants took steps to neutralize the study's effects. Soon after this study was published, Dr. Cramer was contacted and visited by Dr. Bruce Semple from Johnson & Johnson. Dr. Cramer's response was to advise Dr. Semple to place a warning on his company's talc-based body powders regarding the increased risk of ovarian cancer. Rather than acknowledge the concerns raised by Dr. Cramer's study, on August 12, 1982, in a New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," Defendants admitted being aware of the study's conclusions but dismissed its findings and declined to provide the requested warnings.

36. Over the ensuing years, additional evidence of the health risks associated with talc continued to build. On November 10, 1994, the Cancer Prevention Coalition ("CPC") mailed a letter to Ralph Larson, then Defendants' C.E.O, informing Defendants that studies as far back as the 1960's ". . . show[] conclusively that the frequent use of talcum powder in the genital area

poses a serious risk of ovarian cancer." The letter cited a contemporaneous study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Defendants withdraw the Talc Products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose. Despite this evidence, Defendants refused.

37. On September 17, 1997, Alfred Wehner, a toxicology consultant retained by Defendants, wrote a letter to Michael Chudkowski, manager of Pre-Clinical Toxicology at JJCC, Inc., stating that on three separate occasions the Talc Interested Party Task Force ("TIPTF") of the CTFA, which included Defendants, had released false information to the public about the safety of talc. Specifically addressing a November 17, 1994 statement released by the CTFA, Dr. Wehner said the following:

> The response statement dated November 17, 1994, is just as bad. The second sentence in the third paragraph reads: "The workshop concluded that, although some of these studies suggested a weak association might exist, when taken together the results of the studies are insufficient to demonstrate any real association." This statement is also inaccurate, to phrase it euphemistically. At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer. Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary.
>
> The workshop did not conclude that "the results of the studies are insufficient to demonstrate any real association." As pointed out above, a "real" statistically significant association has been undeniably established independently by several investigators, which without doubt will be readily attested to by a number of reputable scientists/clinicians, including Bernard Harlow, Debra Novotny, Candace Sue Kasper Debra Heller, and others.

38. On February 26, 2002, Imerys, which admittedly supplies all of the talc to Defendants for their Talc Products, wrote in its internal memorandum entitled "NTP Talc Review Status," "Specific Litigation Issues & Problems" the following:

> Listing of "talc not containing asbestos fibers" could be potentially devastating from a product liability perspective. [Plaintiff's attorney: "So Mr. Zazenski, please tell the Court when Luzenac [Imerys] first learned that talc was possibly associated with ovarian cancer?" "When did you first start warning consumers that this association was possible and under study." "Did you not feel a moral and ethical obligation to inform women that the hygienic use of talc may increase their risk for ovarian cancer, or were the profits you were making from mining and selling this potentially dangerous, life-threatening product more important than protecting the health and welfare of the 'women and children in our society?'" Etc. etc. etc.]

39. In 2002, E. Edward Kavanaugh, the President of the CTFA, wrote a letter to Dr. Kenneth Olden, Director of the National Toxicology Program ("NTP") and National Institute of Environmental Health Sciences, U.S. Department of Health and Human Services, in an attempt to stop the NTP from listing cosmetic talc as a carcinogen in the upcoming 10th Report on Carcinogens (RoC) Report. Defendants have been long-standing, active members and donors of the CTFA. The NTP had already nominated cosmetic talc for this classification. In this letter, the CTFA admitted that talc was "toxic," and that "some talc particles . . . can reach the human ovaries," and acknowledged and agreed that prior epidemiologic studies have concluded that talc increases the risk of ovarian cancer in women.

40. In February of 2006, the International Association for the Research of Cancer ("IARC"), part of the World Health Organization, published a paper whereby it classified perineal use of talc-based body powder as a "Group 2B" possible human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women

from perineal use of talc. IARC found that between 16% - 52% of women in the world use talcum powder to dust their perineum and found an increased risk of ovarian cancer in women talc-users ranging from 30% - 60%.

41. IARC concluded with this "Evaluation:" "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition, "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence." IARC concluded with this "Overall evaluation:" "Perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B)."

42. Within months of the IARC's finding, Imerys began placing an ovarian cancer warning on the Material Safety Data Sheets ("MSDS") that it provided to Defendants with the non-asbestiform talc[2] it was producing.[3] These MSDSs not only provided Defendants with the warning information about the IARC classification, but they also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as a "very toxic," and a "cancer causing" substance as well. Defendants never passed this warning information on to their consumers

43. On July 12, 2006, Eric Turner, Vice-President of Health, Safety and Environment of Luzenac America, Inc. (Imerys), wrote a letter to Mark Ellis, President of Industrial Minerals Association – North America explaining why the "talc interested parties," which included

[2] Asbestiform talc, i.e., talc containing asbestos-like fibers, has not been used in cosmetic talc products since the 1970s. Defendants have acknowledged that the Talc Products at issue here have not been made with asbestiform talc for decades.

