**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br>　　　　　　　Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br>　　　　　　　Plaintiff,<br>v.<br><br>STATE OF NEW MEXICO, ex rel. HECTOR H. BALDERAS, Attorney General, and STATE OF MISSISSIPPI, ex rel. JIM HOOD, Attorney General,<br>　　　　　　　Defendants. | Adv. Proc. No. 22-01231 (MBK) |

**DEBTOR'S MOTION FOR AN ORDER (I) PRELIMINARILY
ENJOINING THE PROSECUTION OF THE NEW MEXICO AND
MISSISSIPPI STATE ACTIONS AND (II) GRANTING A
TEMPORARY RESTRAINING ORDER PENDING A FURTHER HEARING**

---

[1]　　The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

NATURE OF PROCEEDING ................................................................................. 1

JURISDICTION AND VENUE ............................................................................. 6

SUMMARY OF ARGUMENT ............................................................................. 7

    A.    Ample Justification Exists to Enjoin the State Actions ......................... 7

    B.    A Temporary Restraining Order and Expedited Hearing Are Appropriate ......... 16

FACTUAL BACKGROUND ............................................................................... 17

    Corporate History and 2021 Restructuring ....................................... 17

    The Debtor's Talc Claims .................................................................... 20

    The Talc Claim Temporary Restraining Order and Preliminary Injunction .......... 24

    The New Mexico State Action ............................................................. 27

    The Mississippi State Action .............................................................. 28

    Other State Attorney General Actions and Ad Hoc Committee ........... 31

ARGUMENT ...................................................................................................... 32

I.     THE COURT HAS SUBJECT MATTER JURISDICTION ......................... 33

    A.    The Court Has Both "Arising Under" and "Arising In" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and That Would Have No Existence Outside of Bankruptcy ............... 33

    B.    The Court Also Has "Related to" Jurisdiction Over the State Actions ............... 34

II.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(A) TO ENJOIN NEW MEXICO'S AND MISSISSIPPI'S CONTINUED PROSECUTION OF THE STATE CLAIMS ......................... 36

    A.    The Debtor Has a Realistic Possibility of a Successful Reorganization ............. 38

    B.    The Debtor Will Be Irreparably Harmed Unless the Injunction Issues ............... 40

        1.    The State Claims Are "Inherently Intertwined" with the Talc Claims ...................................................................... 41

        2.    Collateral Estoppel Risk ......................................................... 47

        3.    Evidentiary Prejudice .............................................................. 50

        4.    The Debtor's Indemnity Obligations to the State Protected Parties ........ 53

        5.    Potential Disruption Of Settlement Efforts ............................. 54

    C.    The Balance of Harms Weighs Heavily in Favor of Issuance of the Preliminary Injunction ........................................................... 56

    D.    The Public Interest Supports Issuing the Injunction ........................... 58

## TABLE OF CONTENTS
(continued)

**Page**

III.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER
TO PROMPTLY EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR........... 60

CONCLUSION....................................................................................................................... 63

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ...............................................................................10, 36, 37, 53

*Chao v. Hospital Staffing Services, Inc.*,
  270 F.3d 374 (6th Cir. 2001) ...................................................................................................8

*In re Aldrich Pump LLC*,
  No. 20-30608 (JCW), 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) ............... passim

*In re Am. Film Techs., Inc.*,
  175 B.R. 847 (Bankr. D. Del. 1994) ................................................................................37, 50

*In re Bestwall*,
  606 B.R. 243 (Bankr. W.D.N.C. 2019).......................................................................... passim

*In re Charter First Mortgage, Inc.*,
  42 B.R. 380 (Bankr. D. Or. 1984)............................................................................................8

*In re DBMP LLC*,
  No. 20-30080, 2021 WL 3552350 (W.D.N.C. Aug. 11, 2021) ...................................... passim

*In re Dow Corning Corp.*,
  211 B.R. 545 (Bankr. E.D. Mich. 1997)................................................................................59

*In re E. Orange Gen. Hosp., Inc.*,
  587 B.R. 53 (D.N.J. 2018) ....................................................................................................33

*In re Family Health Servs., Inc.*,
  105 B.R. 937 (Bankr. C.D. Cal. 1989)..................................................................................37

*In re Fed-Mogul Glob., Inc.*,
  684 F.3d 355 (3d Cir. 2012)..................................................................................................40

*In re FPSDA I, LLC*,
  No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ....................................34

*In re G-I Holdings Inc.*,
  420 B.R. 216 (Bankr. D.N.J. 2009) .......................................................................................39

NAI-1532160454

*In re G-I Holdings, Inc.* (*G-I Holdings I*),
     580 B.R. 388 (Bankr. D.N.J. 2018) ......................................................................34

*In re Gander Partners LLC*,
     432 B.R. 781 (Bankr. N.D. Ill. 2010) .................................................................58

*In re Heron, Burchette, Ruckert & Rothwell*,
     148 B.R. 660 (Bankr. D.D.C. 1992) ...................................................................37

*In re Integrated Health Servs., Inc.*,
     281 B.R. 231 (D. Del. 2002) .........................................................................15, 58

*In re Johns-Manville Corp.*,
     26 B.R. 420 (Bankr. S.D.N.Y. 1983) ................................................36, 37, 50, 54

*In re Johns-Manville Corp.* (*Johns-Manville II*),
     40 B.R. 219 (S.D.N.Y. 1984) .............................................................................52

*In re JSS of Albuquerque, LLC*,
     No. 11-17-10092 JA, 2017 WL 3575654 (Bankr. D.N.M. Aug. 10, 2018)..............8

*In re Lomas Fin. Corp.*,
     117 B.R. 64 (S.D.N.Y. 1990)..............................................................................54

*In re LTL Mgmt., LLC*,
     637 B.R. 396 (Bankr. D.N.J. 2022) ....................................................................25

*In re LTL Mgmt., LLC*,
     No. 21-30589, Adv. Pro. No. 21-03032 (MBK), 638 B.R. 291 (Bankr. D.N.J.
     2022) ..................................................................................................................5

*In re Lyondell Chem. Co.*,
     402 B.R. 571 (Bankr. S.D.N.Y. 2009) .................................................................37

*In re Metro Transp. Co.*,
     64 B.R. 968 (Bankr. E.D. Pa. 1986) ...................................................................32

*In re Monroe Well Serv., Inc.*,
     67 B.R. 746 (Bankr. E.D. Pa. 1986) ...................................................................34

*In re Myerson & Kuhn*,
     121 B.R. 145 (Bankr. S.D.N.Y. 1990) .................................................................37

NAI-1532160454

*In re Purdue Pharm. L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) .............................................................................37

*In re Purdue Pharma L.P.*,
   No. 19-23649, Adv. No. 19-08289, ECF No. 82 (Bankr. S.D.N.Y. Oct. 11,
   2019) *aff'd* 619 B.R. 38 (S.D.N.Y. 2020) ..................................................10, 33, 37

*In re Saxby's Coffee Worldwide, LLC*,
   440 B.R. 369 (Bankr. E.D. Pa. 2009) ............................................................57, 58

*In re Sec. Gas & Oil, Inc.*,
   70 B.R. 786 (Bankr. N.D. Cal. 1987) .................................................................36

*In re Sudbury, Inc.*,
   140 B.R. 461 (Bankr. N.D. Ohio 1992) ..........................................................50, 58

*In re TK Holdings Inc.*,
   Case No. 17-50880, Adv. No. 17-50880, ECF No. 63 (Bankr. D. Del. Aug. 22,
   2017) ...........................................................................................................37

*In re TK Holdings, Inc.*,
   No. 17-11375, Adv. Pro. No. 17-50880, ECF No. 64 (Bankr. D. Del. Aug. 16,
   2017) ...........................................................................................................10

*In re Union Tr. Philadelphia, LLC*,
   465 B.R. 765 (Bankr. E.D. Pa.), *aff'd*, 460 B.R. 644 (E.D. Pa. 2011)....................38

*In re Union Trust Phila., LLC (Union Trust II)*,
   460 B.R. 644 (E.D. Pa. 2011) ...........................................................................38

*In re USA Gymnastics*,
   No. 18-09108, Adv. No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019) .....................37

*In re W.R. Grace & Co.*,
   115 F. App'x 565 (3d Cir. 2004) ...............................................11, 37, 41, 48, 52

*In re W.R. Grace & Co.*,
   412 B.R. 657 (D. Del. 2009)......................................................10, 32, 46, 52

*In re W.R. Grace & Co.*,
   591 F.3d 164 (3d Cir. 2009)..............................................................................33

*Johnson & Johnson v. Fitch*,
   142 S. Ct. 732 (2021)........................................................................................29

NAI-1532160454

*Johnson & Johnson v. Fitch ex rel. State*,
    315 So. 3d 1017 (Miss.), *cert. denied sub nom. Johnson & Johnson v. Fitch*,
    142 S. Ct. 732 (2021) ............................................................................................29

*LTL Mgmt., LLC v. San Diego Cnty. Emp. Ret. Ass'n (In re LTL Mgmt., LLC)*,
    No. 21-30589, Adv. Pro. No. 22-01073 (MBK), 2022 WL 1295927 (Bankr.
    D.N.J. Apr. 29, 2022) ..........................................................................................10

*Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC)*,
    No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021) ...............................10, 33, 47

*N.L.R.B. v. Superior Forwarding, Inc.*,
    762 F.2d 695 (8th Cir. 1985) ................................................................................36

*Oberg v. Aetna Cas. & Sur. Co. (In re A.H. Robins Co.)*,
    828 F.2d 1023 (4th Cir. 1987) .......................................................................11, 37, 41

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005) ................................................................................38

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) ................................................................................34

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979) .............................................................................................48

*Penn Terra Ltd. v. Dep't of Envt'l. Res., Com. of Pa.*,
    733 F.2d 267 (3d Cir. 1984) .........................................................................10, 32, 36

*Roggio v. Roggio (In re Roggio)*,
    612 B.R. 655 (Bankr. M.D. Pa. 2020) .................................................................34

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006) ................................................................................33

*TK Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.)*,
    No. 17-11375, Adv. Pro. No. 17-50880, ECF No. 63 (Bankr. D. Del. Aug. 22,
    2017) .....................................................................................................................38

*United States v. 5 Unlabeled Boxes*,
    572 F.3d 169 (3d Cir. 2009) ................................................................................48

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    386 B.R. 17 (Bankr. D. Del. 2008) .................................................................37, 58

NAI-1532160454

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
  No. 01-01139, 2004 WL 954772 (D. Del. Apr. 29, 2004)................................................47, 56

*Wharton v. Com. of Va.*,
  993 F.2d 1541 (4th Cir. 1993) ..........................................................................................7

STATUTES

11 U.S.C. § 105(a) .......................................................................................... passim

11 U.S.C. § 362.............................................................................................. passim

28 U.S.C. § 157.......................................................................................................6

28 U.S.C. § 1334.....................................................................................................33

28 U.S.C. § 1409.....................................................................................................6

Mississippi Consumer Protection Act, Miss. Code § 75-24-5......................................3, 28, 29, 42

New Mexico False Advertising Act, NMSA 1978, § 57-15-1 ...................................23, 27, 41

New Mexico Fraud Against the Taxpayers Act, NMSA 1978, § 44-9-3 ...........................3, 26, 27

New Mexico Medicaid Fraud Act, NMSA 1978, § 30-44-7 ...............................................3, 26, 27

New Mexico Unfair Practices Act, NMSA 1978, § 57-12-21 ..............................................26, 41

OTHER AUTHORITIES

Federal Rule of Civil Procedure 65 ..................................................................60, 61, 63

Federal Rule of Bankruptcy Procedure Rule 7001 .........................................................1

Federal Rule of Bankruptcy Procedure Rule 7008 .........................................................6

Federal Rule of Bankruptcy Procedure Rule 7065 .........................................................1, 60, 61

H. Rep. No. 95-595 ................................................................................................10, 32

13 James Wm. Moore, *et al.*, *Moore's Federal Practice –Civil* § 65.31 (3d ed.
  2021) .............................................................................................................61

NAI-1532160454

*Mass Tort Bankruptcy Cases*, Federal Judicial Center 1 (2005),
    https://www.fjc.gov/content/judicial-management-mass-tort-bankruptcy-
    cases-0 .................................................................................................................................40

Riley Griffin, Jef Feeley, *Johnson & Johnson Ending Sale of Talcum Powder
    Products in U.S.*, TIME, May 20, 2020, https://time.com/5839391/johnson-
    johnson-ends-talcum-baby-powder/ .....................................................................................21

S. Rep. No. 95-989 ..................................................................................................................10, 32

NAI-1532160454

## NATURE OF PROCEEDING

Pursuant to Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") Plaintiff LTL Management LLC (the "Debtor"), the debtor

in the above-captioned chapter 11 case (the "Chapter 11 Case"), seeks an order of the Court

temporarily enjoining the continued prosecution of *State of New Mexico ex rel. Balderas v.*

*Johnson & Johnson, et al.*, No. D-101-CV-2020-00013, pending in the First Judicial District

Court for the County of Santa Fe, New Mexico (the "NM State Action") and *State of Mississippi*

*ex rel. Hood v. Johnson & Johnson, et al.*, No. G2014-0001207, pending in the First Judicial

District Court for the County of Hinds, Mississippi (the "MS State Action" and together with the

NM State Action, the "State Actions") against the Debtor and certain non-debtor entities while

the Chapter 11 Case remains pending.[2]  The Debtor seeks this relief to preserve its ability to

resolve these claims, including the overlapping issues underlying them and the talc-related

claims, through mediation or otherwise in this Court and, ultimately, to successfully reorganize.

A fundamental dispute in the Chapter 11 Case relates to the alleged merits of the

talc-related claims against the Debtor (collectively, the "Talc Claims").[3]  The Debtor and the

defendants in the State Actions maintain that cosmetic talc products manufactured or distributed

by the Debtor's predecessors or Johnson & Johnson ("J&J"), including Johnson's Baby Powder

and Shower to Shower (collectively, the "Talc Products") are safe, did not contain asbestos, and

do not cause disease (and that public statements to that effect were truthful).  By contrast, the talc

---

[2]     The Debtor recognizes that the Court has determined to review the existing preliminary injunction
(described below) periodically and would not oppose a similar periodic review of any preliminary
injunction issued with respect to the State Actions.

[3]     Talc Claims include all claims relating in any way to talc or talc-containing materials that formerly were
asserted (or that could have been asserted) against Old JJCI on any theory of liability (whether direct,
derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or
conveyance, alter ego or otherwise).

claimants allege that such talc products contained asbestos and cause mesothelioma or ovarian

cancer.  This dispute about the safety of cosmetic talc products is also central to the claims

asserted in the State Actions.  In fact, the State Actions rely on the same underlying allegations

and evidence relied upon by the talc claimants, and the plaintiffs in those actions are represented

by the same counsel that represents talc claimants in this chapter 11 case, including some

claimants on the Official Committee of Talc Claimants.[4]  Thus, if the State Actions are permitted

to continue, a key issue in the Chapter 11 Case will be adjudicated outside of this Court at the

same time that parties in the Chapter 11 Case are attempting to resolve the exact same issue in

this Court and formulate a consensual plan of reorganization.  Moreover, the pursuit of the State

Actions would undermine the ongoing mediation with an ad hoc group of states that are

attempting consensually to resolve consumer protection claims that are virtually identical to the

claims asserted in the State Actions.

The defendants in this adversary proceeding are the State of New Mexico ("New

Mexico") and the State of Mississippi ("Mississippi").  The named defendants in the State

Actions are:  (a) the former Johnson & Johnson Consumer Inc. ("Old JJCI")[5]; (b) Johnson

& Johnson ("J&J"); and (c) Bausch Health Companies Inc. f/k/a Valeant Pharmaceuticals

International, Incorporated; Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals

---

[4]    New Mexico is represented by Fears Nachawati Law Firm and Ashcraft & Gerel LLP, which also represent
two members of the Official Committee of Talc Claimants (the "Talc Committee").  *See* Ex. 1 to
Declaration of Dan B. Prieto, New Mexico's First Amended Complaint (the "New Mexico FAC").
(Hereinafter, all citations to exhibits refer to the exhibits attached to the declaration of Dan B. Prieto, filed
contemporaneously herewith.)  In the MS State Action, Mississippi is represented by The Smith Law Firm,
P.L.L.C. and Porter & Malouf, P.A., which also represent talc claimants (but do not represent members of
the Talc Committee).  *See* Ex. 2, Mississippi's Complaint (the "Mississippi Complaint") at 1; Ex. 3,
*Forrest, et al. v. Johnson & Johnson, et al.*, No. 1522-CC00419 (Circ. Ct., St. Louis, Mo. Feb. 23, 2015).