[3] On September 26, 2012, the corporate representative of Imerys testified that his company exclusively supplied Defendants with talc used for its Talc Products. He further testified that ovarian cancer is a potential hazard associated with a women's perineal use of talc-based body powders.

Defendants and Luzenac America, Inc. (Imerys), were foregoing further funding on a talc study called the "Mossman Study." Mr. Turner wrote: "When IARC concluded their review and classified 'perineal use of talc-based powders' as a Group 2b carcinogen, we began to question the value of proceeding any further with the Mossman study. To put it in the vernacular, the 'horse has already left the barn.'" Mr. Turner further wrote: "The cosmetic and pharmaceutical companies engaged in the business of marketing dusting and body powders to the public and show (sic) no enthusiasm for sponsoring new research on this issue." Mr. Turner noted that: "One of their primary arguments is that there are simply too many positive epidemiology studies published to stem the tide of negative sentiment." Mr. Turner concluded that: "Supplying talc for the body powder market is a rather insignificant element in our overall product portfolio and does not warrant any further sponsorship for research projects to support the business."

44. More recently, the CPC has been increasingly concerned about the link between talc-containing products and ovarian cancer. In May 2008, the CPC, joined by its chairman and numerous other physicians and chairs of public health and medical associations,[4] submitted a citizen's petition "seeking a cancer warning on cosmetic talc products." Specifically, the petition sought to require all cosmetic talc products to bear labels with warnings such as, "[f]requent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer" or "[f]requent talc application in the female genital area ***is responsible*** for major risks of ovarian cancer." (Emphasis added). The petition cited numerous studies and publications and sought a hearing to present scientific evidence.

---

[4] The petition was submitted on behalf of: Samuel S. Epstein, M.D., Chairman, CPC, and Professor Emeritus Occupational and Environmental Medicine, University of Illinois at Chicago School of Public Health; Peter Orris, M.D., Professor and Chief of Service, University of Illinois at Chicago Medical Center; Quentin Young, M.D., Chairman, Health and Medicine Policy Research Group, Chicago; Rosalie Bertell, Ph.D., International Association for Humanitarian Medicine, Scientific Advisor to the International Institute of Concern for Public Health, Toronto, and the International Science Oversight Board of the Organic Consumers Association, Washington, D.C.; and Ronnie Cummins, National Director of the Organic Consumers Association.

45. Based on solid evidence, the National Cancer Institute (NCI) lists perineal use of talc as a "risk factor" for ovarian cancer.

46. Despite this knowledge, the talc industry, including Defendants, has resisted making the public aware of the relationship between talc and cancer. On October 4, 2013, a jury in South Dakota Federal Court, in the case styled *Deane Berg v. Johnson & Johnson Consumer Companies, Inc.*, unanimously found that Defendant Johnson & Johnson Consumer Companies, Inc. caused the Plaintiff's ovarian cancer and was negligent in failing to warn about cancer hazards on its talc-based body powders, specifically, Baby Powder® and Shower to Shower®.

## C. DECADES OF EPIDEMIOLOGIC STUDIES DEMONSTRATE THE SCIENTIFIC LINK BETWEEN TALC AND CANCER

47. For more than 30 years, study after study has concluded that perineal talc use by women is associated with an increased risk of ovarian cancer. Despite this, Defendants have never informed the Public about the potentially lethal consequences associated with talc, and continually advertised and marketed talc as safe for human use. However, research done as early as 1961 has shown that particles, similar to talc, can translocate from the exterior genital area to the ovaries in women. Egli GE, Newton M. "The transport of carbon particles in the human female reproductive tract." *Fertility Sterility* 1961; 12:151-155.

48. The first study to suggest a link between ovarian cancer and talc was a report by Henderson, *et al.*, who found talc particles "deeply embedded" in 10 of 13 ovarian tumors, 12 of 21 cervical tumors, one primary carcinoma of the endometrium, and 5 of 12 "normal" ovaries from women with breast cancer. Henderson, W.J.; Joslin, C.A.; Turnbull, A.C.; Griffiths, K.; "Talc and carcinoma of the ovary and cervix." *J. Obstet. Gynaecol. Br. Commonw.* 1971; 78(3): 266-272.

49. In 1968, a study concluded that: "all of the 22 talcum products analyzed have a … fiber content ... averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits … Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo, RM. "Fibrous and mineral content of cosmetic talcum products." *Am. Industrial Hygiene Assoc. J.* 1968; 29:350-354.