[5]    In the NM State Action, New Mexico incorrectly identifies Old JJCI as "Johnson & Johnson Consumer
Companies Inc."  *See* Ex. 1, New Mexico FAC at 1.  In the MS State Action, the complaint likewise
incorrectly identifies Old JJCI as "Johnson & Johnson Consumer Companies, Inc."  *See* Ex. 2, Mississippi
Compl. at 1.

NAI-1532160454

International; and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC

f/k/a Valeant Pharmaceuticals North America, all three of which the Debtor is contractually

obligated to indemnify (the "Bausch Defendants" and, collectively with Old JJCI and J&J,

the "State Protected Parties").[6]

The State Actions are brought by New Mexico and Mississippi (together,

the "States"), by and through their respective attorneys general.  In the NM State Action, New

Mexico alleges that the State Protected Parties deceptively marketed and sold talcum powder

products by making misrepresentations about the safety of the products and the presence of

carcinogens, including asbestos (collectively, the "NM Claims").[7]  Ex. 1, New Mexico FAC

¶¶ 1, 119–217.  Similarly, in the MS State Action, Mississippi alleges that J&J and Old JJCI

violated the Mississippi Consumer Protection Act by failing to disclose alleged health risks

associated with female consumers' use of talc contained in talc products and seeks injunctive and

monetary relief (collectively, the "MS Claims" and collectively with the NM Claims, the "State

Claims").  Ex. 2, Mississippi Compl. ¶¶ 16–17, 96.

All of the State Claims are based ultimately on the disputed allegation that talc

products manufactured and/or distributed by the Debtor's predecessors or J&J were

contaminated with asbestos or otherwise may cause injury.  These allegations create substantial

factual overlap with the Talc Claims.  Proving these allegations in the State Actions will thus

directly implicate the Debtor's ability to resolve the Talc Claims in the Chapter 11 Case.  Indeed,

the continued prosecution of the State Actions would interfere with or impact the valuation of the

---

[6]   The two Bausch Defendants named in the MS State Action (Valeant Pharmaceuticals International, Inc. and Valeant Pharmaceuticals North America, Inc.) settled the claims against them in the MS State Action and accordingly are no longer parties to that action.

[7]   New Mexico also asserted claims for violations of the New Mexico Medicaid Fraud Act, NMSA 1978, Section 30-44-7, and of the New Mexico Fraud Against the Taxpayers Act, NMSA 1978, Section 44-9-3. These claims were dismissed on September 22, 2020.

Talc Claims in the ongoing mediation, in any separate settlement discussions and in any claims

estimation proceedings.

In addition, permitting the State Actions to proceed would undermine and disrupt

the ongoing mediation with over forty states that seeks to consensually resolve the consumer

protection claims alleged by those states.  The claims of these states are based on the very same

allegations as the State Claims at issue in the adversary proceeding.

The relief requested in this adversary proceeding has not been necessary until

recently.  Mississippi was part of a group of forty-one states and the District of Columbia that

formed an ad hoc committee (the "Ad Hoc Committee") for purposes of engaging in mediation

with the Debtor to attempt to resolve the consumer protection claims asserted or alleged by the

member states (collectively, the "Mediating States").  To facilitate mediation with the Mediating

States, the Debtor entered into a reimbursement agreement with the Ad Hoc Committee pursuant

to which the Debtor agreed to reimburse certain costs of the Ad Hoc Committee's professionals

in connection with settlement efforts.  In turn, the Ad Hoc Committee agreed to participate in

mediation and, while the reimbursement agreement is in effect, the Mediating States, including

Mississippi, agreed to stay and not commence actions against the Debtor or its affiliates related

to talc products.  Although New Mexico was not a member of the Ad Hoc Committee, it

separately agreed to stay prosecution of the NM State Action for a period of sixty days.

However, Mississippi recently elected to resign from the Ad Hoc Committee and

has resumed prosecuting the MS State Action.  It insists that the Debtor move forward with a

proposed scheduling order that contemplates a trial date in February 2023 and extensive expert

and fact discovery in the upcoming months.  Likewise, New Mexico has resumed its prosecution

of the NM State Action and has refused to agree to a further stay of the action.  It has insisted on

a trial setting in April 2023, with numerous deadlines and extensive discovery to be conducted in the near term.  In fact, the deposition of J&J's and Old JJCI's corporate representative is scheduled for July 26, 2022.

Given these recent developments, the Debtor requests that the Court issue a preliminary injunction under section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") temporarily enjoining the States from prosecuting the State Actions against the State Protected Parties and the Debtor because they are inextricably intertwined with the Talc Claims and the consumer protection claims of the Mediating States that the Debtor seeks to globally and equitably resolve in the Chapter 11 Case.  The State Actions should also be enjoined as to the State Protected Parties because continued prosecution of the claims against those parties would amount to continued prosecution against the Debtor for the reasons set forth by the Debtor in support of the current preliminary injunction.  In particular, the Debtor would be responsible for any judgment in the State Actions against Old JJCI or J&J.  *See* Adv. Pro. No. 21-03032, ECF No. 128 at 19–22, 41–42; *In re LTL Mgmt., LLC*, No. 21-30589, Adv. Pro. No. 21-03032 (MBK), 638 B.R. 291, 303–06 (Bankr. D.N.J. 2022) ("N.J. Mem. Op.").  The Debtor also has indemnity obligations to the Bausch Defendants in the NM State Action.

Because the States now are vigorously pursuing the State Actions, including by insisting that scheduling orders be entered setting trial dates for early 2023 in their respective cases and that extensive discovery be conducted in the near term (including J&J's and Old JJCI's corporate representative deposition, scheduled for **July 26, 2022** in the NM State Action), the Debtor additionally seeks a temporary restraining order following an expedited, emergency hearing to promptly effectuate the requested relief on an interim basis pending a further hearing on this Motion.

NAI-1532160454

Along with this Motion, the Debtor has filed the *Debtor's Verified Complaint for Injunctive Relief (I) Preliminarily Enjoining the Prosecution of the New Mexico and Mississippi State Actions and (II) Granting a Temporary Restraining Order Pending a Final Hearing* (the "Complaint") that initiated this adversary proceeding.  In support of this Motion, the Debtor incorporates:  (i) the *Declaration of John K. Kim in Support of First Day Pleadings*, No. 21-30589, ECF No. 5 (the "First Day Declaration"), filed earlier in the Chapter 11 Case and attached as Exhibit 4; (ii) the *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions*, Adv. Pro. No. 21-03032, ECF No. 3 (the "Supplemental Declaration," and together with the First Day Declaration, the Prior Declarations"), filed earlier in the Chapter 11 Case and attached as Exhibit 5; (iii) the *Declaration of John K. Kim in Support of Debtor's Complaint for Injunctive Relief and Related Motion With Respect to the New Mexico and Mississippi State Actions* (the "Kim Declaration"), filed contemporaneously herewith; and (iv) the *Declaration of Dan B. Prieto in Support of Debtor's Complaint for Injunctive Relief and Related Motion With Respect to the New Mexico and Mississippi State Actions* and the exhibits attached thereto (the "Prieto Declaration"), filed contemporaneously herewith.

### JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this adversary proceeding and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Bankruptcy Rule 7008, the Debtor consents to the entry of final orders or a final judgment by this Court in this adversary proceeding.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

NAI-1532160454

## SUMMARY OF ARGUMENT

### A.     Ample Justification Exists to Enjoin the State Actions

As an initial matter, Mississippi has argued that the automatic stay does not apply

to the MS State Action, and on January 18, 2022, the Mississippi state court entered an order

finding no basis for a stay of the MS State Action.  Ex. 6, Nov. 5, 2021 Resp. to Defs.' Notice of

Bankruptcy Filing and Stay of Proceedings; Ex. 7, Jan. 18, 2022 Order at 2.  New Mexico has

similarly suggested that the NM State Action is not automatically stayed.  Ex. 8, Nov. 17, 2021

Mot. to Compel at 2 n.1 (State initially "did not know whether a bankruptcy would stay the

litigation" but suggesting that preliminary injunction order exclusion of governmental entities

clarified that State Action was excepted from stay).

The State Actions seek to advance the States' own pecuniary interests, ahead of

other states and the talc claimants, by seeking to liquidate monetary claims against the Debtor,

rather than protecting the public from any *ongoing* alleged hazards.  In point of fact, the State

Actions do not seek to enjoin, nor could they enjoin, the ongoing sale of the Talc Products

because the products sold in the United States and Canada no longer contain talc.  Thus, the

continued pursuit of the State Actions is not an exercise of the States' police power, but rather an

effort to collect fines and penalties for past conduct from the Debtor and other parties.

The Third Circuit has not addressed, however, whether actions by governmental

units to liquidate fines and penalties against a debtor under consumer protection statues are

excepted from the automatic stay under section 362(b)(4) of the Bankruptcy Code.  Further,

some courts have found that such actions are not automatically stayed, although none of those

rulings is binding on this Court.  The Debtor maintains that the State Actions are subject to

section 362's automatic stay, but the Court need not address that issue in this adversary

NAI-1532160454

proceeding because the State Actions can and should be enjoined pursuant to section 105 of the

Bankruptcy Code.[8]

   The State Actions should be enjoined as to the Debtor and the State Protected

Parties under section 105 of the Bankruptcy Code because permitting them to proceed would run

contrary to and seriously conflict with the Bankruptcy Code's purpose of facilitating an effective

reorganization.  As an initial matter, this Court has already extended the stay to talc-related

claims against certain third-party defendants (the "Protected Parties").  *See* N.J. Mem. Op. at

301–02, 322–24.  The State Protected Parties are among those Protected Parties, and many of the

same principles underpinning this Court's decision to stay and enjoin the Talc Claims against the

Protected Parties also support enjoining the State Actions against the Debtor and the State

Protected Parties.

   The Court should enjoin the State Actions for numerous additional reasons.

Litigation of both the State Claims and the Talc Claims would require submission of much of the

same evidence and turn on many of the same issues relating to the safety of the Talc Products.

The Talc Claims allege that exposure to talc is harmful either because talc is dangerous in and of

itself or the talc used by Old JJCI is contaminated with asbestos.  Similarly, the State Claims

---

[8] Mississippi alleges an alter ego claim, which is property of the Debtor's estate and thus automatically
stayed pursuant to section 362(a)(3).  *See* Adv. Pro. No. 21-03032, ECF No. 128 at 46–60; Ex. 2,
Mississippi Compl. ¶ 16.  The exception set forth in section 362(b)(4) does not apply to the alter ego claim.
*Wharton v. Com. of Va.*, 993 F.2d 1541, \*3-4 (4th Cir. 1993) (holding that alter ego claim was property of
the debtor's estate, did not fall within section 362(b)(4) or (5) exceptions to the automatic stay and could
not be pursued by the Commonwealth of Virginia).  Courts have also found that claims for restitution and
disgorgement seek to collect money to protect pecuniary interests and not the State's public interest and do
not fall with the police power exception.  *See In re JSS of Albuquerque, LLC*, No. 11-17-10092 JA, 2017
WL 3575654, at \*6, \*8 (Bankr. D.N.M. Aug. 10, 2018) (holding that "the State's public interest in
asserting claims for restitution and disgorgement is minimal" and thus such claims did not fall within the
exception to the stay under section 362(b)(4) of the Bankruptcy Code); *In re Ora First Mortgage, Inc.*, 42
B.R. 380, 382–85 (Bankr. D. Or. 1984) (restitution claims constitute an adjudication of private rights and
remain stayed); omitted); *cf. Chao v. Hospital Staffing Services, Inc.*, 270 F.3d 374, 391 (6th Cir. 2001)
(action under the Fair Labor Standards Act that merely sought to recover unpaid minimum wages, unpaid
overtime, and liquidated damages did not come within the exception because such action only incidentally
served the public interest).

allege that the State Protected Parties engaged in unfair business practices and made false or

misleading statements in connection with the marketing, sale, and promotion of the Talc

Products, because, as the States allege, those products contained asbestos or were otherwise

harmful.  The core allegations of the Talc Claims and State Claims are thus virtually identical:

that the Talc Products were contaminated with asbestos or were otherwise harmful.

In addition, New Mexico and Mississippi should not be permitted to advance their

interests ahead of those of the Mediating States, nor should the Debtor be forced to litigate

during the pendency of this case claims that are substantially similar to the claims of the

Mediating States, which would undermine the Debtor's ability to reach a consensual resolution

of those claims in the mediation.

Litigation of the State Actions would impact the Debtor's reorganization efforts

by forcing the Debtor to litigate issues key to the Chapter 11 Case outside of this Court, and

place the Debtor at risk of facing collateral estoppel and evidentiary record prejudice that could

result from such parallel litigation.  And, given the Debtor's indemnification obligations,

continued litigation against the State Protected Parties would amount to continued litigation

against the Debtor.  And this would occur at a time when (i) mediations, with representatives of

talc claimants as well as with other similarly situated states and the District of Columbia, are

ongoing and (ii) the Court and parties are actively engaged in determining and, if necessary,

implementing next steps for the Chapter 11 Case in respect of both Talc Claims and consumer

protection claims, including a potential estimation or estimations, in the event that mediation

efforts do not result in a resolution in the near term.  Permitting the State Actions to proceed

would undermine and conflict with both of these processes, "hinder reorganization efforts,"

NAI-1532160454

constitute a "drain on resources and time" of the estate, and encourage inequality in treatment

among similarly situated creditors.  N.J. Mem. Op. at 320–21.

Section 105(a) of the Bankruptcy Code empowers the Court "'to enjoin parties

other than the bankrupt' from commencing or continuing litigation" that threatens to "interfere in

the rehabilitative process whether in a liquidation or in a reorganization case."  *A.H. Robins Co.*

*v. Piccinin*, 788 F.2d 994, 1002–03 (4th Cir. 1986) (first quoting *In re Otero Mills, Inc.*, 25 B.R.

1018, 1020 (D.N.M. 1982), then quoting *In re Johns-Manville Corp.*, 26 B.R. 420, 425 (Bankr.

S.D.N.Y. 1983)).  This is so even if the actions fall within the police power exception set forth in

section 362(b)(4) of the Bankruptcy Code.[9]  *See Penn Terra Ltd. v. Dep't of Envt'l. Res., Com. of*

*Pa.*, 733 F.2d 267, 273 (3d Cir. 1984) ("The bankruptcy court, in its discretion, may issue an

appropriate injunction, even if the automatic stay is not operative."); S. Rep. No. 95-989 at 51,

1978 U.S. Code Cong. & Ad. News at 5787, 5837; H. Rep. No. 95-595 at 342, 1978 U.S. Code

Cong. & Ad. News at 5963, 6298 ("The effect of an exception is not to make [an] action immune

from injunction.  The court has ample other powers to stay actions not covered by the automatic

stay.  Section 105, of the proposed title 11, derived from the Bankruptcy Act § 2a(15), grants the

power to issue orders necessary or appropriate to carry out the provisions of title 11.  The district

court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court

of equity. . . .").[10]  Assessing whether injunctive relief is proper turns on the four familiar

---

[9]     As set forth above, the Debtor does not concede that the State Actions fall within the police power
        exception under section 362(b)(4).

[10]    *See also In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009) (affirming bankruptcy court's issuance
        of section 105(a) injunction barring state environmental agency from fixing civil penalty owed by debtor
        and its former officers for alleged asbestos liability); *In re TK Holdings, Inc.*, No. 17-11375, Adv. Pro.
        No. 17-50880 (BLS), ECF No. 64 (Bankr. D. Del. Aug. 16, 2017) ("Takata PI Ruling") at 24–30 (enjoining
        actions brought by state governments under section 105(a)); *In re Mallinckrodt PLC*, Adv. Pro.
        No. 20-50850, ECF No. 170 (Bankr. D. Del. Nov. 25, 2020) (same); *In re Purdue Pharma L.P.*, Adv. Pro.
        No. 19-08289 (RDD), ECF No. 89 (Bankr. S.D.N.Y. Oct. 18, 2019) (same).

NAI-1532160454

preliminary injunction factors, modified to fit the bankruptcy context.  Each of those factors is satisfied here.

First, the Debtor need only show the prospect or possibility of success and need not prove the same with certainty.  *See* N.J. Mem. Op. at 320; *LTL Mgmt., LLC v. San Diego Cnty. Emp. Ret. Ass'n (In re LTL Mgmt., LLC)*, No. 21-30589, Adv. Pro. No. 22-01073 (MBK), 2022 WL 1295927 (Bankr. D.N.J. Apr. 29, 2022) ("Hall Mem. Op.") at *7.  This Court has already determined that nothing in the record suggests that the Debtor does not have a realistic possibility of successfully reorganizing.  N.J. Mem. Op. at 320; Hall Mem. Op. at *7. The Debtor is well capitalized and has access to funds to satisfy its talc liability.  The "Debtor has explained its strategy for reorganization and has already executed the Funding Agreement which will aid in the reorganization process, a Future Talc Claims Representative and Mediators have been appointed, and the parties are moving forward with the mediation process." Hall Mem. Op. at *7.  The Debtor is thus well positioned to resolve the claims against it through confirmation of a plan of reorganization.