50. In 1976, a follow-up study to these findings was conducted that examined 21 samples of consumer talcum powders, including baby powders, on the market between 1971 and 1975. The study concluded that: "The presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc. . .We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl AN, Langer AM, Selifoff IJ, Tordini A, Klimentidis R, Bowes DR, Skinner DL. "Consumer talcums and powders: mineral and chemical characterization." *J. Toxicol. Environ. Health* 1976; 2:255-284.

51. As noted above, in the mid-1970s, in response to concerns about cancer risks associated with talc, manufacturers of cosmetic talc products stopped using asbestiform talc.

52. Still, years after the industry stopped using asbestiform talc, evidence continued to mount of the increased risk of ovarian cancer associated with cosmetic talc use. In 1982, a case-control study, funded by a grant from National Institutes of Health ("NIH"), was conducted by Daniel Cramer of the Departments of Obstetrics, Gynecology, and Pathology, Boston

Hospital for Women, Division of the Brigham and Women's Hospital, the Department of Epidemiology, Harvard School of Public Health and the Department of Pathology, Massachusetts General Hospital, Harvard Medical School. This study found that talc applied directly to the genital area around the time of ovulation leads to talc particles becoming deeply imbedded in the substance of the ovary, causing foreign body reaction and growth of epithelial ovarian tissue. The study ultimately found a statistically significant 92% increased risk of ovarian cancer from genital talc use. This study proved an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer. Cramer, D.W.; Welch, W.R.; Scully, R.E.; Wojciechowski, C.A. "Ovarian cancer and talc: a case control study." *Cancer* 1982; 50: 372-376.

53. Since 1982, there have been 21 additional studies by different doctors and scientists throughout the world, including 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study, which have provided epidemiologic data addressing the talc and ovarian cancer association. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use and the majority statistically significant elevations.

54. In 1983, Patricia Hartge and Robert Hoover of the National Cancer Institute, along with Linda Lesher and Larry McGowan of the George Washington University Medical Center, performed a case-control study that found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P; Hoover, R.; Lesher, L.P.; McGowan, L. "Talc and ovarian cancer." *JAMA,* 1983; 250(14): 1844.

55. From 1988 to 1992, cancer research in the United States found repeatedly that frequent talcum powder application in the genital area increases a woman's risk of developing

ovarian cancer. Hartge P, Hoover R, Lesher LP, McGowan L. "Talc and ovarian cancer." Letter JAMA 1983; 250: 1844; Whittemore AS, Wu ML, Paftenbarger, RS, Sarles DL, Kampert JB, Grosser S, Jung DEL, Ballon S, Hendrickson M. "Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures talcum powder, tobacco, alcohol, and coffee." *Am. J. Epidemiol.* 1988; 1128: 1228-1240; Rosenblatt KA, Szklo M, Rosenshein NB. " Mineral fiber exposure and the development of ovarian cancer." *Gynecol. Oncol.* 1992; 45:20-25; Harlow BL, Cramer DW, Bell DA, Welch WR. "Perineal exposure to talc and ovarian cancer risk." *Obstet. Gynecol.* 1992; 80:: 19-26.

56. In 1988, Alice Whittemore, and several others, performed a case control study of 188 women diagnosed with epithelial ovarian cancer with 539 control women. This study found that 52% of the cancer patients habitually used talcum powder on the perineum. The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their perineum. This study also showed a positive dose-response relationship. Whittemore, A.S.; Wu, M.L.; Paffenbarger, R.S., Jr.; et al. "Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee." *Am. J. Epidemiol.* 1988; 128 (6): 1228-1240.

57. In 1989, a case control study conducted in England of 235 women diagnosed with epithelial ovarian cancer and 451 controls found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once per week. Booth, M.; Beral, V.; Smith, P.; "Risk factors for ovarian cancer: a case-control study." *Br. J. Cancer.* 1989; 60 (4): 592-598.

58. In 1989, a case control study was conducted by Bernard Harlow of Harvard Medical School at Brigham and Women's Hospital, which found an increased risk of ovarian

cancer generally from genital talcum powder use after bathing, and found a statistically significant 180% increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum. This study also found a positive dose-response relationship. Harlow, B.L.; Weiss, N.S. "A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc." *Am. J. Epidemiol.* 1989; 130 (2): 390-394.

59. Five separate meta-analyses were also conducted on the topic of talcum powder use and ovarian cancer. A meta-analysis is a statistical technique that allows similar measures of the same illness and exposure from different studies to be combined to determine whether an association exists. All five analyses found a significant positive association between the use of talcum powder in the genital area and ovarian cancer.