Second, the Debtor will be irreparably harmed without an injunction.  Whether irreparable harm exists depends on "whether the litigation 'could interfere with the reorganization of the debtor' or 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization.'"  *In re W.R. Grace & Co.*, 115 F. App'x 565, 570 (3d Cir. 2004) (first quoting *Oberg v. Aetna Cas. & Sur. Co.* (*In re A.H. Robins Co.*), 828 F.2d 1023, 1025 (4th Cir. 1987), then quoting *In re Johns-Manville* (*Johns-Manville I*), 26 B.R. at 436); *see also In re Aldrich Pump LLC*, No. 20-30608 (JCW), 2021 WL 3729335, at *33 (Bankr. W.D.N.C. Aug. 23, 2021) ("[T]he critical, if not decisive, issue over whether

NAI-1532160454

injunctive relief should be granted is whether and to what extent the non-debtor litigation

interferes with the debtors' reorganization efforts." (quoting *In re Brier Creek Corp.*,

486 B.R. 681, 694 (Bankr. E.D.N.C. 2013))).  Indeed, the Court has recently clarified that "the

mere risk of a potentially adverse impact on a debtor's bankruptcy can be sufficient to support a

preliminary injunction" and the "plaintiff's theory that the debtor would not suffer an adverse

impact should not be tested at the debtor's peril."  Hall Mem. Op. at *8.

Continued prosecution of the State Claims against the Debtor and the State

Protected Parties would irreparably harm the Debtor because, as set forth above, the Debtor

would be forced to engage in litigation of issues critical to this Chapter 11 Case, while it

simultaneously seeks to resolve those issues in the Chapter 11 Case and while the Court and

parties are in the midst of determining and effectuating a path forward in the Chapter 11 Case in

the event that consensual resolutions are not imminent.

The Talc Claims and the State Claims are intimately intertwined.  The States

cannot prove their claims without first proving that the Talc Products were contaminated with

asbestos or were otherwise harmful—the essence of the Talc Claims.  The tables in Section

II.B.1, below demonstrate the extent to which the allegations in the State Action complaints are

identical in substance to the allegations supporting the Talc Claims.  *See* Sec. II.B.1, *infra*.

In addition, continued litigation of the State Claims exposes the Debtor to the risk

that findings in the State Actions could bind the Debtor and effectively establish issues with

respect to the Talc Claims and consumer protection claims asserted by other states.  Similarly,

litigation of the State Claims could create "an evidentiary record that prejudices the Debtor" both

in connection with the other state consumer protection claims and the Talc Claims.  Thus,

continued litigation of the State Claims could result in the adjudication of issues that would

NAI-1532160454

materially prejudice the Debtor's ability to achieve a successful reorganization.  *In re DBMP*

*LLC*, No. 20-30080, 2021 WL 3552350, at *27 (W.D.N.C. Aug. 11, 2021).  This Court, in

issuing the injunctions in place in this Chapter 11 Case, has recognized the importance of

avoiding the risks to the Debtor of collateral estoppel, *see* N.J. Mem. Op. at 314–17, and record

taint, that could arise if litigation that implicates issues critical to this Chapter 11 Case is allowed

to continue.  Hall Mem. Op. at *7–8.  These risks are particularly acute here, where the Debtor

itself would be a party to the State Actions.

    Continued prosecution of the State Actions, the only two such actions moving

forward at this time, also could negatively impact the Debtor's efforts to reach consensus with

the forty other states and the District of Columbia (the remaining members of the Ad Hoc

Committee) that have asserted, or may assert, similar claims, and have agreed to stay their

respective actions or investigations in an effort to attempt to reach a consensual resolution with

the Debtor.   New Mexico's and Mississippi's separate pursuit of the State Actions would

undermine this collective effort to globally and equitably resolve similar claims in the Chapter 11

Case for many of the same reasons that continued litigation of the Talc Claims would have

undermined mediation and negotiation efforts in this case.   *See* N.J. Mem. Op. at 307

(recognizing that "continued litigation against the Protected Parties would undoubtedly impair

mediation efforts and negotiations within this bankruptcy"); *see also* Hall Mem. Op. at *9 ("In

determining whether to grant a preliminary injunction in this case, this Court affords significant

weight to the harms that could befall the Debtor—including a complicated and drawn out claims

valuation process, a hindered mediation, and weakened insurance coverage claims."); *In re*

*DBMP LLC*, 2021 WL 3552350, at *41 (permitting the continued prosecution of asbestos claims

against certain proposed protected parties "would undermine the purposes of chapter 11 and

-13-

section 524(g) to resolve all such current and future claims in a fair and equitable manner

through a chapter 11 plan").

In sum, this Court's rationale for finding irreparable harm absent a stay of the

Talc Claims against the Protected Parties applies fully here, as to the Debtor and each of the

State Protected Parties:  "[C]ontinued litigation will have an adverse impact on the bankruptcy

estate, will hinder reorganization efforts, and will serve as a constant drain on resources and

time."  N.J. Mem. Op. at 320–21.

Third, the balance of the harms weighs heavily in favor of an injunction.

Prosecution of the State Claims may result in rulings and an evidentiary record that impacts the

Talc Claims, the consumer protection claims of other states, and efforts to resolve the Chapter 11

Case.  It also would unfairly permit New Mexico and Mississippi to liquidate their own claims

outside of this Court while all other states and talc claimants remain stayed and seek to resolve

their claims in the Chapter 11 Case.  *See* N.J. Mem. Op. at 321 (explaining that grant of the

injunction protects the interests of current and future claimants because the bankruptcy process

"prevents a race for proceeds[] and promotes equality in distribution").

By contrast, the State Claims would only be temporarily paused while the Debtor

seeks to reorganize—a pause that is unlikely to impose much, if any, harm on the States, which

primarily seek to liquidate money damage claims based on past conduct by assessing fines and

penalties on the Debtor and other parties.  Certainly, the States "will suffer no greater harm in

terms of delay than the plaintiffs in the Talc Claims, who also have been stayed to allow

mediation and reorganization efforts to play out."  Hall Mem. Op. at *12.  And, the Debtor

would not oppose subjecting that "pause" to review every four months, consistent with the

Court's approach for the other preliminary injunctions issued in this Chapter 11 Case.  "Delay, in

NAI-1532160454

and of itself, is insufficient to overcome irreparable harm caused to the Debtor and its estate."

Adv. Pro. No. 21-03032, ECF No. 102 (the "W.D.N.C. Prelim. Inj. Order" or "Initial PI Order")

at 6.  The balance of the harms thus likewise favors injunctive relief.

Finally, the public interest also favors a preliminary injunction by promoting a

successful resolution of the Talc Claims and the Mediating States' consumer protection claims.

"In the context of a bankruptcy case, promoting a successful reorganization is one of the most

important public interests," *In re Integrated Health Servs., Inc.*, 281 B.R. 231, 239 (D. Del.

2002), and injunctive relief here would do so.  This Court has made clear that it "holds no doubts

that claim resolution through the bankruptcy process is in the public interest."  N.J. Mem. Op.

at 322; *see also* W.D.N.C. Prelim. Inj. Order at 6 ("The public interest lies with the Debtor

completing its reorganization process and resolving the Debtor Talc Claims in a uniform and

equitable manner.").  Enjoining the State Actions, like the Talc Claims, will support a uniform,

timely and equitable resolution and is in the public interest.  The State Actions are not unique—

investigations or similar proceedings already have been initiated by over forty states.  The State

Claims also are premised upon the same core allegations that underly the Talc Claims.  Claims

resolution through the bankruptcy process would allow for a "uniform, timely, and equitable

resolution" of the states' consumer protection claims as well as the Talc Claims.  Hall Mem.

Op. at *13.  By contrast, the separate litigation of issues that are critical to the bankruptcy case

"would undoubtedly interfere with" the Debtor's reorganization.  *DBMP*, 2021 WL 3552350,

at *43; *Aldrich Pump*, 2021 WL 3729335, at *38.  The public interest strongly favors the

uniform treatment of claims and maintaining the Debtor's focus on reorganizing and establishing

a bankruptcy trust.

**B.      A Temporary Restraining Order and Expedited Hearing Are Appropriate**

A temporary restraining order is necessary given the resumption of litigation in the State Actions.  New Mexico initially agreed to stay the NM State Action for sixty days, to allow the Debtor to engage in mediation efforts with the Mediating States and the Talc Claimants.  Ex. 9, Apr. 8, 2022 Joint Expedited Mot. to Stay Proceedings; Ex. 10, Apr. 8, 2022 Order.  That agreed stay expired, and New Mexico insists on moving forward with litigation.  To that end, on June 17, 2022, New Mexico filed a motion in the NM State Action requesting a scheduling order that sets trial for April 2023 and numerous discovery and motion deadlines in the upcoming months.  Ex. 11, June 17, 2022 Mot. to Modify Scheduling Order.  Under New Mexico's proposed scheduling order, the parties would be required to, among other things, mediate by August 29, 2022, exchange non-expert witness lists by September 1, 2022, and complete all discovery by November 30, 2022.  *Id.* at 3.  Moreover, the corporate representative deposition of J&J and Old JJCI is set for July 26, 2022.  Kim Decl. ¶ 8; Ex. 12, New Mexico's Second Am. Notices of Dep. to Old JJCI and J&J.

Mississippi was a member of the Ad Hoc Committee and similarly agreed to stay its litigation.  Kim Decl. ¶ 15.  Now, a short time after the Court approved the Debtor's reimbursement agreement with the Ad Hoc Committee and appointed a third mediator to assist with mediation of the states' claims, Mississippi has determined to resign from the Ad Hoc Committee and thus terminate its agreement to a standstill of the MS State Action.  *Id.* Mississippi has demanded that a scheduling order be entered as soon as possible based on a February 17, 2023 trial date that would require extensive fact and expert discovery to be completed in the near term.  *Id.*

In light of the resumption of the State Actions, and in particular, the deposition in the NM State Action scheduled for July 26, 2022 and other imminent proposed pretrial deadlines

-16-

in both State Actions, the Debtor requests that, following an expedited, emergency summary hearing, the Court issue a temporary restraining order enjoining the States from continuing to prosecute the State Actions against the Debtor and the State Protected Parties. A temporary restraining order will preserve the status quo until this Court has the opportunity to hold a further hearing on the Debtor's requested relief. For all the same reasons that issuance of a preliminary injunction is justified, a prompt temporary restraining order is warranted too. Allowing the continued prosecution of the State Claims while the Court considers this request would risk the same sort of immediate and irreparable harm that denying this request would cause. And given the short duration of a temporary restraining order to preserve the status quo, there would be no harm to the States. Such relief is thus proper, and the Debtor respectfully requests that the Court issue it.

## FACTUAL BACKGROUND

Because the Court is already familiar with many of the relevant facts, the Debtor provides an abbreviated description of the factual background below. Additional information is available in the Debtor's earlier filings, including: the *Informational Brief of LTL Management LLC*, No. 21-30589, ECF No. 3; the First Day Declaration; and the *Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing*, Adv. Pro. No. 21-03032, ECF No. 1.

*       *       *

On October 14, 2021 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Western District of North Carolina ("N.C. Bankruptcy Court"). On November 16, 2021, the N.C. Bankruptcy Court transferred the Chapter 11 Case to the

-17-

District Court, which referred the Chapter 11 Case to this Court. *See* No. 21-30589, ECF

No. 416. The Debtor is continuing in possession of its property and is managing its business, as

a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### Corporate History and 2021 Restructuring

On October 12, 2021, Old JJCI implemented the corporate restructuring described

in detail in the First Day Declaration (the "2021 Corporate Restructuring"). First Day Decl. ¶ 16.

As a result of that restructuring, Old JJCI ceased to exist, and two new entities were created:

(i) the Debtor, which was initially formed as a Texas limited liability company and then

converted into a North Carolina limited liability company; and (ii) a second entity, which was

initially formed as a Texas limited liability company and then merged into a New Jersey

corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this

entity changed its name to "Johnson & Johnson Consumer Inc." ("New JJCI"). *Id.*

New JJCI manufactures and sells a broad range of products used in the baby care,

beauty, oral care, wound care and women's health-care fields, as well as over-the-counter

pharmaceutical products. *Id.* ¶ 19. The Debtor's ultimate parent company, J&J, is a holding

company that, through its operating subsidiaries, conducts business in virtually all countries in

the world, focused primarily on products related to human health and well-being. *Id.*

Old JJCI and its affiliates have engaged in multiple restructurings through the

years to achieve business and operational objectives. *Id.* ¶ 20. The 2021 Corporate

Restructuring was implemented to enable the Debtor to fully resolve Talc Claims through a

chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy

proceeding. *Id.* ¶ 21.

As a result of the 2021 Corporate Restructuring:

    a) Old JJCI ceased to exist;

b) The Debtor, as well as New JJCI, were formed;

c) The Debtor received certain of Old JJCI's assets, as set forth below, and became solely responsible for certain of its liabilities, including Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws);

d) New JJCI was allocated all other assets of Old JJCI and became solely responsible for all other liabilities of Old JJCI;

e) A funding agreement (the "Funding Agreement") was established between New JJCI, J&J, and the Debtor for the purpose of ensuring that the Debtor has at least the same, if not greater, ability to pay the Talc Claims against it as Old JJCI had before the 2021 Corporate Restructuring;[11] and

f) The Debtor agreed to indemnify New JJCI and its affiliates for any losses it might suffer related to the Talc Claims.

*Id.* ¶¶ 22–23.

At the time of the 2021 Corporate Restructuring, the Debtor received the following assets:

a) Old JJCI's rights and interests as payee under the Funding Agreement;

b) A bank account and approximately $6 million in cash;

c) All contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, insurance coverage rights, service contracts, and engagement and retention contracts, if any;

d) All equity interests in Royalty A&M, which owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party

---

[11] Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (i) at any time when there is no bankruptcy case and (ii) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. First Day Decl. ¶ 27. In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (i) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (ii) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding. *Id.*

NAI-1532160454

sales of certain products, a business that is projected to generate approximately $50 million in revenue per year over the next five years and has the ability to borrow up to $50 million from J&J on terms consistent to those provided to other J&J affiliates;

e)  Causes of action that relate to the assets and liabilities allocated to the Debtor;

f)  Privileges that relate to the assets and liabilities allocated to the Debtor; and

g)  Records that relate to the assets and liabilities allocated to the Debtor.

*Id.* ¶¶ 24, 26, 30.

In total, the Debtor's value is approximately $373.1 million, without taking into account the Funding Agreement with New JJCI and J&J or insurance.  *Id.* ¶ 26.

### **The Debtor's Talc Claims**

As this Court is aware, cosmetic talc litigation against the Debtor has focused primarily on JOHNSON'S® Baby Powder and Shower-to-Shower products (hereinafter, "Johnson's Baby Powder")[12] as a purported cause of ovarian cancer and mesothelioma.  First Day Decl. ¶ 32.  For over 125 years, Johnson's Baby Powder has been used by hundreds of millions of consumers worldwide.  *Id.*

J&J, a New Jersey company incorporated in 1887, first began selling Johnson's Baby Powder in 1894, launching its baby-care line of products.  *Id.* ¶ 10.  In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder.  *Id.*  In 1979, J&J transferred all its assets and liabilities associated with the baby

---

[12]  While Talc Claims generally focus on Johnson's Baby Power, certain Talc Claims have also identified Shower to Shower, a talc-based deodorizing product that was previously produced by J&J/Old JJCI before being sold to a competitor in 2012.  *See Debtor's Informational Brief*, No. 21-30589, ECF No. 3 at 10 n.24; *see also* Supp. Kim Decl. ¶ 12 ("In 2012, Old JJCI sold the assets and liabilities relating to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc.," one of the Bausch Defendants).  In general, when referenced by claimants, Shower to Shower is treated interchangeably with Johnson's Baby Powder because both are cosmetic products that contain talc as a primary or major ingredient.  *See Debtor's Informational Brief*, No. 21-30589, ECF No. 3 at 10 n.24.

products division to Old JJCI.  *Id.*  Following this transaction, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder, and instead, Old JJCI manufactured and sold Johnson's Baby Powder.  *Id.* ¶¶ 10, 33.  Old JJCI is responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other disease.  *Id.* ¶¶ 9–15.

As set forth in the Debtor's Informational Brief, No. 21-30589, ECF No. 3, filed on the Petition Date, the Debtor stands behind the safety of the Talc Products and maintains, based on decades of internal and third party studies and testing, that they are not a cause of either ovarian cancer or mesothelioma.  On May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada.  *Id.* ¶ 33.  The decision was based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder.[13]  *Id.*

As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in the federal multi-district litigation in New Jersey and approximately 3,300 cases in multiple state-court jurisdictions across the country.  *Id.* ¶ 42.  In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio.  *Id.* ¶ 44.