60. In 1992, Bernard Harlow and Daniel Cramer from Harvard Medical School at Brigham and Women's Hospital conducted the first meta-analyses that included the odds ratio from a new series of 235 cases with ovarian cancer and 239 controls and 5 other published studies sponsored by the National Cancer Institute ("NCI"). The study was considered the most comprehensive study of talc use and ovarian cancer to date. The summary OR (and 95% confidence interval) was 1.3 (1.1, 1.6) indicating a statistically significant 30% increased risk of ovarian cancer from genital talcum powder use. The conclusion from this study was that "a lifetime pattern of talc use may increase the risk for epithelial ovarian cancer. . . ." Harlow, B.L.; Cramer, D.W.; Bell, D.A.; Welch, W.R. "Perineal exposure to talc and ovarian cancer risk." *Obstet. Gynecol.* 1992; 45 (1): 20-25.

61. The study also found that the most frequent method of talcum powder exposure was to use it as a dusting powder directly to the perineum (genitals). "Brand or generic 'baby

powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." Through personal interviews with these women, Harlow and his team found that nearly 17% of the control group reported frequent talcum powder application to the perineum. This study concluded that ".... given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Harlow, B.L.; Cramer, D.W.; Bell, D.A.; Welch, W.R. "Perineal exposure to talc and ovarian cancer risk." *Obstet. Gynecol.* 1992; 80 (1): 19-26.

62. In 1992, Karin Rosenblatt, among others, conducted a case-control study from the Department of Epidemiology, the Johns Hopkins School of Hygiene and Public Health, and Department of Gynecology and Obstetrics. This was a hospital case-control study that found a 70% increased risk of ovarian cancer in women from genital talcum powder use, and a 379% increased risk of ovarian cancer in women who used talc on sanitary napkins in their genital area. Rosenblatt, K.A.; Szklo, M.; Rosenshein, N.B. "Mineral fiber exposure and the development of ovarian cancer." *Gynecol. Oncol.* 1992; 45 (1): 20-25.

63. Yong Chen, *et al.,* conducted a case-control study in 1992 of 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls. The study found an elevated risk of 290% for ovarian cancer for women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. Yong Chen; Pao-Chen Wu; Jeng-He Lang; Wen-Jun Ge; Hartge, P.; and Brinton, L.A. "Risk Factors for Epithelial Ovarian Cancer in Beijing, China." *Int. J. Epidemiol.* 1992; (21 (1): 23-29.

64. In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talcum powder that found clear evidence of carcinogenic activity.

Talcum powder was found to be a carcinogen, with or without the presence of asbestos-like fibers. National Toxicology Program. "Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)." *Technical Report Series No. 421,* September 1993.

65. David Purdie conducted a case control study in 1995 involving over 1,600 women, the largest study of its kind to date. This study found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talcum powder in the region of the abdomen or perineum. Purdie, D.; Green, A.; Bain, C.; et al. "Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group." *Int. J. Cancer.* 1995; 62 (6): 678-684.

66. In 1995, a second meta-analysis was conducted by A.J. Gross and P.H. Berg and included data from nine separate papers. This meta-analysis yielded a summary odds ratio (based upon the crude measures) of 1.27 (1.09, 1.48) – again a statistically significant 27% increased risk of ovarian cancer from genital talc use. Gross, A.J.; Berg, P.H. "A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer." *J. Expo. Anal. Environ. Epidemiol.* 1995; 5 (2): 181-195.

67. In 1996, a case-control study was conducted by Asher Shushan, which found a statistically significant 97% increased risk of ovarian cancer in women who used talc-based powders in their genital area. Shushan, A.; Paltiel, O.; Iscovich, J.; Elchalal, U.; Peretz, T.; Schenker, J.G., "Human menopausal gonadotropin and the risk of epithelial ovarian cancer." *Fertil. Steril.* 1995; 65 (1): 13-18.

68. In 1996, the condom industry stopped dusting condoms with talcum powder due to the health concerns of ovarian cancer. "Concern about talc as an ovarian carcinogen goes

back 50 years in the medical literature. By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries. Scientists believed in some cases that the scarring led to infertility or cancer." McCullough, Marie, "Women's health concerns prompt condom makers to stop using talc." *Jersey Journal (City Edition)*, April 17, 1996.

69. In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. Cook, L.S.; Kamb, M.L.; Weiss, N.S. "Perineal powder exposure and the risk of ovarian cancer." *Am. J. Epidemiol.* 1997; 145: 459-465.

70. In 1997, a case-control study was conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health at the Yale University School of Medicine, which included over 1,000 women. The study found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc via sanitary napkins to their perineum. The study indicated, "Commercial talc substitutes often replace talc with cornstarch. Furthermore, women may choose to powder or dust with cornstarch instead of talc. When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found." The study concluded, "The results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma. Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be

deliberated." Chang, S.; Risch, H.A. "Perineal talc exposure and risk of ovarian carcinoma." *Cancer.* 1997; 79 (12): 2396-2401.

71. In 1998, Beatrice Godard conducted a case-control study that found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineum. Godard, B.; Foulkes, W.D.; Provencher, D.; et al., "Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study." *Am. J. Obstet. Gynecol.* 1998; 179 (2): 403-410.