---

[13]      In 2012, Old JJCI sold the assets and liabilities relating to certain products, including Shower to Shower, to Valeant Pharmaceuticals International, Inc.  Supp. Kim Decl. ¶ 12.  It is the Debtor's understanding that Shower to Shower sold in the U.S. and Canada no longer includes talc.  *See* Riley Griffin, Jef Feeley, *Johnson & Johnson Ending Sale of Talcum Powder Products in U.S.*, Time, May 20, 2020, https://time.com/5839391/johnson-johnson-ends-talcum-baby-powder/.

NAI-1532160454

Even though J&J has not manufactured or sold talc-containing products since prior to 1979, in virtually every lawsuit asserting a Talc Claim, the Talc Claim is asserted against both Old JJCI and J&J.  In many jurisdictions, the plaintiffs seek to hold Old JJCI and J&J jointly and severally liable for such talc claims.  The plaintiffs rarely, if ever, attempt to differentiate between talc-containing products sold by J&J and talc-containing products sold by Old JJCI.  Supp. Kim Decl. ¶ 6.

## **The Debtor's Indemnified Parties**

### *Indemnity of J&J*

In 1979, J&J transferred all its assets associated with the Baby Products division to Johnson & Johnson Baby Products ("J&J Baby Products").  First Day Decl. ¶¶ 10–14.  In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division.  Supp. Kim Decl. ¶ 5; N.J. Mem. Op. at 297.  As the Court has concluded, the assumption included "all liabilities, including contingent and future product liability claims." N.J. Mem. Op. at 309.  Over the next few decades, nearly all assets[14] of the Baby Products division were transferred in a series of transactions and mergers, ultimately resting with Old JJCI.  First Day Decl. ¶¶ 10–14; N.J. Mem. Op. at 297.  Following these intercompany transactions, Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing baby powder caused ovarian cancer and mesothelioma.  First Day Decl. ¶¶ 15, 32; N.J. Mem. Op. at 297.  In addition, through a series of transfers and indemnification agreements, Old JJCI also assumed responsibility for all claims alleging that "Shower to Shower" caused cancer or other diseases.  N.J. Mem. Op. at 297.  "Thus, in 1979, J&J Baby Products became the real party in interest for all actions suits or proceedings relating to the talc previously sold by J&J or in any

---

[14]    The only exception was assets allocated to the diaper program.

way arising out of the talc business being transferred.  And, as a result of a series of transactions

culminating in the 2021 Corporate Restructuring, the Debtor assumed that liability and

substituted in as the real party in interest." *Id.* at 311.

### *Indemnity of the Bausch Defendants (NM State Action)*

Old JJCI also agreed to indemnify certain transaction counterparties for liability

arising from the sale of Talc Products, including the Bausch Defendants in the NM State Action.

Supp. Kim Decl. ¶ 11; Adv. Pro. No. 21-03032, ECF No. 2, App. B; Kim Decl. ¶ 20.  In 2012,

Old JJCI sold the assets and liabilities relating to certain products to Valeant Pharmaceuticals

International, Inc. ("Valeant").  Supp. Kim Decl. ¶ 12.  Thereafter, in 2019, Old JJCI and Valeant

(now known as Bausch Health Companies Inc., one of the Bausch Defendants in the NM State

Action) entered into an indemnification agreement.  *Id.*  Pursuant to that indemnification

agreement, Old JJCI agreed to indemnify Valeant for, among other things, consumer protection

actions commenced by state attorneys general for conduct through September 9, 2012.  Kim

Decl. ¶ 20.

### *Claims Identical as to J&J, Old JJCI, and the Bausch Defendants (NM State Action)*

New Mexico's claims against the Bausch Defendants, Old JJCI and J&J are

generally the same.  *Id.* ¶ 7.  New Mexico alleges that all the defendants in the NM State Action

are liable in connection with the marketing and sale of talc products, and it has asserted the same

causes of actions collectively against all defendants, with the exception of the false advertising

claim under the New Mexico False Advertising Act, which is only brought against Old JJCI and

J&J.  Ex. 1, New Mexico FAC ¶¶ 6–7, 119–204, 218–21; *see also id.* ¶¶ 205–17.

### **The Debtor's Decision to File for Chapter 11 Reorganization**

Old JJCI and J&J have consistently asserted that there is no scientific or other

support for the plaintiffs' allegations that Johnson's Baby Powder was either contaminated with

-23-

asbestos, or was a cause of ovarian cancer or mesothelioma.  In cases litigated to date, Old JJCI

and J&J had substantial success, obtaining dismissals of roughly 1,300 ovarian cancer and over

250 mesothelioma cases without payment and achieving 16 key defense verdicts.  First Day

Decl. ¶ 38.  Old JJCI also succeeded in securing reversals of many plaintiff verdicts on appeal.

*Id.*  Despite these results—and the lack of any real proof that its product was unsafe—Old JJCI

also suffered a number of verdicts that contained unpredictable and wildly divergent

compensatory and punitive damages awards.  *Id.*  In addition, prior to the commencement of this

case, Old JJCI had incurred nearly $1 billion in defending a flood of personal-injury lawsuits

relating to alleged talc exposure, nearly all of which was spent in only the last five years.  *Id.* ¶

40.  In the months prior to the Petition Date, Old JJCI was paying anywhere from $10 million to

$20 million monthly in defense costs.  *Id.*  And cosmetic talc litigation against the Debtor was

anticipated to grow for decades more, as were the extraordinary costs of resolving tens of

thousands of expected claims.  *Id.* ¶ 41.

The status quo was untenable given the cost, burden, uncertainty, and anticipated

duration of the cosmetic talc litigation.  The Chapter 11 Case is the only available option to

appropriately assess, resolve, and administer the current and future talc-related claims in an

efficient and equitable manner.  *Id.* ¶ 58.  As a result, the Debtor filed its voluntary petition for

relief under chapter 11 of the Bankruptcy Code in the N.C. Bankruptcy Court on October 14,

2021.

### The Talc Claim Temporary Restraining Order and Preliminary Injunction

On October 21, 2021, the Debtor commenced an adversary proceeding in the

Chapter 11 Case and filed a motion, Adv. Pro. No. 21-03032, ECF No. 2 (the "First PI Motion"),

seeking (i) a declaration that the automatic stay applies to prohibit the commencement or

continuation of the Talc Claims against the Protected Parties, (including J&J, Old JJCI, New

-24-

JJCI, third-party retailers who sold Old JJCI's talc-containing products, indemnified parties, and others) while its Chapter 11 Case remains pending; and (ii) a preliminary injunction under section 105(a) of the Bankruptcy Code to enjoin the commencement or prosecution of actions outside of the Chapter 11 Case.  Various parties filed objections to the First PI Motion, Adv. Pro. No. 21-03032, ECF Nos. 49–50, and the Debtor filed a reply, Adv. Pro. No. 21-03032, ECF No. 58.

The N.C. Bankruptcy Court granted a temporary restraining order prohibiting and enjoining the prosecution of Talc Claims against the Debtor and Old JJCI and scheduled a further hearing on the First PI Motion, following discovery.  Adv. Pro. No. 21-03032, ECF No. 28.  Thereafter, on November 15, 2021, the N.C. Bankruptcy Court entered an order preliminarily determining that the automatic stay prohibited the commencement or continuation of the Talc Claims against the non-debtor parties and preliminarily enjoining the same for a period of 60 days.  W.D.N.C. Prelim. Inj. Order, ¶ 2.

By an order entered on November 16, 2021, the N.C. Bankruptcy Court transferred the Chapter 11 Case and the adversary proceeding to the District Court, including the decision of whether to extend the relief granted by the Initial PI Order, and the Chapter 11 Case was automatically referred to this Court.  *See* No. 21-30589, ECF No. 416.

Following additional briefing and discovery in connection with the relief requested in the First PI Motion, the Court held an evidentiary hearing on extending the relief granted by the Initial PI Order on February 18, 2022.  On February 25, 2022, the Court issued its Memorandum Opinion, Adv. Pro. No. 21-03032, ECF No. 184, providing that it would extend the relief granted under the Initial PI Order, including the issuance of a preliminary injunction with respect to the Talc Claims, for the duration of the Chapter 11 Case, subject to the Court

revisiting continuation of the automatic stay and the preliminary injunction on June 29, 2022, and every four months thereafter.[15]  N.J. Mem. Op. at 323–24.  The corresponding preliminary injunction order [ECF No. 187] (the "PI Order"), does not expressly address the claims of governmental entities because such entities were not parties to the adversary proceeding.

On July 1, 2022, the Court entered a text order adjourning the hearing on the continuation of the preliminary injunction and automatic stay against third parties to July 6, 2022.  At the request of the Talc Committee, the Court subsequently further adjourned the hearing to July 26, 2022.  [ECF No. 2609].

From the outset of the Chapter 11 Case, the Debtor has repeatedly expressed its desire to engage in mediation with the holders of Talc Claims to facilitate the establishment and funding of a trust to resolve the Chapter 11 Case and provide equitable recoveries to creditors. Although any mediation process was delayed pending the Court's ruling on the Motions to Dismiss filed in the Chapter 11 Case, promptly following the denial of those motions, the Debtor renewed its request for mediation.  On March 18, 2022, the Bankruptcy Court entered the Order Establishing Mediation Protocol.  On May 27, 2022, the Court appointed a separate mediator to assist with mediation with respect to, among other things, the states' consumer protection claims. [ECF No. 2370].   Mediation efforts are ongoing.

---

[15]    On March 4, 2022, the Court entered an order (Adv. Pro. 21-03032, ECF No. 187) granting the requested relief consistent with the Memorandum Opinion.  Also on February 25, 2022, the Court entered an opinion regarding its denial of motions to dismiss (together, the "Motions to Dismiss") filed by the Official Committee of Talc Claimants, (No. 21-30589, ECF 632) and the law firm of Arnold & Itkin, LLP (No. 21-30589, ECF No. 766).  *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  The Court entered an order on March 2, 2022 (No. 21-30589, ECF No. 1603) formally denying the Motions to Dismiss.

NAI-1532160454

### The New Mexico State Action

New Mexico initiated the NM State Action on January 2, 2020 and filed its First Amended Complaint on March 3, 2020. *See* Kim Decl. ¶ 5; Ex. 1, New Mexico FAC. New Mexico asserted the following claims in connection with the marketing, sale, and promotion of the Talc Products: (1) violation of the New Mexico Unfair Practices Act, NMSA 1978, Section 57-12-21; (2) violation of the New Mexico Medicaid Fraud Act, NMSA 1978, Section 30-44-7; (3) violation of the New Mexico Fraud Against the Taxpayers Act, NMSA 1978, Section 44-9-3; (4) violation of the New Mexico False Advertising Act, NMSA 1978, Section 57-15-1[16]; (5) fraud and negligent misrepresentation; (6) negligence; and (7) unjust enrichment. Ex. 1, New Mexico FAC ¶¶ 1, 119–217. Based on these claims, New Mexico sought damages, restitution, civil penalties, punitive damages, attorneys' fees and costs, and declaratory and injunctive relief. *Id.* ¶¶ 218–21 & at 59–60. On September 22, 2020, the First Judicial District Court for the County of Santa Fe, New Mexico (the "New Mexico Court") granted the State Protected Parties' motions to dismiss the claims under the New Mexico Medicaid Fraud Act and the New Mexico Fraud Against the Taxpayers Act. *See* Ex. 14, Sept. 22, 2020 Order on Old JJCI's and J&J's Mot. to Dismiss; Ex. 15, Sept. 22, 2020 Order on the Bausch Def.'s Mot. to Dismiss.

On April 8, 2022, New Mexico agreed to stay the NM State Action for sixty days, to allow the Debtor to engage in mediation efforts with the Mediating States and the Talc Claimants. Ex. 9, Apr. 8, 2022 Joint Expedited Mot. to Stay Proceedings; Ex. 10, Apr. 8, 2022 Order. That agreed stay expired, and New Mexico now insists on moving forward with litigation. To that end, on June 17, 2022, New Mexico filed a motion requesting a scheduling

---

[16] New Mexico did not assert a claim under the New Mexico False Advertising Act against the Bausch Defendants.

order that sets trial for April 2023 and numerous discovery and motion deadlines in the

upcoming months.  Ex. 11, June 17, 2022 Mot. to Modify Scheduling Order.  Under New

Mexico's proposed scheduling order, the parties would be required, among other things, to

mediate by August 29, 2022, to exchange non-expert witness lists by September 1, 2022, and to

complete all discovery by November 30, 2022.  *Id.* at 3.  Moreover, the corporate representative

deposition of J&J and Old JJCI is set for July 26, 2022.  Kim Decl. ¶ 8; Ex. 12, New Mexico's

Second Am. Notices of Dep. to Old JJCI and J&J.[17]

### The Mississippi State Action

Mississippi initiated the MS State Action on August 22, 2014.  *See* Ex. 2,

Mississippi Compl.  Mississippi alleges J&J and Old JJCI[18] committed unfair and deceptive

trade practices in violation of the Mississippi Consumer Protection Act, Miss. Code § 75-24-5,

related to the manufacturing, sale, and marketing of the Talc Products by failing to warn and

failing to disclose a causal link between these talc products and ovarian cancer.  *Id.* ¶¶ 3, 5, 96.[19]

Mississippi also contends that J&J and Old JJCI share such a unity of interest in ownership that

they are the alter egos of one another.  *Id.* ¶ 16.  Mississippi further claims that J&J and Old JJCI

acted as the agent of one another and acted within the course and scope of the agency, and that

they acted in concert and/or aided and abetted each other and conspired to engage in the

violations of the Mississippi Consumer Protection Act.  *Id.* ¶ 17.  Mississippi seeks damages,

---

[17]  On March 16, 2022, prior to the entry of the temporary stay of the NM State Action, the New Mexico Court entered an order compelling J&J and Old JJCI to comply with New Mexico's notices for corporate representative depositions.  Ex. 13, Mar. 16, 2022 Order.

[18]  The two Bausch Defendants originally named in the MS State Action (Valeant Pharmaceuticals International, Inc. and Valeant Pharmaceuticals North America, Inc.) settled the claims against them in the MS State Action and were dismissed from the case on January 8, 2020.  *See* Ex. 16, Jan. 8, 2020 Final Order of Dismissal.

[19]  On October 29, 2018, Mississippi filed a motion for leave to amend its complaint, but the motion remains pending.  *See* Ex. 17, Oct. 29, 2018 Mot. for Leave to Amend Compl.

NAI-1532160454

civil penalties, punitive damages, an accounting and disgorgement of ill-gotten revenues, injunctive relief, attorneys' fees, investigative and other costs, and prejudgment interest. *Id.* at 31–32.

On December 18, 2018, the Chancery Court of the First Judicial District of Hinds County, Mississippi (the "Mississippi Court") denied J&J's and Old JJCI's motion for summary judgment. Ex. 18, Dec. 18, 2018 Order. On January 7, 2019, J&J and Old JJCI filed a petition for an interlocutory appeal to the Mississippi Supreme Court, arguing that Mississippi's claims based on the labeling of the talc products are outside the scope of the Mississippi Consumer Protection Act and/or are preempted by the FDA's denial of a Citizen Petition seeking to require ovarian cancer warnings on the labels of all talc products. Ex. 19, Jan. 7, 2019 Petition. The Mississippi Supreme Court granted the petition on October 3, 2019. Ex. 20, Oct. 3, 2019 Order. On April 1, 2021, the Mississippi Supreme Court affirmed the trial court's denial of summary judgment. *See Johnson & Johnson v. Fitch ex rel. State*, 315 So. 3d 1017 (Miss.), *cert. denied sub nom. Johnson & Johnson v. Fitch*, 142 S. Ct. 732 (2021). Thereafter, J&J and Old JJCI filed a petition for writ of certiorari with the United States Supreme Court challenging the Mississippi Supreme Court's ruling on preemption, which was denied on December 12, 2021. *See Johnson & Johnson v. Fitch*, 142 S. Ct. 732 (2021).

After the case returned to the trial court, Mississippi moved for a trial setting. Ex. 21, June 15, 2021 Mot. for Trial Setting. J&J and Old JJCI objected to any trial setting due to Mississippi's pending motion for leave to amend its complaint, which left uncertainty as to the scope of the case. Ex. 22, June 29, 2021 Resp. to Mot. for Trial Setting. On October 18, 2021, J&J & Old JJCI filed a notice of the Debtor's bankruptcy filing and stay of proceedings. Ex. 23, Oct. 18, 2021 Notice of Bankruptcy. Mississippi opposed the stay, contending that the police

power exception prevents the automatic stay of the MS State Action.  Ex. 6, Nov. 5, 2021 Resp.

to Defs.' Notice of Bankruptcy Filing and Stay of Proceedings; *see also* Ex. 24, Nov. 12, 2021

Reply in Supp. of Defs.' Notice of Bankruptcy Filing; Ex. 25, Nov. 26, 2021 Suppl. to Reply in

Supp. of Defs.' Notice of Bankruptcy Filing; Ex. 26, Dec. 3, 2021 Resp. to Defs.' Suppl. to

Reply in Supp. of Defs.' Notice of Bankruptcy Filing.