72. In 1999, Dr. Daniel Cramer, conducted another case-control study funded by a grant from the NCI. This study included 563 women newly diagnosed with epithelial ovarian cancer and 523 control women. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum. "We conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." Cramer, D.W.; Liberman, R.F.; Titus-Ernstoff, L.; et al. "Genital talc exposure and risk of ovarian cancer." *Int. J. Cancer.* 1999; 81 (3): 351-356.

73. Also in 1999, Daniel Cramer performed a third meta-analysis supported by a grant from the NCI. It included all of the studies in the Gross and Berg meta-analysis plus four new studies, as well as the odds ratio (OR) based upon a new series of 563 cases with ovarian cancer and 523 controls from Massachusetts and New Hampshire. The summary odds estimate was 1.39 (1.24, 1.49), again, a statistically significant 39% increased risk of ovarian cancer from genital talcum powder use.

74. In 2000, Roberta Ness, from the University of Pennsylvania, produced a case-control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talcum powder causes inflammation and that inflammation contributes to cancer cell development. Ness, R.B.; Grisso, J.A.; Cottreau, C.; et al. "Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology.* 2000; 11 (2): 111-117.

75. A prospective cohort study conducted in 2000, and considered the most informative study to date, found a 40% increase in invasive serous cancers from women who applied talcum powder to their perineum. Gertig, D.M.; Hunter, D.J.; Cramer, D.W.; Coditz, G.A.; Speizer, F.E.; Willett, W.C.; Hankinson, S.E. "Prospective study of talc use and ovarian cancer." *J. Natl. Cancer Inst.;* 2000; 92: 249-252.

76. In 2003, a fourth meta-analysis was conducted that re-analyzed data from 16 studies published prior to 2003 and found a 33% increase in ovarian cancer risk among talcum powder users. This study was funded by industry players. Huncharek, M.; Geschwind, J.F.; Kupelnick, B. "Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies." *Anticancer Res.* 2003; 23: 1955-60.

77. In 2004, Paul Mills, Deborah Riordan, Rosemary Cress, and Heather Young of the Cancer Registry of Central California – Public Health Institute in Fresno, California; the Fresno Medical Education Program at the University of California in San Francisco, California; the California Cancer Registry in Sacramento, California; and the Department of Epidemiology and Biostatistics at George Washington University School of Public Health and Health Services in Washington, D.C., performed a case-control study of nearly 1400 women from 22 counties in

Central California and found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talcum powder use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talcum powder use. The study looked at cornstarch powders and found no increased risk in ovarian cancer in women who used these types of powders on the perineum as "Cornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc." This study concluded by stating, ". . . users should exercise prudence in reducing or eliminating use. In this instance, the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy. Unlike other forms of environmental exposures, talcum powder use is easily avoidable." Mills, P.K.; Riordan, D.G.; Cress, R.D.; Young H.A. "Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California." *Int. J. Cancer.* 2004; 112:458-64.

78. This study found a 54% increased risk in ovarian cancer from talcum powder use in women who had not undergone a tubal ligation, whereas the study found no impact on women who had their tubes tied. Because it had been found in previous studies that talc particles migrate up the fallopian tubes in women, this finding provided strong evidence to support the idea that talc is a carcinogen. *Id.*

79. In 2005, the Fifth Edition of "Myths & Facts about ovarian cancer: What you need to know," was published by Steven Piver, M.D. and Gamal Eltabbakh, M.D. This publication was partly sponsored by Glaxo Smith Kline. Dr. Piver is the Chair Emeritus of the Department of Gynecologic Oncology, and Founder and Director of the Gilda Radner Familial Ovarian Cancer Registry at Roswell Park Cancer Institute in Buffalo, New York. Dr. Eltabbakh

is a tenured Professor of Obstetrics and Gynecology and Medicine, and Director of the Division of Gynecologic Oncology at the University of Vermont in Burlington, Vermont. In the section entitled: "What Causes Ovarian Cancer?" it lists "Use of Talc (Baby Powder) in the Genital Area" as a risk factor for causing ovarian cancer and further states, "… research has established that each has at least a small role" in causing cancer in women. M. Steven Piver, et al. "Myths & Facts about ovarian cancer: What you need to know." *CMP Medica.* 2007 5th Ed.

80. In 2006, in addition to IARC's classification of perineal use of talc-based body powder as a "Group 2B" possible human carcinogen, the Canadian government, under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A", "very toxic", "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). As a point of reference, asbestos is also classified as "D2A."

81. In 2007, Amber Buz'Zard and Benjamin Lau performed a study whereby they induced carcinogenesis by applying talc to normal human epithelial and granulosa ovarian cancer cell lines. Buz'Zard A.R.; Lau, B.H., "Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures." *Phytother. Res.* 2007; 21 (6): 579-586.