On January 18, 2022, the Mississippi Court ruled that the W.D.N.C. Preliminary

Injunction and bankruptcy stay did not apply to the MS State Action, reasoning that the

injunction prohibited a specific list of named parties from pursuing talc-related claims, but that

the prohibition excluded actions brought by governmental entities.  Ex. 7, Jan. 18, 2022 Order at

1–2.  The Mississippi Court further ordered the parties to obtain a trial setting.  *Id.* at 2.  On

February 10, 2022, the Mississippi Court allowed the parties a brief stay and set the case for trial

during the period from February 17, 2023 to March 10, 2023.  Ex. 27, Feb. 10, 2022 Order.

Mississippi subsequently joined the Ad Hoc Committee and agreed to temporarily stay its

litigation.  Kim Decl. ¶ 15.  Now, shortly after the Court approved the Debtor's reimbursement

agreement with the Ad Hoc Committee and appointed a third mediator to assist with mediation

of the states' claims, Mississippi determined to resign from the Ad Hoc Committee. *Id.*

Mississippi has demanded that a scheduling order be entered as soon as possible based on a

February 17, 2023 trial date that would require extensive fact and expert discovery to be

completed in the near term.  *Id.*  Under the proposed scheduling order, Mississippi's expert

disclosures would be due August 19, 2022, and the Debtor's and J&J's expert disclosures would

be due October 13, 2022.  *Id.*  This proposed schedule, if approved by the Mississippi Court,

would require significant expert discovery on an expedited basis and the dedication of increasing

amounts of time and resources to comply with other pretrial deadlines and prepare for trial.  *Id.*

¶¶ 15–16.  In addition, the Debtor anticipates receiving extensive discovery requests and deposition notices in the near term.  *Id.* ¶ 15.

### <u>Other State Attorney General Actions and Ad Hoc Committee</u>

In addition to New Mexico and Mississippi, the attorneys general of several other states have also initiated investigations in their respective states against Old JJCI and J&J related to the marketing, promotion, and sale of the Talc Products, all based on allegations of unfair business practices and consumer protection violations similar to those at issue in the State Actions.  Specifically, the attorneys general for the states of Arizona, North Carolina, Texas, and Washington have issued civil investigative demands, and the Maryland attorney general has issued an Administrative Subpoena for Consumer Protection.  *See* Exs. 28–32.

Like the State Actions, the investigations initiated by the attorneys general for Arizona, Maryland, North Carolina, Texas, and Washington relate to talc's safety and alleged impact on consumers, and they substantially overlap with the State Claims as well as the Talc Claims.  *See id.*  Each of these states agreed to join the Ad Hoc Committee, stay their respective investigations and engage in mediation efforts with the Debtor [ECF No. 2338 ¶¶ 9–10, 15].

The Debtor and the Mediating States are continuing to engage in mediation.  As set forth above, on May 27, 2022, the Court appointed a separate mediator to assist with mediation [ECF No. 2370], and on June 24, 2022, the Court authorized the Debtor's entry into an agreement pursuant to which the Debtor would reimburse certain of the Ad Hoc Committee's costs [ECF No. 2585].

NAI-1532160454

## ARGUMENT

Pursuant to section 105(a) of the Bankruptcy Code, the Court should enter a

preliminary injunction enjoining the States from prosecuting the State Actions to avoid an

immediate and ongoing adverse impact on the Debtor's ability to successfully negotiate,

formulate, and confirm a chapter 11 plan.  Section 105 permits a court to enjoin a governmental

civil action against a debtor even if the action might otherwise be determined to be exempt from

the automatic stay pursuant to section 362(b)(4).  *See Penn Terra Ltd.*, 733 F.2d at 273 ("The

bankruptcy court, in its discretion, may issue an appropriate injunction, even if the automatic

stay is not operative."); *In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009) (affirming

bankruptcy court's issuance of section 105(a) injunction barring state environmental agency

from fixing civil penalty owed by debtor and its former officers for alleged asbestos liability*); In

re Metro Transp. Co.*, 64 B.R. 968, 972–93 (Bankr. E.D. Pa. 1986); ("[E]ven where an automatic

stay, per 11 U.S.C. § 362(a), is not in place, a bankruptcy court may, in its discretion, grant a

stay pursuant to 11 U.S.C. § 105(a)."); S. Rep. No. 95-989 at 51, 1978 U.S. Code Cong. & Ad.

News at 5787, 5837; H. Rep. No. 95-595 at 342, 1978 U.S. Code Cong. & Ad. News at 5963,

6298 ("The effect of an exception is not to make [an] action immune from injunction.  The court

has ample other powers to stay actions not covered by the automatic stay.  Section 105, of the

proposed title 11, derived from the Bankruptcy Act § 2a(15), grants the power to issue orders

necessary or appropriate to carry out the provisions of title 11.  The district court and the

bankruptcy court as its adjunct have all the traditional injunctive powers of a court of

equity. . . .").[20]

---

[20]    *See also* Takata PI Ruling at 24–30 (enjoining lawsuits brought by state governments under section 105 and
explaining "it is a core principle of the U.S. Bankruptcy laws that proceedings in other forums may be
stayed in order to afford a breathing spell and, more importantly, to provide for consistent treatment of
similarly situated stakeholders. Vindication of that core principle requires the imposition of a temporary

NAI-1532160454

## I.    THE COURT HAS SUBJECT MATTER JURISDICTION

Bankruptcy courts possess subject matter jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The Court has jurisdiction over this proceeding because it (i) arises under, (ii) arises in, and (iii) is related to the Chapter 11 Case. Proceedings arising under and arising in a chapter 11 case are considered "core" proceedings, whereas proceedings related to a chapter 11 case are considered "non-core." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)).

### A.    The Court Has Both "Arising Under" and "Arising In" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and That Would Have No Existence Outside of Bankruptcy

The Debtor's request to enjoin the State Actions under section 105(a) "arises under" the Bankruptcy Code. "A case 'arises under' title 11 'if it invokes a substantive right provided by title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) (quoting *Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.)*, 72 F.3d 1171, 1178 (3d Cir. 1996)). Section 105(a) does not independently confer subject matter jurisdiction. *See In re W.R. Grace & Co.*, 591 F.3d 164, 170–71 (3d Cir. 2009) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004)) (holding that, because section 105(a) does not provide an independent source of federal subject matter jurisdiction, a court must establish that it has subject matter jurisdiction prior to issuing an injunction under section 105(a)). However, for the reasons described below, the Debtor's request to temporarily enjoin the State Actions for the duration of the Chapter 11 Case is necessary to preserve and effectuate the automatic stay, which is "a substantive right provided

---

stay upon the state actions."); *In re Mallinckrodt PLC*, Adv. Pro. No. 20-50850, ECF No. 170 (Bankr. D. Del. Nov. 25, 2020) (enjoining lawsuits brought by state governments under section 105); *In re Purdue Pharma L.P.*, Adv. Pro. No. 19-08289 (RDD), ECF No. 89 (Bankr. S.D.N.Y. Oct. 18, 2019) (same).

NAI-1532160454

by the Bankruptcy Code." *Roggio v. Roggio* (*In re Roggio*), 612 B.R. 655, 660 (Bankr. M.D. Pa.

2020).  Thus, the Court has "arising under" jurisdiction to consider the Debtor's request for a

section 105(a) injunction to temporarily stay the State Actions because "common sense indicates

that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability

of the automatic stay, then it has jurisdiction over a related motion for preliminary injunctive

relief." *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *5 (Bankr. E.D.N.Y. Dec.

21, 2012).

        The Court independently has "arising in" jurisdiction to consider the Debtor's

request for injunctive relief.  A proceeding "arises in" a bankruptcy case when it would "have no

existence outside of the bankruptcy." *In re G-I Holdings, Inc.* (*G-I Holdings I*), 580 B.R. 388,

415 (Bankr. D.N.J. 2018) (quoting *Stoe*, 436 F.3d at 261).  A request for a section 105(a)

injunction, tied to and lasting only during the pendency of a debtor's bankruptcy case—like the

Debtor's request here—arises only in bankruptcy cases. *See In re Monroe Well Serv., Inc.*,

67 B.R. 746, 753 n.9 (Bankr. E.D. Pa. 1986) (explaining that "a proceeding in which a section

105 injunction is sought" is "a proceeding 'arising in' title 11"); *Brier Creek*, 486 B.R. at 685

(holding that "arising in" jurisdiction existed because "a § 105 injunction arises only in

bankruptcy cases in that such an injunction would have no existence outside of bankruptcy").

    **B.**    **The Court Also Has "Related to" Jurisdiction Over the State Actions**

        At a minimum, however, the Court has "related to" jurisdiction with respect to the

request for an injunction.  "Related to" jurisdiction exists over proceedings involving

non-debtors when "the outcome of that proceeding could conceivably have any effect on the

estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.

1984); *see also In re Bestwall*, 606 B.R. 243, 249 (Bankr. W.D.N.C. 2019) (discussing *Pacor*

and explaining that "courts have made clear that [the *Pacor*] standard applies whether any claims

-34-

against a third party are alleged to be 'direct' or 'derivative'" in the mass tort context).  More

specifically, an action against a non-debtor "is related to bankruptcy if the outcome could alter

the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and

which in any way impacts upon the handling and administration of the bankruptcy estate." *Id.*

Here, the State Actions would, at the very least, have an effect on the Debtor's

estate and reorganization.  First, given the States' apparent positions that the State Actions are

not automatically stayed, in the absence of the requested injunction, the State Actions will

continue to proceed as to the Debtor.  Additionally, as discussed below, the Talc Claims and the

State Claims are intimately intertwined to such an extent that permitting the State Actions to

proceed, as to any of the Parties, will jeopardize the legal interests of the Debtor that are intended

to be resolved in the Chapter 11 Case.  Indeed, continuation of the State Actions could result in

determinations of issues, and an evidentiary record, that could materially impact the potential

value of the Talc Claims and impact negotiations, including with other states similarly situated to

New Mexico and Mississippi, regarding a consensual plan of reorganization.  Thus, the

continuation of the State Actions while the Debtor's bankruptcy is ongoing, and negotiations

among numerous key constituencies are underway, interferes with the Debtor's legal interests

and rights in a way that impacts the administration and handling of its bankruptcy estate.

"Related to" jurisdiction exists here.  *See* N.J. Mem. Op. at 303 (finding that the Court possessed

"related to" jurisdiction with respect to actions seeking to prosecute Talc Claims against non-

debtor entities because "litigation of talc claims against the Protected Parties has a 'conceivable

effect' on the bankruptcy estate").

NAI-1532160454

## II.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(a) TO ENJOIN NEW MEXICO'S AND MISSISSIPPI'S CONTINUED PROSECUTION OF THE STATE CLAIMS

Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  That provision "'empowers the bankruptcy court to enjoin parties other than the bankrupt' from commencing or continuing litigation."  *A.H. Robins*, 788 F.2d at 1002 (quoting *Otero Mills*, 25 B.R. at 1020).  This includes "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process" of a bankruptcy case.  *Johns-Manville I*, 26 B.R. at 425 (quoting 2 *Collier on Bankruptcy* § 362.05 (15th ed. 1982)).  Section 105 authorizes bankruptcy courts to enjoin actions brought by governmental entities where those actions interfere with or impede a debtor's reorganization or pose a threat to the debtor's estate.  *See Penn Terra Ltd.*, 733 F.2d at 273 ("The bankruptcy court, in its discretion, may issue an appropriate injunction, even if the automatic stay is not operative."); *see also N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d 695, 699 (8th Cir. 1985) ("It is of particular importance that bankruptcy courts be able to determine factually, on a case by case basis, whether regulatory proceedings will threaten the assets of the estate because otherwise the court's power to preserve the estate over which it presides is illusory . . . ."); *In re Sec. Gas & Oil, Inc.*, 70 B.R. 786, 793 (Bankr. N.D. Cal. 1987) ("Issuance of an injunction under Section 105 is appropriate where the threatened state activity would unduly interfere with the proper functioning of the Bankruptcy Code.").

Assessing whether issuance of a section 105 injunction is proper requires a broad inquiry into "whether the litigation 'could interfere with the reorganization of the debtor' or 'would interfere with, deplete[,] or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan

NAI-1532160454

of reorganization.'" *In re W.R. Grace Co.*, 115 F. App'x at 570 (first quoting *In re A.H. Robins
Co.*, 828 F.2d at 1025), then quoting *Johns-Manville I*, 26 B.R. at 436); *A.H. Robins*, 788 F.2d at
1003 (quoting *Johns-Manville I*, 26 B.R. at 425) (explaining that a court may use its
section 105(a) authority to enjoin parties from prosecuting actions that "might interfere in the
rehabilitative process whether in a liquidation or in a reorganization case"); *W.R. Grace & Co. v.
Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 30 (Bankr. D. Del. 2008) (explaining that
enjoining third-party litigation is appropriate where, among other things, "the third-party action
will have an adverse impact on the debtor's ability to accomplish reorganization").

Acting under the broad authority granted by section 105(a), courts have
consistently stayed claims, including those brought by governmental entities, against non-debtor
entities, including a debtor's affiliates, both in mass tort and non-mass tort bankruptcies, to
maintain the integrity of the debtor's estate.[21]  Under section 105, "the Court may issue or extend
stays to enjoin a variety of proceedings which will have an adverse impact on the Debtor's
ability to formulate a Chapter 11 plan." *A.H. Robins*, 788 F.2d at 1003 (alteration in original)
(quoting *In re Johns-Manville Corp. (Johns-Manville II)*, 40 B.R. 219, 226 (S.D.N.Y. 1984)).

The authority to stay proceedings involving non-debtors extends to actions that
are independent of claims against the Debtor so long as such proceedings could have an adverse
impact on the Debtor's reorganization. *See In re Purdue Pharm. L.P.*, 619 B.R. 38, 57–62

---

[21]    As to mass tort bankruptcies, *see In re Purdue Pharma L.P.*, No. 19-23649, Adv. No. 19-08289, ECF
No. 82 (Bankr. S.D.N.Y. Oct. 11, 2019) *aff'd* 619 B.R. 38 (S.D.N.Y. 2020); *In re USA Gymnastics*,
No. 18-09108, Adv. No. 19-50075 [Adv. Pro. ECF No. 71] (Bankr. S.D. Ind. Apr. 22, 2019); *In re TK
Holdings Inc.*, Case No. 17-50880, Adv. No. 17-50880, ECF No. 63 (Bankr. D. Del. Aug. 22, 2017); *In re
Lyondell Chem. Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009); *A.H. Robins*, 788 F.2d at 999-1000.  As to non-
mass tort bankruptcies, *see In re Am. Film Techs., Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying
claims against a debtor's directors); *In re Family Health Servs., Inc.*, 105 B.R. 937, 942–43 (Bankr. C.D.
Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor
HMO); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that
injunction of suits against non-debtor partners should issue); *In re Myerson & Kuhn*, 121 B.R. 145, 160
(Bankr. S.D.N.Y. 1990) (enjoining suits against non-debtor partners).

NAI-1532160454

(S.D.N.Y. 2020) (affirming bankruptcy court's issuance of preliminary injunction to halt pending

state and private actions against debtors and certain non-debtors, including former or current

owners, directors, officers and other associated entities and including claims that were allegedly

independent or not derivative of the debtors); Order Pursuant to 11 U.S.C. § 105 Granting in Part

and Denying in Part Debtor's Mot. for a Prelim. Inj., *TK Holdings Inc. v. State of Hawai'i (In re

TK Holdings Inc.)*, No. 17-11375, Adv. Pro. No. 17-50880, ECF No. 63 (Bankr. D. Del. Aug.

22, 2017) (enjoining state and private actions against non-debtors for 90 days, subject to further

extensions, notwithstanding arguments that claims against non-debtors were direct claims).

       In determining whether to grant preliminary injunctive relief under section 105(a),

courts in the Third Circuit generally apply the traditional four-factor test for a preliminary

injunction, tailored to the bankruptcy context. *See In re Union Trust Phila., LLC (Union Trust

II)*, 460 B.R. 644, 660 (E.D. Pa. 2011); *In re Union Tr. Philadelphia, LLC*, 465 B.R. 765, 771

& n.4 (Bankr. E.D. Pa.), *aff'd*, 460 B.R. 644 (E.D. Pa. 2011).  The four factors are:  (1) the

debtor's reasonable likelihood of a successful reorganization; (2) the imminent risk of irreparable

harm to the debtor's estate in the absence of an injunction; (3) the balance of harms between

debtor and the nonmoving party; and (4) whether the public interest weighs in favor of an

injunction. *Union Trust II*, 460 B.R. at 660; *see also Aldrich Pump*, 2021 WL 3729335, at \*33;

*DBMP*, 2021 WL 3552350, at \*38.  Movants must satisfy all four factors to obtain relief.  *Union

Trust II*, 460 B.R. at 660; *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal

Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (explaining that each preliminary injunction

factor must be satisfied).  Here, the preliminary injunction factors all support enjoining the State

Actions.