82. In 2008, Margaret Gates, of Channing Laboratory, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School; Departments of Epidemiology and Biostatistics, Harvard School of Public Health; Obstetrics and Gynecology Epidemiology Center, Brigham and Women's Hospital, and Norris Cotton Cancer Center, Dartmouth-Hitchcock Medical Center, performed a combined study of over 3,000 women from a New England based case-control study and a prospective Nurses' Health Study that included additional cases and years of follow up from these studies (the "Gates Study"). This study was funded by the NCI, and found a general 36% statistically significant increased risk of epithelial

ovarian cancer from genital talcum powder use. A 60% increased risk of the serous invasive subtype was also found. This study found a strong and positive dose-response relationship whereby increased risk was seen with higher talcum powder usage in women.

83. Dr. Gates commented about this study saying these latest results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer." She also stated that "…the finding of highly significant trends between increasing frequency of use and risk 'strengthens the evidence of an association, because most previous studies have not observed a dose response.'" She noted that: "We believe that women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk. Physicians should ask the patient about talc use history and should advise the patient to discontinue using talc in the genital area if the patient has not already stopped." Dr. Gates further stated that: "An alternative to talc is cornstarch powder, which has not been shown to increase ovarian cancer risk, or to forgo genital powder use altogether." Gates, M.A.; Shelley, S.; Tworoger, S.S.; Terry, K.L.; Titus-Ernstoff, L.; *et al.* "Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer." *Cancer Epidemiology, Biomarkers & Prev.* 2008; 17 (9): 2436-2444.

84. In October of 2008, Michael Thun, Vice-President of Epidemiology and Surveillance Research at the American Cancer Society, commented on the Gates Study. He stated this study demonstrates the dose-response relationship between talcum powder and ovarian cancer. Dr. Thun stated: "There are very few modifiable risk factors for ovarian cancer. The main one is the use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer. Others include tubal ligation, hysterectomy, and parity. Then, there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in,

alongside asbestos, postmenopausal hormone therapy, and radiation." Chustecka, Zosia; Lie, Desiree, "Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer," *Medscape Medical News,* 2008.

85. In 2008, Melissa Merritt conducted a case-control study of over 3,000 women for the Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group, which confirmed a statistically significant 17% increased risk of ovarian cancer for women who used talcum powder on their perineum. This study also confirmed a statistically significant 21% increased risk of ovarian cancer of a serous subtype in women who used talc on their perineum. Merritt, M.A.; Green, A.C.; Nagle, C.M.; Webb, P.M., "Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer." *Int. J. Cancer.,* 2008; 122 (1):170-176.

86. In 2009, Anna Wu, among others, conducted a case-control study of over 1,200 women and found the risk of ovarian cancer increased significantly with increasing frequency and duration of talcum powder use. The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talcum powder use. The study also found a statistically significant 108% increased risk of ovarian cancer in women with the longest duration and most frequent talc use. The study concluded by stating, ". . . [the] risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies." Wu, A.H.; Pearce, C.L.; Tseng, C.C.; Templeman, C.; Pike, M.C., "Markers of inflammation and risk of ovarian cancer in Los Angeles County," *Int. J. Cancer.* 2009; 124 (6): 1409-1415.

87. In 2011, Dr. Daniel Cramer of Brigham and Women's Hospital, Harvard Medical School, made public a case-control study of over 4,000 women funded by the NCI. This study

found a 200% to 300% increased risk of ovarian cancer for women who applied talc-based body powders to their perineum. This study found a strong dose-response relationship. In commenting on this study, Dr. Cramer stated, "I have always advised gynecologists, if they examine a woman and see that she is using talc in the vaginal area, tell her to stop ... There are alternatives. This study strongly reinforces that advice."

88. In 2011, Karin Rosenblatt and several other authors conducted a case-control study of over 2,000 women that found a 27% increased risk of ovarian cancer from genital talcum powder use in women. Rosenblatt, K.A.; Weiss, N.S.; Cushing-Haugen, K.L.; Wicklund, K.G.; Rossing, M.A., "Genital powder exposure and the risk of epithelial ovarian cancer," *Cancer Causes Control.* 2011; 22(5): 737-742.

89. In June of 2013, Kathryn Terry published a pooled analysis of over 18,000 women in eight case-control studies and found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital talcum powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, K.L.; Karageorgi, S.; Svetsov, Y.B.; Merritt, M.A.; Lurie, G.; et al., "Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls," *Cancer Prevention Research* 2013; 6: 811-821.)

90. The National Cancer Institute (NCI)'s website currently lists perineal talcum powder use as a "risk factor" for ovarian cancer based on "solid evidence."