NAI-1532160454

**A.      The Debtor Has a Realistic Possibility of a Successful Reorganization.**

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." N.J. Mem. Op. at 320 (quoting *Union Trust II*, 460 B.R. at 660); *see also In re G-I Holdings Inc.*, 420 B.R. 216, 281 (Bankr. D.N.J. 2009) (evaluating the "reasonable likelihood of a successful plan of reorganization"). "[T]o demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty." N.J. Mem. Op. at 320 (citing *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377 (3d Cir. 2013) (Jordan, J., dissenting) *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (collecting cases)). Courts have "consistently recognize[d] that satisfying this factor does not set a high bar." *DBMP*, 2021 WL 3552350, at *39; *see also In re Bestwall*, 606 B.R. at 254.

This Court has already determined that the Debtor has satisfied its burden with respect to this factor. *See* N.J. Mem. Op. at 320; *see also* Hall Mem. Op. at *7 (concluding "Debtor has met its burden" to show a realistic possibility of successfully reorganizing). And there is no reason for the Court to revisit that determination at this point. The Debtor entered bankruptcy in good faith to permanently, fully, and equitably resolve current and future talc-related claims against it through the establishment of a trust. The Debtor has ample funding to do so. The Debtor's aggregate value (excluding insurance assets and the value of the Funding Agreement) is approximately $373.1 million. First Day Decl. ¶ 26. And to the extent its assets (including insurance) are insufficient, it has access to additional funds through the Funding Agreement with J&J and New JJCI. *Id.* These assets should be sufficient to support the reorganization and the creation of a trust to resolve the Debtor's talc-related liabilities.

-39-

The Debtor has favorable prospects for resolving the Talc Claims through a

reorganization that conforms with the Bankruptcy Code.  Similarly situated companies facing

extensive liability from mass torts have successfully used bankruptcy to resolve those claims,

and bankruptcy has been recognized as the most logical forum for doing so.  *See In re*

*Fed-Mogul Glob., Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive

alternative to the tort system for corporations [facing mass tort claims] because it permits a

global resolution and discharge of current and future liability, while claimants' interests are

protected by the bankruptcy court's power to use future earnings to compensate similarly

situated tort claimants equitably."); S. Elizabeth Gibson, *Judicial Management of Mass Tort*

*Bankruptcy Cases*, Federal Judicial Center 1 (2005), https://www.fjc.gov/content/judicial-

management-mass-tort-bankruptcy-cases-0 (noting that "bankruptcy courts have become a forum

for companies seeking the resolution of pending and threatened mass tort litigation" and that, as

of the publication date, "over seventy companies, motivated primarily by their desire to reach a

final resolution of their mass tort liabilities, have sought bankruptcy protection").  The Debtor is

committed to do the same and is in ongoing mediation with representatives of talc claimants and

the Mediating States.  Kim Decl. ¶ 23; *see also* First Day Decl. ¶ 60.

In sum, the "Debtor has explained its strategy for reorganization and has already

executed a Funding Agreement which will aid in the reorganization process, a Future Talc

Claims Representative and Mediators have been selected, and the parties are moving forward

with the mediation process."  Hall Mem. Op. at *7.  The Debtor is likely to successfully

reorganize.

### B.      The Debtor Will Be Irreparably Harmed Unless the Injunction Issues

The continued prosecution of the State Claims against the Debtor and the State

Protected Parties will irreparably harm the Debtor.  In analyzing irreparable harm, the key

NAI-1532160454

question is "whether the litigation 'could interfere with the reorganization of the debtor' or

'would interfere with, deplete or adversely affect property of [the] estates or which would

frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan

of reorganization.'" *Grace*, 115 F. App'x at 570 (first quoting *In re A.H. Robins Co.*, 828 F.2d

at 1025, then quoting *In re Johns-Manville*, 26 B.R. at 436); *Aldrich Pump*, 2021 WL 3729335,

at *33 ("[T]he critical, if not decisive, issue over whether injunctive relief should be granted is

whether and to what extent the non-debtor litigation interferes with the debtors' reorganization

efforts." (quoting *Brier Creek*, 486 B.R. at 694)).  Indeed, the Court has recently clarified that

"the mere risk of a potentially adverse impact on a debtor's bankruptcy can be sufficient to

support a preliminary injunction" and the "plaintiff's theory that the debtor would not suffer an

adverse impact should not be tested at the debtor's peril."  Hall Mem. Op. at *8.  Continued

prosecution of the State Claims will harm the Debtor's reorganization efforts in several ways.

## 1.    The State Claims Are "Inherently Intertwined" with the Talc Claims

The essence of both the State Claims and the Talc Claims is the allegation that the

talc used by Old JJCI and J&J contained asbestos or was otherwise harmful.  In the NM State

Action, New Mexico brings claims for violations of the New Mexico Unfair Practices Act and

New Mexico False Advertising Act, as well as fraud and negligent misrepresentation,

negligence, and unjust enrichment, based on the allegation that the State Protected Parties

engaged in unfair business practices and made false or misleading statements with respect to the

safety of the Talc Products and their alleged contamination with asbestos.  Ex. 1, New Mexico

FAC ¶¶ 119–217.  For instance, New Mexico contends that the Talc Products "were [falsely]

advertised as healthful for babies, children, and adults." *Id.* ¶ 23.  And, New Mexico alleges that

the State Protected Parties "have marketed and sold asbestos-containing talcum products"

without warning of their potentially carcinogenic or otherwise harmful effects. *Id.* ¶ 7; *see also*

-41-

*id.* ¶¶ 69, 74–75.  New Mexico also claims that the State Protected Parties "willfully, knowingly and deceptively withheld material facts regarding the risk of mesothelioma, ovarian cancer, and other cancers associated with the use of" the Talc Products.  *Id.* ¶ 179.

Mississippi likewise claims that J&J and Old JJCI engaged in unfair business practices and made false or misleading statements with respect to the safety of the Talc Products and their alleged contamination with asbestos, in violation of the Mississippi Consumer Protection Act.  *See, e.g.*, Ex. 2, Mississippi Compl. ¶ 96.  Mississippi claims that J&J and Old JJCI "have hidden and failed to warn consumers about the dangers associated with their Talc Products" and instead intended "for women to use their Talc Products in the manner most likely to result in an increased risk of ovarian cancer."  *Id.* ¶ 25.

The States thus cannot prove their claims without proving the disputed allegations that are also at the heart of the Talc Claims:  that Old JJCI's and J&J's talc products were in fact contaminated with asbestos or were otherwise harmful.  And, in point of fact, the States rely on the same underlying allegations asserted by claimants asserting Talc Claims (which, in turn, will need to be established through the same evidence).  The tables below match allegations in the State Actions to substantively identical allegations in representative examples of Talc Claim complaints (focused on alleging that Talc Products cause both ovarian cancer and mesothelioma).  The tables reveal the extensive overlap between the State Claims and the Talc Claims.

NAI-1532160454

*Comparison of New Mexico Complaint to Talc Claim Complaints*[22]

| New Mexico FAC, Ex. 1 (¶) | MDL First Amended Complaint, Ex. 33[23] (¶) *(Ovarian cancer)* | JCCP Fourth Amended Complaint, Ex. 34[24] (¶) *(Ovarian cancer)* | *Anderson* Complaint, Ex. 35[25] (page:line) *(Mesothelioma)* |
|---|---|---|---|
| **Defendants have manufactured [the Talc Products] containing Asbestos . . . that were and are continuing to be sold and marketed as safe for daily use by consumers . . . . Defendants' Talc Products were advertised as healthful for babies, children, and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a fragrance, prevent chaffing, and/or absorb moisture. (¶ 23)** | [Defendants] advertised and marketed their 'Johnson's Baby Powder' product as a symbol of 'freshness' and 'comfort,' eliminating friction on the skin, absorbing 'excess wetness' to keep skin feeling dry and comfortable, and 'clinically proven gentle and mild.' [Defendants] induced women through advertisements to dust themselves with this product[.] . . . [Defendants] advertised and marketed their 'Shower to Shower' product as safe for use by women[.] (¶¶ 25, 26) | [Defendants] advertised and marketed 'Johnson's Baby Powder' as the beacon of 'freshness' and 'comfort,' eliminating friction on the skin, absorbing 'excess wetness' helping keep skin feeling dry and comfortable, and 'clinically proven gentle and mild'. [Defendants] compelled women through advertisements to dust themselves with this product to mask odors. (¶ 79) | [D]efendants manufactured products composed of talc that were sold and marketed as safe for daily use by consumers on their person to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Defendants' products were advertised as healthful for babies, children and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture. (9:22-10:3) |
| **Defendants and the CTFA conspired . . .: (a) to withhold from** | (a) The [Defendants] labeled and advertised the PRODUCTS in the | Defendants, IMERYS and the CTFA conspired . . .: (a) to withhold from users | Defendants and CTFA conspired . . .: (a) to withhold from users of |

---

[22]     In addition to the similarities identified below, other substantial overlap exists between the New Mexico Complaint and the Talc Claim complaints.  *Compare* Ex. 1, New Mexico FAC ¶¶ 79–108, 173, 176 *with* Ex. 33, MDL First Am. Master Compl. ¶¶ 28, 30 32–35, 41–42, 44–45, 123, 146(d); *compare* Ex. 1, New Mexico FAC ¶¶ 25, 27, 29, 30, 32–35, 44–46, 48, 51, 52–53, 57, 59, 62, 66–68, 72–74, 76, 79–86, 91–100, 103, 105–08 *with* Ex. 34, JCCP Fourth Am. Compl. ¶¶ 89, 92–93, 95, 99–100, 109–10, 154–57, 161–63, 165, 180–81, 192, 194–97, 201, 203; *compare* Ex. 1, New Mexico FAC ¶¶ 24–68, 71–78 *with* Ex. 35, *Anderson* Compl. 10:4–25:12, 26:3–28:4.

[23]     *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, & Prods. Liability Litig.*, MDL No. 16-2738 (D.N.J. Mar. 15, 2017), Plaintiffs' First Amended Master Long Form Complaint and Jury Demand ("MDL First Am. Master Compl.").

[24]     *Johnson & Johnson Talcum Powder Cases*, JCCP No. 4872 (Sup. Ct., Los Angeles Cnty., Cal. Jan. 31, 2020), JCCP Plaintiffs' Fourth Amended Master Complaint for Damages and Demand for Jury Trial ("JCCP Fourth Am. Master Compl.").

[25]     *Andersen, et al. v. Boulton Insulation Co., Inc., et al.*, No. 20-2-06720-8 (Sup. Ct., Pierce Cnty., Wash. July 1, 2020), Complaint for Personal Injury ("*Anderson* Compl.").

-43-

| New Mexico FAC, Ex. 1 (¶) | MDL First Amended Complaint, Ex. 33[23] (¶) *(Ovarian cancer)* | JCCP Fourth Amended Complaint, Ex. 34[24] (¶) *(Ovarian cancer)* | *Anderson* Complaint, Ex. 35[25] (page:line) *(Mesothelioma)* |
|---|---|---|---|
| **users of their products . . . information regarding the health risks of inhaling and/or ingesting and/or perineal (genital) application of [the Talc Products] containing Asbestos . . .; b) to eliminate, suppress, or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in . . . talcum powder products; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce . . .; and (d) to falsely represent that talc . . . [was] safe and healthful for use[.] (¶ 69)** | following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable" . . .; (b) The [Defendants] advertised the product SHOWER to SHOWER to be applied "all over" . . .; (c) The [Defendants], . . . misrepresented to consumers . . . that the PRODUCTS were safe for use all over the body . . .; (d) Despite actual knowledge of the health risks of the PRODUCTS, the [Defendants] failed to disclose to the consumers . . . that the PRODUCTS were inherently dangerous and carcinogenic in nature[.] (¶¶ 145–46) | of their products—and from persons who Defendants knew and should have known would be exposed thereto— information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce . . .; and (d) to falsely represent that talc and talcum powder products, including those of Defendants, were safe for use by consumers (¶ 198) | their products . . . information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products; (b) to eliminate, suppress or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce . . .; and (d) to falsely represent that talc and talcum powder products, including those of defendants, were safe and healthful for use by consumers. (25:13-25:21) |
| **Plaintiff reasonably and in good faith relied upon the false and fraudulent representations made by Defendants and the CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens[.] (¶ 70)** | Plaintiffs reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and effective for use by women in the perineal area. (¶ 113) | Plaintiff reasonably and in good faith relied upon the false and fraudulent representations . . . made by Defendants . . . regarding the hazards of talc and talcum powder products[.] (¶ 199) | Plaintiffs reasonably and in good faith relied upon the false and fraudulent representations made by defendants and CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens[.] (25:22-26:2) |

NAI-1532160454

*Comparison of Mississippi Complaint to Talc Claim Complaints*[26]

| Mississippi Complaint, Ex. 2 (¶) | MDL First Amended Complaint, Ex. 33 (¶) *(Ovarian cancer)* | *Forrest* Complaint, Ex. 3[27] (¶) *(Ovarian cancer)* | *Roy* Complaint, Ex. 36[28] (¶) *(Mesothelioma)* |
|---|---|---|---|
| **Defendants have marketed their Talc Products for cosmetic use – as daily use powders safe for human use that are intended to maintain freshness and cleanliness, eliminate friction on the skin, and to absorb unwanted excess moisture for women. Nowhere have the Defendants warned of the increased risk of ovarian cancer linked to the perineal use of the defendants' Talc Products. (¶ 28)** | [Defendants] advertised and marketed their "Johnson's Baby Powder" product as a symbol of 'freshness' and 'comfort,' eliminating friction on the skin, absorbing 'excess wetness' to keep skin feeling dry and comfortable, and 'clinically proven gentle and mild.' . . . [Defendants] advertised and marketed their 'Shower to Shower' product as safe for use by women[.] (¶¶ 25, 26) | [Defendants] advertised and marketed their 'Johnson's Baby Powder' product as a symbol of 'freshness' and 'comfort,' eliminating friction on the skin, absorbing 'excess wetness' to keep skin feeling dry and comfortable, and 'clinically proven gentle and mild.' . . . [Defendants] did not disclose any potential risks or health hazards . . . . [Defendants] advertised and marketed their 'Shower to Shower' product as safe for use by women[.] (¶¶ 198–99) | 'Johnson's Baby Powder' has been a symbol of freshness, cleanliness, and purity. [Defendants] advertised and marketed this product as the beacon of 'freshness' and 'comfort,' eliminating friction on the skin, absorbing 'excess wetness' helping keep skin feeling dry and comfortable, and 'clinically proven gentle and mild.' . . . [Defendants] advertised and marketed the product 'Shower to Shower' as safe for use by women. (¶¶ 34–35) |
| **Defendants knew or should have known of the hazards associated with the use of Their Talc Products. (¶ 91)** | [Defendants] knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971. (¶ 70) | Defendants knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971. (¶ 240; *see also* ¶¶ 270, 273) | Defendants knew or should have known . . . of the health hazards inherent in the PRODUCTS they were manufacturing, marketing, testing, promoting, distributing and/or selling. (¶ 48) |

---

[26]   In addition to the overlap noted below, other extensive similarities exist between the Mississippi Complaint and the Talc Claim complaints. *Compare* Ex. 2, Mississippi Compl. ¶¶ 26, 31–32, 34, 36–37, 42, 44, 48, 52, 54–57, 62–72, 74, 77, 81–82, 86, 88–89 *with* Ex. 33, MDL First Am. Master Compl. ¶¶ 25–26, 28, 30, 32, 41–43, 45–47; *compare* Ex. 2, Mississippi Compl. ¶¶ 31, 32, 34, 40, 42, 44, 48, 52-53, 64, 68 *with* Ex. 3, *Forrest* Compl. ¶¶ 198–99, 201–04, 207, 209–10, 212; *compare* Ex. 2, Mississippi Compl. ¶¶ 31, 32, 34, 36, 40, 42, 48, 52, 64, 68 *with* Ex. 36, *Roy* Compl. ¶¶ 34–35, 39, 42–47, 62.

[27]   *Forrest, et al. v. Johnson & Johnson, et al.*, No. 1522-CC00419 (Circ. Ct., St. Louis, Mo. Feb. 23, 2015), Complaint and Jury Demand ("*Forrest* Compl.")