91. Defendants knew or should have known of the hazards associated with the use of their Talc Products.

92. Defendants had and continue to have a duty to warn about the hazards associated with the use of their Talc Products. Defendants have failed and continue to fail to inform the Public of the known catastrophic health consequences associated with the use of their Talc Products.

93. In addition, Defendants purposely procured and disseminated false, misleading, and deceptive information regarding the safety of the Talc Products to the public and specifically targeted minority communities in selling the Talc Products.

94. The public has been and will continue to be deceived and/or misled by Defendants' omissions and deceptive representations that the Talc Products are safe for women to use in the genital area. The risk of ovarian cancer, which is often fatal, far outweighs any benefit of the cosmetic use of the Talc Products, especially when non-talc products are readily available and equally effective as the Talc Products.

## V. CAUSE OF ACTION
### Violations of the Mississippi Consumer Protection Act
### Miss. Code Ann. §§ 75-24-1. et seq.

95. The State hereby repeats, incorporates by reference, and realleges each and every allegation set forth in this Complaint.

96. Defendants engaged in unfair methods of competition and unfair and deceptive trade practices in or affecting commerce in violation of Miss. Code Ann. §§ 75-24-5(1) and (2):

a. in the course of trade or commerce, Defendants misrepresented their goods as having uses and/or benefits that they do not have in violation of Miss. Code Ann. § 75-24-5(2)(e);

b. in the course of trade or commerce, Defendants misrepresented their goods as having qualities and/or standards that they did not have in violation of Miss. Code Ann. § 75-24-5(2)(g);

c. Defendants actively promoted, advertised and marketed their products by disseminating misrepresentations and omissions to Mississippi consumers, focusing on certain minority communities;

d. the State seeks an injunction preventing Defendants from deceptively marketing their Talc Products, requiring disgorgement of ill-gotten revenue obtained as a result of that deceptive marketing, and any other remedies the Court deems appropriate pursuant to Miss. Code Ann. §§ 75-24-9 and 75-24-11;

e. the State seeks investigative costs and attorneys' fees pursuant to Miss. Code Ann. § 75-24-19(b); and,

f. the State seeks civil penalties pursuant to Miss. Code Ann. § 75-24-19(1)(b) because Defendants knowingly and willfully used unfair and deceptive trade practices. The State seeks such additional relief pursuant to Miss. Code Ann. §§ 75-24-11 and 75-24-5 as the Court may determine is warranted under the facts presented.

## VI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Attorney General Jim Hood on behalf of the State of Mississippi prays for the following relief from this Honorable Court:

1. a finding by the Court that, by the acts and omissions alleged herein, Defendants engaged in unfair and deceptive business acts and practices in the course of engaging in commerce within the State of Mississippi in violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.;*

2. an award of actual damages to the State in such amount as is proven at trial, together with prejudgment interest;

3. punitive damages;

4. an injunction requiring Defendants to warn of the hazards associated with the use of the Talc Products, to remove all products that fail to warn of the hazards associated with the product, and to prevent the continued violation of the Mississippi Consumer Protection Act;

5. an order pursuant to Miss. Code Ann. § 75-24-9 and § 75-24-11 requiring that Defendants submit to an accounting to determine the amount of improperly obtained revenue that was paid to Defendants for sale of their dangerous and defective Talc Products as a result of their unfair and deceptive trade practices, acts, and omissions, and to disgorge those ill-gotten revenues;

6. an order pursuant to Miss. Code Ann. § 75-24-19(1)(b) directing Defendants to pay a civil penalty of up to but not to exceed Ten Thousand Dollars ($10,000.00) for each and every violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5;

7. an order directing Defendants to pay attorneys' fees, investigative costs and other costs of this action; and,

8. such other relief that this Court deems just and equitable under the law as may be proven at the trial of this matter.

RESPECTFULLY SUBMITTED, this the 22nd day of August, 2014.

**PLAINTIFFS, STATE OF MISSISSIPPI, ex rel. JIM HOOD, ATTORNEY GENERAL**

By: ______________________

Geoffrey Morgan MSB No. 3474
George W. Neville MSB No. No. 3822
Mary Jo Woods MSB No. 10468
Martin Millette MSB No. 102416
Special Assistant Attorneys General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, Mississippi 39205
Phone/Fax: 601-359-3680/601-359-2003
Email: gmorg@ago.state.ms.us; gnevi@ago.state.ms.us; mwood@ago.state.ms.us; and mamil@ago.state.ms.us

Allen Smith, Jr.
**THE SMITH LAW FIRM, P.L.L.C.**
618 Towne Center Boulevard, Suite B
Ridgeland, Mississippi 39157
Telephone: 601-952-1422
Facsimile: 601-952-1426
allen@smith-law.org