[28]   *Roy v. Colgate-Palmolive Company, et al.*, No. 2020-02718 (Dist. Ct., Parish of Orleans, La. Mar. 19, 2020), Original Petition for Damages ("*Roy* Compl.").

NAI-1532160454

| Mississippi Complaint, Ex. 2 (¶) | MDL First Amended Complaint, Ex. 33 (¶) *(Ovarian cancer)* | *Forrest* Complaint, Ex. 3[27] (¶) *(Ovarian cancer)* | *Roy* Complaint, Ex. 36[28] (¶) *(Mesothelioma)* |
|---|---|---|---|
| **Defendants had and continue to have a duty to warn about the hazards associated with the use of their Talc Products. Defendants have failed and continue to fail to inform the Public of the known catastrophic health consequences associated with the use of their Talc Products. (¶ 92)** | Defendants, though having knowledge of the increased risk of ovarian cancer associated with genital use of talc based body powder, nevertheless actively marketed the safety of the product to users and failed to inform customers . . . of a known catastrophic health hazard associated with the use of the [Talc Products.] (¶ 51) | [D]espite [Defendants'] knowledge that [the Talc Products] were carcinogenic and could lead to an increased risk of ovarian cancer . . . Defendants failed to provide adequate warning or instruction to consumers, including Plaintiffs, regarding the increased risk of ovarian cancer[.] (¶ 241) | The Defendants had a duty to warn about the health hazards associated with the use of [the Talc Products], but failed to inform customers . . . of known catastrophic health hazards . . . associated with the use of their PRODUCTS. (¶ 49) |
| **Defendants purposely procured and disseminated false, misleading, and deceptive information regarding the safety of the Talc Products to the public[.] (¶ 93)** | Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc based body powders and the PRODUCTS to the public[.] (¶ 52) | [Defendants] [c]aused to be released . . . reports containing information and statements regarding the risks of ovarian cancer which Defendants knew were incorrect, incomplete, outdated, and misleading. . . . (¶ 283(b)(iii)) | [Defendants] . . . disseminated false, misleading, and biased information regarding the safety of the PRODUCTS to the public[.] (¶ 51) |

The identity of issues between the State Claims and Talc Claims thus poses a substantial risk of collateral estoppel and evidentiary record taint, and the State Claims threaten to interfere with this proceeding and deny the Debtor the protections of chapter 11 and the opportunity to pursue a reorganization. W.D.N.C. Prelim. Inj. Order at 5–6.

This is the case regardless of whether the claims against the State Protected Parties are viewed as "direct" claims. Even allegedly direct claims against non-debtors can give rise to an identity of interests between the debtor and the non-debtors. *W.R. Grace & Co.*, 386 B.R. at 30–36 (rejecting the argument that the test for identity of interest could not be satisfied where the non-debtor was allegedly independently liable and preliminarily enjoining

-46-

actions against a non-debtor railroad company because the debtors' operations and conduct were

at the "core of the issues" raised in the actions against the non-debtor); *Mallinckrodt PLC v.*

*Conn. (In re Mallinckrodt PLC)*, No. 20-408, 2021 WL 523625, at *3, *6 (D. Del. Feb. 11, 2021)

(explaining that the non-debtors could have independent liability that would not preclude or

estop the bankruptcy court's conclusions that the claims were "inextricably intertwined" for

purposes of a preliminary injunction); *Purdue*, 619 B.R. at 45, 53 (recognizing an identity of

factual interest in allegations against the non-debtor and the debtors and fact that objectors would

rely on the same facts to prove the claims against the non-debtor as against the debtor); Tr. of

Oct. 11, 2019 Hr'g, *Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.)*, Adv. Pro.

No. 19-08289, ECF No. 87 (Bankr. S.D.N.Y. Oct. 11, 2019) at 262:4-6 (stating that even if "a

claim against a third party is independent or not derivative of the Debtors, it still may be enjoined

under proper circumstances"); *see also W.R. Grace & Co. v. Chakarian (In re W.R. Grace &*

*Co.)*, No. 01-01139, 2004 WL 954772, at *2–3 (D. Del. Apr. 29, 2004) (finding that there was an

identity of interest between the debtor and the non-debtor owner of property that was previously

owned by the debtor in litigation between two non-debtors given entitlement to contractual

indemnity).

### 2.    Collateral Estoppel Risk

The Debtor faces the risk that findings in the State Actions could bind the Debtor

and effectively establish issues with respect to the other substantially similar claims asserted by

other states.  And, due to the substantial overlap between the State Claims and the Talc Claims,

the Debtor faces the risk that findings in the State Actions could bind the Debtor and effectively

establish issues with respect to the Talc Claims through the doctrine of collateral estoppel.[29]

---

[29]    Collateral estoppel bars the re-litigation of issues where (1) the earlier suit resulted in a final judgment on
the merits; (2) the issue in question was identical to an issue actually litigated and necessary to the

This risk is underscored by the fact that collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation.  *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder class action of plaintiffs who were not parties to prior SEC litigation against the corporation).

Courts consistently have concluded that the risk of collateral estoppel warrants a stay of third-party litigation that would thwart the purposes of the automatic stay, including as to actions brought by governmental entities.  *See Purdue*, 619 B.R. at 59–62 (enjoining governmental actions because they would potentially increase liabilities, including due to collateral estoppel); Takata PI Ruling at 27 (granting injunction as to governmental proceedings in part to prevent the risk of collateral estoppel); *see also In re W.R. Grace & Co.*, 115 F. App'x at 569–70 (risk of future preclusive consequences was enough to weigh in favor of extending stay); Hall Mem. Op. at *8, *12 (risk of potentially adverse impact on a debtor's bankruptcy, such as through collateral estoppel, is sufficient to support a preliminary injunction).

So too here, the risk of collateral estoppel warrants an injunction.  If allowed to proceed with the State Actions, the States would be permitted to litigate claims substantially similar to those of the Mediating States and to litigate the same key facts—involving the same products, the same time periods, and the same alleged injuries—related to the talc liabilities of Old JJCI and J&J that are at issue with respect to the Talc Claims asserted against the Debtor. Supp. Kim Decl. ¶ 17; Kim Decl. ¶ 24.  Accordingly, any rulings or findings regarding the State Claims may bind the Debtor with respect to the Mediating States' claims and the Talc Claims.

---

judgment; and (3) the party against whom collateral estoppel is asserted was adequately represented in the prior suit.  *United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 173 (3d Cir. 2009) (quoting *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)).

NAI-1532160454

This would frustrate the Debtor's efforts to resolve the Talc Claims and the claims of the Mediating States in the Chapter 11 Case and would undermine the effect of the automatic stay applicable to Talc Claims and the Court's existing injunction orders.  Indeed, this Court has recognized that a risk of collateral estoppel exists, and it has found that such risk supports extending the stay to non-debtor third parties.  *See* N.J. Mem. Op. at 313–15.

Permitting the States to seek to indirectly establish claims against the Debtor through actions against the State Protected Parties also would place the Debtor at risk of collateral estoppel.  The States seek to hold the State Protected Parties liable based on the same general allegations:  that they engaged in the marketing, promotion, and sale of the Talc Products (which contained asbestos or were otherwise harmful) in violation of consumer protection and unfair trade practice laws.  Ex. 1, New Mexico FAC ¶¶ 6–7, 119–204, 218–21; Ex. 2, Mississippi Compl. ¶¶ 3, 5, 96.  The States make no attempt to differentiate their allegations as to each party or to define the actions for which each party is responsible.  *See id.*  Indeed, New Mexico contends broadly that "[a]t all relevant times, Defendants, and each of them, have engaged in the business of, or were successors in interest to, entities engaged in the business of" developing, producing, marketing, and conducting in a range of other conduct with respect to the sale of talc products.  Ex. 1, New Mexico FAC ¶ 6.  And Mississippi contends that J&J and Old JJCI "are the alter egos of one another" and "acted in concert and/or aided and abetted each other and conspired to engage in the common course of misconduct alleged" in the MS State Action.  Ex. 2, Mississippi Compl. ¶¶ 16–17.  Given the States' overlapping allegations as to the State Protected Parties, and in light of the similarities between the State Claims and the claims asserted by the Mediating States as well as the Talc Claims, a significant risk of collateral estoppel exists as to findings made against any of the State Protected Parties.

-49-

Courts have repeatedly recognized that the risk of collateral estoppel warrants enjoining actions against non-debtor third parties. *See Bestwall*, 606 B.R. at 256 (determining that the risks posed by the doctrines of res judicata and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates); *Am. Film Techs.*, 175 B.R. at 850–55 (staying claims against debtor's directors and holding that a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions); *In re Sudbury, Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); *Manville*, 26 B.R. at 429 (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted). These justifications plainly apply here and support enjoining the State Claims against the State Protected Parties.

### 3.    Evidentiary Prejudice

In addition to the risk of collateral estoppel, continued prosecution of the State Claims would, at the very least, create an evidentiary record that could prejudice the Debtor in connection with the claims of the Mediating States as well as the Talc Claims.

The creation of a potentially prejudicial evidentiary record in the State Actions is not a theoretical possibility. As noted above, New Mexico's proposed scheduling order would require the parties to, among other things, exchange non-expert witness lists by September 1, 2022, and to complete all discovery by November 30, 2022. Ex. 11, June 17, 2022 Mot. to Modify Scheduling Order at 3. Moreover, the corporate representative deposition of J&J and Old JJCI is set for July 26, 2022. Kim Decl. ¶ 8; Ex. 12, New Mexico's Second Am. Notices of

Dep. to Old JJCI and J&J.  Likewise, Mississippi insists on proceeding with pretrial deadlines

based on the current February 17, 2023 trial date.  Kim Decl. ¶ 15.  Based on the proposed

scheduling order for this trial date, Mississippi's expert disclosures would be due August 19,

2022, and the Debtor's and J&J's expert disclosures would be due October 13, 2022.  *Id.*  Expert

discovery and the requested depositions will directly overlap with issues that are central to the

Talc Claims and the claims of the Mediating States, including alleged asbestos product

contamination, testing, and safety issues.  *Id.* ¶ 25.  Thus, continued prosecution of the State

Claims against the Debtor or the State Protected Parties could generate an evidentiary record

concerning the alleged risks of talc that would materially affect the Talc Claims as well as the

claims of the Mediating States.  As this Court concluded:

> Because the talc-related claims against the Debtor and the
> Protected Parties implicate the same product, the same time
> period, the same alleged defect and the same alleged harm,
> it is possible that the evidentiary record developed in
> continued litigation against the Protected Parties could
> prejudice Debtor. . . .

N.J. Mem. Op. at 317; *see also* Hall Mem. Op. at *8 ("[T]he mere *possibility* of harm can be

sufficient to warrant extension of the automatic stay.").

Courts in other proceedings have likewise recognized that the need to protect

against evidentiary prejudice is grounds for an injunction, including as to actions brought by

governmental entities.  *See* Takata PI Ruling at 27 (enjoining governmental proceedings in part

to prevent the risk of record taint and to protect the debtor from the task of monitoring the

lawsuits outside the chapter 11 case); *see also DBMP*, 2021 WL 3552350, at *41 (litigating the

same claims outside of the bankruptcy "would undermine the purposes of chapter 11 and

section 524(g) to resolve all such current and future claims in a fair and equitable manner

through a chapter 11 plan"); *Bestwall*, 606 B.R. at 256 ("Litigation of the Bestwall Asbestos

Claims against the Protected Parties will create the additional risk that statement, testimony, and other evidence generated in proceedings against the Protected Parties will be used to try to establish Bestwall Asbestos Claims against the Debtor.").

As one court put it, "once a witness has testified to a fact, or what sounds like a fact, that witness may be confronted with his prior testimony under oath in a future proceeding" involving the debtor regardless of whether the debtor "was a party to the record on which the initial testimony was taken." *Johns-Manville II*, 40 B.R. at 225. The same concern arises for other evidence: "Once an admission against interest is made, under oath or otherwise, by the agent of a party, that admission stands for all time." *Id.* Regardless of what the parties to the other proceeding might "stipulate, the thousands of other claimants and cross-claimants who are after [the debtor's] assets, would be entitled to use the product of such discovery." *Id.*

The Third Circuit has likewise highlighted this concern. In *In re W.R. Grace & Co.*, the Third Circuit concluded that a section 105 injunction properly issued when considering an appeal from a district court's order vacating a bankruptcy court's order that refused to modify an injunction staying state-court litigation. 115 F. App'x at 566. In vacating the district court's order, the Third Circuit explained that the bankruptcy court "properly noted the practical difficulty and inevitable implication on the debtor of findings that might be made in [the state-court litigation]." *Id.* at 569. The court approved of the bankruptcy court's view that at the core of the state-court litigation was the "conduct" attributable to the debtor and, as a result, the state-court litigation was "implicating something on behalf of the debtor." *Id.* The Third Circuit thus concluded that the bankruptcy court's application of the stay to the state-court litigation was proper. *See id.* at 570. Here, given that the litigation would proceed against the Debtor itself (as well as the State Protected Parties), the impact on the Debtor and estate are far from hypothetical.

### 4.    The Debtor's Indemnity Obligations to the State Protected Parties

Continued prosecution of State Claims against any of the State Protected Parties would also irreparably harm the Debtor because it has indemnity obligations that could make judgments against the State Protected Parties on the State Claims tantamount to judgments against the Debtor.

First, because Old JJCI no longer exists and the Debtor is solely responsible for its talc-related claims, a judgment against Old JJCI in the State Actions would necessarily constitute a judgment against the Debtor.  Second, the Debtor has a contractual obligation to indemnify J&J in the event it is held liable for any talc-related claim, including the State Actions, pursuant to the 1979 Agreement.[30]  Finally, the Debtor has a contractual obligation to indemnify the Bausch Defendants in the NM State Action[31] for any litigation in connection with the Shower to Shower products relating to the period prior to September 9, 2012.  Kim Decl. ¶ 20.[32]

These indemnification obligations render the Debtor the real-party defendant in respect of State Claims against Old JJCI, J&J, or the Bausch Defendants.  Continued litigation against these parties in the State Actions, therefore, would undermine the protections of the automatic stay and supports issuance of an injunction.  *See A.H. Robins*, 788 F.2d at 999 (noting obligation to indemnify between the debtor and non-debtor is the typical situation that gives rise to "such identity between [them]" as to make an injunction appropriate); *id*. at 1008 (finding "no

---

[30]    Although the Funding Agreement with New JJCI and J&J serves as a backstop to ensure that the Debtor's ability to pay the Talc Claims has not been diminished as compared to that of Old JJCI, the New JJCI and J&J indemnity claims nonetheless would affect the estate because the Debtor's assets must be used first to fund a trust to pay these claims under a plan of reorganization.

[31]    The Debtor's obligations to the Bausch Defendants in the MS State Action are not discussed here, as the Bausch Defendants have settled the claims against them and have been dismissed from the MS State Action.

[32]    The Debtor also has a contractual obligation to indemnify the Bausch Defendants in the event that any of these entities are held liable for any Talc Claims.  Supp. Kim Decl. ¶ 11; Adv. Pro. No. 21-03032, ECF No. 2, App. B.

NAI-1532160454

difficulty in sustaining the grant of a preliminary injunction" that enjoined tort system plaintiffs from proceeding against the debtor's co-defendants, which included its insurer); *Bestwall*, 606 B.R. at 255 ("[A]n injunction is warranted because contractual and common law indemnification obligations would make the Debtor the real party in interest in any suit against New GP or other Protected Parties and effectively eliminate the protections of the automatic stay.); *Manville*, 26 B.R. at 436 (enjoining "any proceeding against Manville's insurers based on the alleged liability of Manville [or] its affiliates."); *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990) (affirming grant of preliminary injunction due to indemnification obligations); N.J. Mem. Op. at 307, 331.

The fact that the State Actions are brought by governmental entities does not undermine the need for an injunction; indeed, courts have enjoined state actions based in part on debtors' indemnification obligations.  *See Purdue*, 619 B.R. at 59–60 (injunction against governmental actions was proper in part because judgments in the actions would place burden on estate due to indemnification obligations); *see also* Takata PI Ruling at 14–17 (recognizing that the debtor's indemnity obligations created identity of interests among the parties, supporting an injunction against governmental proceedings).

### 5.    Potential Disruption of Settlement Efforts

Continued litigation of the State Actions also threatens the Debtor's current and anticipated settlement efforts with key constituencies.  The Debtor should not be forced to litigate key issues to this Chapter 11 Case in the State Actions—at the very same time the Debtor, the Talc Committee (which includes counsel for New Mexico in the NM State Action) and every other state that has alleged a claim similar to those alleged in the State Actions, are (and should be) focusing their efforts on attempting to achieve a settlement of those issues. Indeed, as set forth above, proving the allegations in the State Actions will directly implicate the

NAI-1532160454

Debtor's ability to resolve the Talc Claims (as well as the claims of the Mediating States) in the

Chapter 11 Case.  And continued prosecution of the State Actions against the Debtor and the

State Protected Parties outside of this Court will interfere with or impact the valuation of the Talc

Claims in settlement negotiations and in any claims estimation proceeding.  Any resolution of

the Talc Claims outside of this Court could have a material impact on the State Actions.  Talc

Claims are currently stayed under the Court's order and, for the same reasons, the State Actions

should likewise be stayed.