**and**

Tim Porter
Patrick Malouf
**PORTER & MALOUF, P.A.**
825 Ridgewood Road
Ridgeland, Mississippi 39157
Telephone: 601-957-1173
Facsimile: 601-957-7366
tim@portermalouf.com
patrick@portermalouf.com

# COVER SHEET

## Civil Case Filing Form

*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court Administrative Office of Courts — Form AOC/01 (Rev 2009)

Court Identification Docket #: 25 | 1 | CH — County # / Judicial District / Court ID (CH, CI, CO)

Case Year: 2014

Docket Number: 1207 — 0/3

Local Docket ID: GN

08 22 14 — Month / Date / Year

This area to be completed by clerk

Case Number if filed prior to 1/1/94

In the CHANCERY Court of HINDS County — 1st Judicial District

**Origin of Suit (Place an "X" in one box only)**

- [X] Initial Filing
- [ ] Remanded
- [ ] Reinstated
- [ ] Reopened
- [ ] Foreign Judgment Enrolled
- [ ] Joining Suit/Action
- [ ] Transfer from Other court
- [ ] Appeal
- [ ] Other

**Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual: Hood — Last Name; Jim — First Name; Maiden Name, if applicable; M.I.; Jr/Sr/III/IV

___ Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ___

X Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency: Mississippi Attorney General

Business ___
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A ___

Address of Plaintiff: 550 High St, Jackson, MS

Attorney (Name & Address): Geoffrey Morgan, P.O. Box 220, Jackson, MS 39205 — MS Bar No. 3474

___ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney

Signature of Individual Filing: ___

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual: ___ Last Name; First Name; Maiden Name, if applicable; M.I.; Jr/Sr/III/IV

___ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ___

___ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency ___

Business: Johnson + Johnson
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A ___

Attorney (Name & Address) - If Known ___ MS Bar No. ___

**Damages Sought:** Compensatory $ ___ Punitive $ ___ ___ Check ( x ) if child support is contemplated as an issue in this suit.*
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

**Domestic Relations**
- [ ] Child Custody/Visitation
- [ ] Child Support
- [ ] Contempt
- [ ] Divorce:Fault
- [ ] Divorce: Irreconcilable Diff.
- [ ] Domestic Abuse
- [ ] Emancipation
- [ ] Modification
- [ ] Paternity
- [ ] Property Division
- [ ] Separate Maintenance
- [ ] Termination of Parental Rights
- [ ] UIFSA (eff 7/1/97; formerly URESA)
- [ ] Other ___

**Appeals**
- [ ] Administrative Agency
- [ ] County Court
- [ ] Hardship Petition (Driver License)
- [ ] Justice Court
- [ ] MS Dept Employment Security
- [ ] Worker's Compensation
- [ ] Other ___

**Business/Commercial**
- [ ] Accounting (Business)
- [ ] Business Dissolution
- [ ] Debt Collection
- [ ] Employment
- [ ] Foreign Judgment
- [ ] Garnishment
- [ ] Replevin
- [ ] Other ___

**Probate**
- [ ] Accounting (Probate)
- [ ] Birth Certificate Correction
- [ ] Commitment
- [ ] Conservatorship
- [ ] Guardianship
- [ ] Heirship
- [ ] Intestate Estate
- [ ] Minor's Settlement
- [ ] Muniment of Title
- [ ] Name Change
- [ ] Testate Estate
- [ ] Will Contest
- [ ] Other ___

**Actions Involving Children**
- [ ] Adoption - Contested
- [ ] Adoption - Uncontested
- [ ] Consent to Abortion Minor
- [ ] Removal of Minority
- [ ] Other ___

**Civil Rights**
- [ ] Elections
- [ ] Expungement
- [ ] Habeas Corpus
- [ ] Post Conviction Relief/Prisoner
- [ ] Other ___

**Contract**
- [ ] Breach of Contract
- [ ] Installment Contract
- [ ] Insurance
- [ ] Specific Performance
- [ ] Other ___

**Statutes/Rules**
- [ ] Bond Validation
- [ ] Civil Forfeiture
- [ ] Declaratory Judgment
- [ ] Injunction or Restraining Order
- [ ] Other ___

**Real Property**
- [ ] Adverse Possession
- [ ] Ejectment
- [ ] Eminent Domain
- [ ] Eviction
- [ ] Judicial Foreclosure
- [ ] Lien Assertion
- [ ] Partition
- [ ] Tax Sale: Confirm/Cancel
- [ ] Title Boundary or Easement
- [ ] Other ___

**Torts**
- [ ] Bad Faith
- [ ] Fraud
- [ ] Loss of Consortium
- [ ] Malpractice - Legal
- [ ] Malpractice - Medical
- [ ] Mass Tort
- [ ] Negligence - General
- [ ] Negligence - Motor Vehicle
- [X] Product Liability
- [ ] Subrogation
- [ ] Wrongful Death
- [ ] Other ___