Litigation outside of this Chapter 11 Case of two out of the many similar claims

asserted by the Mediating States and of issues that substantially overlap with the Talc Claims

would hinder the Debtor's efforts to resolve all claims in a global and consistent manner.  New

Mexico and Mississippi should not be permitted to proceed with their lawsuits while the Debtor

is pursuing not only a resolution of the Talc Claims, but a resolution with every other state with

claims or potential claims similar to those asserted by New Mexico and Mississippi.  As this

Court has recognized, "continued litigation against the Protected Parties would undoubtedly

impair mediation efforts and negotiations within this bankruptcy[.]"  N.J. Mem. Op. at 307; *see

also* Hall Mem. Op. at *5 ("continued litigation would certainly impair ongoing mediation

efforts and negotiations within this bankruptcy").  And here, the impact would be exacerbated by

the fact that the litigation would proceed not only against the State Protected Parties but against

the Debtor itself.

Courts have acknowledged that facilitating settlement is a key basis for issuing an

injunction under section 105(a), including as to actions brought by governmental entities.  *See In

re Purdue Pharms. L.P.*, 619 B.R. at 59 (injunction that was "entered for the sole purpose of

giving the parties a clear shot at negotiating an overall settlement" was proper) (citations and

-55-

quotations omitted); *see also In re Caesars Ent. Operating Co.*, Inc., 808 F.3d 1186, 1189 (7th Cir. 2015) (vacating denial of injunction and recognizing that "nothing in section 105(a)" bars the request for an injunction based on the need to pursue settlement negotiations); Takata PI Ruling at 27–28 (recognizing the "functional benefit of requiring all stakeholders to focus their attention" on the reorganization effort, as opposed to pursuing separate proceedings). So too here, an injunction would facilitate the Debtor's settlement efforts and would thus promote the ultimate objective of this bankruptcy proceeding.

**C.    The Balance of Harms Weighs Heavily in Favor of Issuance of the Preliminary Injunction**

The Debtor faces significant harm should the State Actions proceed. Indeed, continuation of the State Actions while the Chapter 11 Case remains pending would undermine the very purpose of this reorganization. *See* N.J. Mem. Op. at 321 (balancing the harms and explaining the talc claimants will "benefit from . . . the handling of their claims through the bankruptcy process"); W.D.N.C. Prelim. Inj. Order at 6 (finding that "the purpose of the Debtor's Chapter 11 Case would be defeated if the litigation" in issue were allowed to proceed).

Allowing the State Claims to proceed risks resolving the key factual issues underlying the State Claims, the Talc Claims and the consumer protection claims of the Mediating States in courts other than this Court – impeding negotiations with the Debtor's stakeholders and efforts to establish a bankruptcy trust, and undermining the goals of the Chapter 11 Case. *See* N.J. Mem. Op. at 321 (explaining that grant of the injunction protects the interests of current and future claimants because the bankruptcy process "prevents a race for proceeds[] and promotes equality in distribution"); *Bestwall*, 606 B.R. at 257 ("The very purpose of the Debtor's Chapter 11 case would be defeated if litigation of the Bestwall Asbestos Claims against the Protected Parties is permitted."); *see also In re W.R. Grace & Co.*, 2004 WL 954772, at *4

-56-

(extending 105(a) injunction to a non-debtor where litigation against it had "a direct effect on the

reorganization proceedings of the[] Debtors").

In contrast, any prejudice caused to New Mexico and Mississippi by temporarily

staying the State Actions would be minimal, to the extent it would exist at all.  There is no

continuing alleged harm here:  the Talc Products sold in the U.S. and Canada no longer contain

talc.  As a result, all that would be accomplished by permitting the State Actions to proceed

would be the liquidation of the States' claims ahead of the claims of other similarly situated

parties.

While a preliminary injunction would spare the Debtor significant harm, it would

only temporarily delay resolution of the State Actions, which involve complex consumer

protection claims.  The issuance of an injunction will not permanently deprive the States of an

opportunity to pursue the State Claims.  Instead, it will merely temporarily halt those alleged

claims, giving the Debtor time to reach consensus on a plan of reorganization.  "[I]t is well

established that mere delay is insufficient to prevent the issuance of an injunction."  *Bestwall*,

606 B.R. at 257; *see also DBMP* 2021 WL 3552350, at *42 (concluding that "potential delays

occasioned by the stay and injunction [were] outweighed" by continued litigation and derailing

the debtor's reorganization effort); *Union Trust I*, 465 B.R. at 773–74 (same); *In re Saxby's

Coffee Worldwide, LLC*, 440 B.R. 369, 382 (Bankr. E.D. Pa. 2009) (granting injunction because

defendants had not "identified any particularized harm they are likely to suffer if delayed for a

short period of time from enforcing their remedies against [the non-debtors]"); *see also*

W.D.N.C. Prelim. Inj. Order at 6 ("Delay, in and of itself, is insufficient to overcome irreparable

harm caused to the Debtor and its estate."); *see also* Hall Mem. Op. at *12 (where securities

action had been pending since 2018, "additional delay" of extending stay to action would not "be

so detrimental to [securities actions claimants'] claims as to warrant continued prosecution at the

risk of derailing the chapter 11 case").  And, if the Court follows its ruling with respect to the

existing preliminary injunction, that pause will be subject to review every four months, further

minimizing any potential harm to the States.

     **D.**     **The Public Interest Supports Issuing the Injunction**

     Granting a section 105 injunction will maximize the potential for the Debtor's

successful reorganization and is thus entirely in the public interest.  *Integrated Health*, 281 B.R.

at 239 ("In the context of a bankruptcy case, promoting a successful reorganization is one of the

most important public interests."); *see also Saxby's Coffee*, 440 B.R. at 383 ("To the extent that

the injunction is necessary to and will foster the Debtor's reorganization it serves 'one of the

most important public interests.'" (quoting *Integrated Health*, 281 B.R. at 239)); *In re Gander*

*Partners LLC*, 432 B.R. 781, 789 (Bankr. N.D. Ill. 2010); *Sudbury*, 140 B.R. at 465.  This Court

has expressly recognized this:  "[T]his Court holds no doubts that claim resolution through the

bankruptcy process is in the public interest."  N.J. Mem. Op. at 321–22; *see also* Hall Mem. Op.

at *13 ("[T]he Debtor's reorganization and the uniform, timely, and equitable resolution of the

Talc Claims for the benefit of injured parties—existing and future—are at the forefront of this

Court's mind."); W.D.N.C. Prelim. Inj. Order at 6 ("The public interest lies with the Debtor

completing its reorganization process and resolving the Debtor Talc Claims in a uniform and

equitable manner.").  The public has an especially strong interest in successful reorganizations in

the mass tort context.  *W.R. Grace & Co.*, 386 B.R. at 36.  Indeed, "[i]n this case, due to the

volume of claims, jurisdictional spread, and numerous controversies, completing the

reorganization process also serves the public interest by resolving thousands of claims in a

uniform and equitable manner."  *Id.*; *see also DBMP*, 2021 WL 3552350, at *42 ("DBMP's

successful reorganization also would promote Congress's particular goal in section 524(g) by

establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims.").

Further, permitting the State Actions to continue would jeopardize and would run contrary to and seriously conflict with the Bankruptcy Code's purpose of facilitating an effective reorganization. It would thereby undermine the public interest. Promoting a successful reorganization is the best way to equitably resolve the Debtor's liabilities. The paramount interest in a restructuring proceeding is that the restructuring be successful.

Enjoining the State Actions will support a uniform, timely and equitable resolution and is in the public interest. *See* Takata PI Ruling at 23–24 (in granting injunction to stay governmental actions brought by individual states, finding it significant that "[t]he threat of injury or loss posed by the debtors' products presents a substantial and identical risk in all 50 states in the U.S. territories," while "any relief obtained by those entities in the state actions will necessarily be to the detriment of the citizens of other states")); *In re Dow Corning Corp.*, 211 B.R. 545, 588 (Bankr. E.D. Mich. 1997) ("[I]t is anything but just when presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a multimillion dollar verdict against a defendant while another takes nothing."). The State Actions are not unique—in point of fact, investigations or similar proceedings already have been initiated by five other states. *See* Exs. 28–32. As set forth above, the State Claims also are premised upon the same core allegations that underly the Talc Claims. Kim Decl. ¶ 24. Claims resolution through the bankruptcy process would allow for a "uniform, timely, and equitable resolution" of the states' consumer protection claims as well as the Talc Claims. Hall Mem. Op. at *13. By contrast, the separate litigation of issues that are critical to the bankruptcy case "would undoubtedly interfere with" the Debtor's reorganization. *DBMP*, 2021 WL 3552350, at *43; *Aldrich Pump*, 2021 WL

-59-

3729335, at *38.  The public interest strongly favors uniform treatment of claims and

maintaining the Debtor's focus on reorganizing and establishing a bankruptcy trust.

Finally, for the reasons set forth above, issuing a preliminary injunction would not

permit the Debtor or the State Protected Parties to escape their alleged liability under consumer

protection laws, should they be found to have any.  *See, e.g.*, *DBMP*, 2021 WL 3552350, at *42

(preliminary injunction was "necessary to protect the Debtor during its efforts to reorganization,

but it will not 'allow any party to escape any asbestos related liabilities'" (citation omitted)).

Rather, an injunction would merely give the Debtor a "breathing spell" to successfully

restructure and pursue mediation efforts, and ensure uniform treatment of the claims asserted

against the Debtor.  That is decidedly in the public interest.  *See* Hall Mem. Op. at *12 ("[T]his

Court holds no doubts that claim resolution through the bankruptcy process is in the public

interest.").

\*       \*       \*

Each of the four factors favors a preliminary injunction, and the Court should

exercise its authority under section 105(a) to temporarily pause the State Claims while the

Debtor moves forward with its restructuring.

## III.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO PROMPTLY EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR

The Debtor requests that this Court enter a temporary restraining order to enjoin

the States from prosecuting the State Claims following an expedited, emergency summary

hearing.  This would preserve the status quo until the Court has the opportunity to hold a further

hearing on the Debtor's requested relief under section 105(a) of the Bankruptcy Code.  The

Court has authority to issue a temporary restraining order pursuant to Rule 65(b) of the Federal

Rules of Civil Procedure, which is made applicable to this adversary proceeding by Bankruptcy

-60-

Rule 7065.[33]  Upon filing, the Debtor will have provided notice to the States through service of

this Motion and the related Complaint.  The Debtor thus requests that the Court schedule a

summary hearing for a temporary restraining order on an expedited, emergency basis.  *See*

13 James Wm. Moore, *et al.*, *Moore's Federal Practice – Civil* § 65.31 (3d ed. 2021) ("A

temporary restraining order may be granted . . . after a summary hearing with notice." (citation

omitted)).

  A temporary restraining order is properly granted where it is necessary to prevent

immediate and irreparable injury pending a hearing upon a motion for an injunction.  *Id.* § 65.36.

For the reasons detailed above, the facts here satisfy the requirements for a temporary restraining

order.  A denial of the Debtor's request for a temporary restraining order pending a hearing on

the Debtor's request for injunctive relief would thus cause the very harm that this filing seeks to

prevent.

  New Mexico and Mississippi had previously agreed to stay their respective

lawsuits, but they now have determined to proceed with the State Actions, and they seek to do so

at an accelerated pace.  They are further rapidly increasing the burdens on the Debtor by seeking

various forms of discovery and compliance with pretrial deadlines in the near term.

  A temporary restraining order is necessary given the resumption of litigation with

respect to the State Actions.  On June 17, 2022, New Mexico filed a motion requesting a

scheduling order that sets trial for April 2023 and numerous discovery and motion deadlines in

the upcoming months.  Ex. 11, June 17, 2022 Mot. to Modify Scheduling Order.  Under New

Mexico's proposed scheduling order, the parties would be required, among other things, to

---

[33] Although Civil Rule 65(c) requires the posting of a bond as a prerequisite to a preliminary injunction,
Bankruptcy Rule 7065 exempts an application made by a debtor, trustee or debtor in possession from the
bond requirement.  Fed. R. Bankr. P. 7065.

NAI-1532160454

mediate by August 29, 2022, to exchange non-expert witness lists by September 1, 2022, and to

complete all discovery by November 30, 2022. *Id.* at 3. Crucially, the corporate representative

deposition of J&J and Old JJCI is set for **July 26, 2022**. Kim Decl. ¶ 8; Ex. 12, New Mexico's

Second Am. Notices of Dep. to Old JJCI and J&J.

      Mississippi similarly insists on various pretrial deadlines in the near term for the

MS State Action. It demands that a scheduling order be entered as soon as possible based on a

February 17, 2023 trial date (which would require extensive fact and expert discovery to be

completed in the near term). Ex. 27, Feb. 10, 2022 Order; Kim Decl. ¶ 15. Under the proposed

scheduling order, Mississippi's expert disclosures would be due August 19, 2022, and the

Debtor's and J&J's expert disclosures would be due October 13, 2022. Kim Decl. ¶ 15. In

addition, the Debtor anticipates receiving extensive discovery requests and deposition notices in

the near term. *Id.* A scheduling order based on a February 17, 2023 trial date thus would require

the Debtor to dedicate increasing amounts of time and resources to comply with discovery

obligations and other pretrial deadlines and to prepare for trial. *Id.* ¶¶ 15–16.

      The trial preparation demands that New Mexico and Mississippi seek to impose

on the Debtor and the State Protected Parties will trigger the risks of collateral estoppel and

record taint noted above. And, the involvement of the Debtor in the State Actions would divert

resources away from reorganization efforts. *Id.* ¶ 33.

      In addition, the continued prosecution of the State Claims risks significant,

immediate, and irreversible harm to the Debtor and its estate. The Chapter 11 Case is at a critical

juncture, where there is significant opportunity for the Debtor and its stakeholders to continue

pursuing mediation with a view to achieving a consensual and equitable resolution of this case

for the benefit of all and where the Court and parties are focused on determining the appropriate

NAI-1532160454

next steps for this Chapter 11 Case in the event that a resolution does not occur in the near term. *Id.* ¶ 34.  Allowing the States to proceed with their efforts to establish in other jurisdictions the same disputed facts with respect to the State Claims that are at the heart of the Talc Claims, and to liquidate their claims ahead of the Mediating States, which have each agreed to stand down, would jeopardize the Debtor's attempts to achieve a global and equitable resolution of this Chapter 11 Case.  *Id.*  Thus, the Court should enter a temporary restraining order bringing a halt to all proceedings in the State Actions to avoid immediate harm to this Chapter 11 Case.  *Id.*

The N.C. Bankruptcy Court previously issued a temporary restraining order enjoining litigation as to third parties to avoid any immediate and irreparable harm to the Debtor and its estate.  Order (Oct. 26, 2021), Adv. Pro. No. 21-03032, ECF No. 28.  Similarly, under the circumstances here, immediate temporary injunctive relief is appropriate and required to safeguard the Debtor's prospects for a successful reorganization.

Although temporary restraining orders generally are limited to 14 days, before that period expires and for good cause, this Court may extend its order for an additional 14 days. Fed. R. Civ. P. 65(b)(2).  After holding the summary hearing, the Debtor requests that the Court (i) for good cause, enter a temporary restraining order extending for the maximum period allowed under Civil Rule 65, which is 28 days; and (ii) set a hearing on the other relief requested in this Motion on or before that date.

## **CONCLUSION**

For the reasons discussed above, the Debtor requests that the Court enter an order preliminarily enjoining New Mexico's and Mississippi's continued prosecution of their

-63-

respective State Actions while the Debtor's Chapter 11 Case remains pending.[34]  A proposed

form of order granting the Debtor's request for injunctive relief is attached hereto as <u>Exhibit A</u>.

Further, the Debtor respectfully requests that the Court enter an order,

substantially in the form attached hereto as <u>Exhibit B</u>, temporarily restraining the States from

continuing to prosecute any State Claim against any of the Parties until the Court has had an

opportunity to hold a hearing on the Debtor's other requested relief.

---

[34]    This injunction includes, without limitation:  (a) the pursuit of discovery from the Debtor or the State
Protected Parties or their officers, directors, employees, or agents; (b) the enforcement of any discovery
order against the Debtor or the State Protected Parties; and (c) further motions practice related to the
foregoing.

NAI-1532160454

Dated: July 14, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Lyndon M. Tretter, Esq. (*pro hac vice*)
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
ltretter@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*