**GIBBONS P.C.**
Robert K. Malone, Esq.
Dale E. Barney, Esq.
David N. Crapo, Esq.
Michael A. Conforti, Esq.
One Gateway Center
Newark, New Jersey  07102
(973) 596-4500
rmalone@gibbonslaw.com
*Attorneys for State of New Mexico*
*and State of Mississippi*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>     Debtor. | Chapter 11<br><br>Case No.:  21-30589 (MBK)<br><br>Judge:  Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>STATE OF NEW MEXICO, *ex rel.*<br>HECTOR H. BALDERAS, Attorney General,<br>and STATE OF MISSISSIPPI, *ex rel.* LYNN<br>FITCH, Attorney General,[2]<br><br>     Defendants. | Adv. Pro. No.:  22-01231 (MBK) |

**THE STATES' OPPOSITION TO**
**DEBTOR'S MOTION FOR INJUNCTIVE RELIEF**

---

[1]The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]Although the Debtor's caption includes Jim Hood as Mississippi's Attorney General, Lynn Fitch has been acting Attorney General of Mississippi since January 9, 2020.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT................................................................................ 1

FACTUAL SUMMARY OF THE STATE ACTIONS ................................................ 3

    A.  The New Mexico State Action.................................................................. 4

    B.  The Mississippi State Action ................................................................... 6

LEGAL ARGUMENT ............................................................................................. 8

  I.  THE DEBTOR HAS FAILED TO MEET ITS BURDEN OF DEMONSTRATING ENTITLEMENTS TO
THE EXTENSION OF THE AUTOMATIC STAY TO GOVERNMENTAL UNITS UNDER SECTION
105(A) OF THE BANKRUPTCY CODE ..................................................................... 8

    A.  The Debtor Has Failed to Demonstrate That This Court Has Subject Matter
Jurisdiction to Issue the Injunction .............................................................. 9

    B.  The Debtor Has Failed to Demonstrate That It Is Entitled to Relief Under Section
105(a) of the Bankruptcy Code .................................................................. 14

       i.  The Debtor Has Failed to Demonstrate a Likelihood of a Successful
Reorganization ..................................................................................... 14

      ii.  The Debtor Has Failed to Demonstrate Imminent, Irreparable Harm .................. 15

     iii.  The Balance of Harms and Public Policy Weigh in Favor of the States .............. 19

  II.  THE TEXAS TWO-STEP........................................................................... 20

 III.  THE STATES ARE SOVEREIGN ENTITIES, AND THE STATE ACTIONS ARE WELL-PROTECTED
EXERCISES OF THEIR POLICE AND REGULATORY POWERS ................................. 22

    A.  States Are Sovereign Entities................................................................ 22

    B.  The States' "Police and Regulatory Powers"............................................. 27

 IV.  THE STATE ACTIONS ARE NOT SUBJECT TO THE PRELIMINARY INJUNCTION ORDER......... 32

CONCLUSION...................................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robbins Co., Inc. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ................................................................18

*Cent. Virginia Cmty. Coll. v. Katz*,
  546 U.S. 356 (2006).................................................................. *passim*

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004)..................................................................13

*In re E. Orange Gen Hosp., Inc.*,
  587 B.R. 53 (D.N.J. 2018) ......................................................................9

*In re First Alliance Mortg. Co.*,
  263 B.R. 99 (BAP 9th Cir. 2001) ........................................................32

*Forcine Concrete & Constr. Co., Inc. v. Manning Equip. Sales & Serv.*,
  426 B.R. 520 (E.D. Pa. 2010) ..............................................................17

*In re G-I Holdings, Inc.*,
  420 B.R. 216 (Bankr. D.N.J. 2009) .....................................................14

*In re Gandy*,
  327 B.R. 796 (Bankr. S.D. Tex. 2005) ....................................27, 28, 31

*Gardner v. New Jersey*,
  329 U.S. 565 (1947).............................................................................22

*In re Halo Wireless, Inc.*,
  684 F.3d 581 (5th Cir. 2012) ...............................................................27

*In re Johns-Manville Corp.*,
  26 B.R. 420 (Bankr. S.D.N.Y. 1983), *vacated on other grounds by In re
  Johns-Manville Corp.*, 41 B.R. 926 (S.D.N.Y. 1984).....................15, 19

*LTL Management LLC v. Those Parties Listed on Appendix A to Complaint and
  John and Jane Does 1-1000 (In re LTL Management, LLC)*,
  Adv. Pro. No. 21-3032 (Bankr. W.D.N.C.) ........................................12

*In re LTL Mgmt. LLC*,
  2021 WL 5343945 (Bankr. W.D.N.C. Nov. 16, 2021)........................21

*In re LTL Mgmt., LLC*,
  638 B.R. 291 (Bankr. D.N.J. 2022) ...................................................1, 3

*In re LTL Mgmt., LLC*,
    640 B.R. 322 (Bankr. D.N.J. 2022) ....................................................................3

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, Adv. Pro.
    No. 21-03032; and *LTL Mgmt., LLC v. San Diego Cty. Emps. Ret. Ass'n*, Adv.
    Pro. No. 22-01073) ...........................................................................................11

*In re Mallinckrodt, PLC*,
    No. 20-12522, Adv. Pro. No. 20-50850 (JTD) (Bankr. D. Del. Nov. 25, 2020),
    ECF No. 170 ......................................................................................................30

*In re Marshall*,
    600 F.3d 1037 (9th Cir. 2010) ...........................................................................9

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    564 B.R. 192 (S.D.N.Y. 2016)..........................................................................17

*In re Nortel Networks, Inc.*,
    669 F.3d 128 (3d Cir. 2011)...............................................................................31

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984), *overruled on other grounds in part by Things
    Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)...........................................13

*In re Patriot Coal Corp.*,
    482 B.R. 718 (Bankr. S.D.N.Y. 2012) ..........................................................20, 21

*Penn Terra Ltd. v. Dep't of Envtl. Res., Commonwealth of Pennsylvania*,
    733 F.2d 267 (3d Cir. 1984)...............................................................................27

*In re PennEast Pipeline Co., LLC.*,
    938 F.3d 96 (3d Cir. 2019), *rev'd and remanded on other grounds, PennEast
    Pipeline Co., LLC v. New Jersey*, 141 S.Ct. 2244 (2021)......................................21

*In re Philadelphia Entm't & Dev. Partners LP*,
    860 Fed. App'x. 25 (3d Cir. 2021).....................................................................26

*In re Philadelphia Newspapers, LLC*,
    407 B.R. 606 (E.D. Pa. 2009) .......................................................................8, 14

*In re Purdue Pharma L.P.*,
    No. 19-23649, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Oct. 18,
    2019) ................................................................................................................30

*In re Purdue Pharmaceuticals L.P.*,
    619 B.R. 38 (S.D.N.Y. 2020).............................................................................17

*Queenie, Ltd. v. Nygard, Int'l,*
    321 F.3d 282 (2d Cir. 2003)...........................................................................17

*In re Related Asbestos Cases,*
    23 B.R. 523 (N.D. Cal. 1982) ........................................................................19

*Stoe v. Flaherty,*
    436 F.3d 209 (3d Cir. 2006)......................................................................9, 10

*In re TK Holdings, Inc.,*
    No. 17-11375, Adv. Pro. No. 17-50880 (BLS) (Bankr. D. Del. Aug. 16, 2017)...............29, 30

*United States Trustee v. Gryphon at the Stone Mansion, Inc.,*
    166 F.3d 552 (3d Cir. 1999)...........................................................................10

*United States v. Nicolet, Inc.,*
    857 F.2d 202 (3d Cir. 1988)......................................................................19, 27

*United States v. W.T. Grant Co.,*
    345 U.S. 629 (1953)........................................................................................31

*In re Venoco LLC,*
    998 F.3d 94 (3d Cir. 2021)...................................................... *passim*

*Village of Rosemont v. Jaffe,*
    482 F.3d 926 (7th Cir. 2007) .........................................................................24

*In re W.R. Grace & Co.,*
    591 F.3d 164 (3d Cir. 2009).......................................................................9, 11

*In re W.R. Grace,*
    412 B.R. 657 (Bankr. Del. 2009) ............................................... *passim*

*In re Winstar Commc'ns, Inc.,*
    554 F.3d 382 (3d Cir. 2009)...........................................................................12

*Winter v. Nat'l Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..............................................................................14, 22, 23

**Statutes**

11 U.S.C. § 101(27) ...........................................................................................12

11 U.S.C. § 362(b)(4) ........................................................................................11

11 U.S.C. §505...................................................................................................25

11 U.S.C. § 548(a)(1)(A) ..................................................................................20

11 U.S.C. § 1141(d)(3) ...............................................................................................................26

28 U.S.C. § 157(b)(1) .................................................................................................................9

28 U.S.C. § 157(b)(2) ...............................................................................................................30

Miss. Code Ann. § 75-24-5(2)(e)...............................................................................................13

**Rules**

Fed. R. Evid. 706 ......................................................................................................................10

The State of New Mexico and the State of Mississippi (the "States") hereby submit this opposition (the "Opposition") to the *Motion For An Order (I) Preliminarily Enjoining The Prosecution Of The New Mexico And Mississippi State Actions And (II) Granting A Temporary Restraining Order Pending A Further Hearing* [**Adv. Dkt. No. 2**][3] (the "Motion"),[4] filed by LTL Management LLC, the debtor and debtor-in-possession herein ("LTL" or the "Debtor"), and in support thereof, the States respectfully represent as follows:

## PRELIMINARY STATEMENT

The Debtor comes before this Court to request injunctive relief that has already been expressly rejected in at least three (3) separate Orders within this bankruptcy case. First, Judge Whitley in North Carolina determined, in granting the Debtor's request for preliminary injunctive relief under section 362 of the Bankruptcy Code, that the prohibition against "commencing or continuing to prosecute any Enjoined Talc Claim against any of the Protected Parties" "shall not apply to restrict or enlarge the rights of the Debtor *or any governmental unit* under applicable bankruptcy law." *In re LTL Mgmt. LLC*, Adv. Pro. No. 21-03032 (Bankr. W.D.N.C.), ECF No. 102 ¶¶ 2, 7 (emphasis added). Then—twice more—this Court entered substantially similar Orders granting the Debtor's requests for preliminary injunctive relief, which both identically declared that the prohibition against "commencing or continuing to prosecute any Enjoined Talc Claim against any of the Protected Parties," "shall not apply to restrict or enlarge the rights of the Debtor *or any governmental unit* under applicable bankruptcy law." **3032 Adv. Dkt. No. 187 ¶¶ 2, 6**; **Bankr. Dkt. No. 1635 ¶¶ 2, 6** (emphasis added).

---

[3]All references to "Bankr. Dkt. No." shall be to filings in Case No. 21-30589; all references to "3032 Dkt. No." shall be to filings in Adv. Pro. No. 21-03032; all references to "1073 Dkt. No." shall be to filings in Adv. Pro. No. 22-01073; and all references to "Adv. Dkt. No." shall be to filings in this adversary proceeding, Adv. Pro. No. 22-01231.

[4]All Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

Further, this Court has already ruled that fraud and fraud-related claims against non-debtors do not share a sufficient factual and legal nexus to impact the administration of this bankruptcy estate. **Bankr. Dkt. No. 2092**. The Court explicitly held that where the claims are "bottomed on fraud . . . the Court cannot make a finding that the debtor has any indemnification obligations or that there's any shared insurance that would be threatened by continued prosecution of such claims." **Bankr. Dkt. No. 2094 at 89:1-6** (finding "the automatic stay does not apply" in such cases). For this additional and similar reason, the automatic stay does not apply to the State Actions, as they are bottomed on fraud (consumer fraud) and fraud-related (unfair and deceptive trade practices) claims.

The Debtor's Motion and its proposed injunction against the States is contrary to section 362(b)(4) of the Bankruptcy Code and would constitute a perverse balancing of state sovereignty versus the Bankruptcy Court's section 105(a) authority. The Debtor apparently believes that section 105(a) of the Bankruptcy Code is the ultimate trump card—the Court can simply waive its wand and principles of federalism vanish while a multi-billion-dollar entity contorts the Bankruptcy Code to shield itself from the States' constitutional and statutory exercise of their police and regulatory powers. Not only has the Debtor failed to meet the requirements for a preliminary injunction but, respectfully, the Court should refuse to venture into these uncharted waters, where the Debtor hopes to open up Section 105(a) to engulf and enjoin even non-derivative claims by governmental bodies against non-debtors. This is a bridge too far in a case already replete with questionable manipulations of the Bankruptcy Code by one of the wealthiest corporations on Earth.

As for the State Actions—against non-debtors—subject matter jurisdiction is clearly lacking because each of the State Actions plead claims that are independent and direct claims under

2

state law, which are not derivative of the claims against the Debtor's estate.  Neither of the State

Actions allege talc-related personal injury claims or other types of causes of actions that may be

part of the "*res*" of the Debtor's bankruptcy estate.  To that end, the Debtor's argument that its

"indemnification obligations . . . would amount to continued litigation against the Debtor" is

entirely too conclusory.  **Motion at 9**.  The Debtor assumes that the State Actions (consumer

fraud/unfair and deceptive trade practices) are "inextricably intertwined" with the Talc Claims

(personal injury).  They are not.

The Debtor is using this adversary proceeding to evade this nation's strong tradition of

federalism, as embodied in section 362(b)(4) of the Bankruptcy Code.  Exceptions should

accordingly be found sparingly, and this matter is no exception.  On this point, the Third Circuit

has voiced that "at times bankruptcy policy must yield to higher priorities," which include, as here,

the "fixing [of] civil penalties."  *In re W.R. Grace*, 412 B.R. 657, 664 (Bankr. Del. 2009).  Simply

put, the States' abilities to seek injunctive relief and civil penalties, against non-debtors, is exactly

the type of police power that Congress intended bankruptcy courts across the country to protect.

For these reasons and the reasons stated herein, the States respectfully submit that the Court

should deny the Debtor's Motion in its entirety.

## FACTUAL SUMMARY OF THE STATE ACTIONS

Relevant factual backgrounds surrounding prepetition litigation against Johnson &

Johnson ("J&J"), including one of J&J's corporate subsidiaries, Johnson & Johnson Consumer

Inc., i.e. the "New JJCI" identified in the Motion, ("JJCI" and, together with J&J, the

"Defendants"), and the circumstances concerning this bankruptcy filing are set forth in the *Initial*

*Statement of Official Committee of Talc Claimants Respecting Chapter 11 Case* [**Bankr. Dkt. No.**

**489**] and in the *Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter*

*11 Case* [**Bankr. Dkt. No. 632**].  The Court has additionally itself provided multiple rundowns of

the bankruptcy case's relevant backdrop. *See In re LTL Mgmt., LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022); *and see In re LTL Mgmt., LLC*, 640 B.R. 322 (Bankr. D.N.J. 2022). Those factual backgrounds are incorporated herein by reference, with the following additions that are specific to this adversary proceeding:

### A.      The New Mexico State Action

On March 3, 2020, the State of New Mexico filed its *First Amended Complaint*, seeking, among other things, injunctive relief and civil penalties against the Defendants and against various Bausch entities (the "NM Action"). ***See* Adv. Dkt. No. 2-2 at 1**. The NM Action currently alleges violations of the New Mexico Unfair Practices Act, the New Mexico False Advertising Act, and "other common law and equitable causes of action" based on the "Defendants' wrongful marketing, sale and promotion of Defendants' asbestos-containing talcum powder products" (the "Talc Products"). ***Id.* at 2 ¶ 1**. The NM Action is explicit that it brought claims "exclusively under the laws of the State of New Mexico"; that "[n]o federal claims are being asserted"; and that the claims "are brought solely by the State and are wholly independent of any claims that individual consumers may have against Defendants." ***Id.* at 3 ¶¶ 2-3**; ***see also id.* at 7 ¶ 20** ("exclusively state law claims against Defendants").

Generally, the NM Action alleges that J&J defrauded consumers in the State of New Mexico and therefore violated state statutes prohibiting unfair trade practices and false advertising. The NM Action alleges that, for years, the Defendants sold, advertised, and marketed their Talc Products "as healthful for babies, children, and adults." ***Id.* at 9 ¶ 23**. In their sales, marketing, and advertising of those products, the NM Action asserts that the Defendants "made false statements to [New Mexico consumers and] the general public," while "possess[ing] medical and scientific data that raised concerns regarding the presence of carcinogens" in the Talc Products ***Id.* at 9-10 ¶¶ 24-25**. In sum, J&J knowingly and falsely represented that the Talc Products met

4

certain standards or were of a certain quality making them safe for use and thereby violated, *inter alia*, the New Mexico Unfair Practices Act. Studies regarding J&J's Talc Products raised concerns of "possible health hazards" associated with the Talc Products, and the NM Action emphasizes "there is no evidence that" those dangers "were communicated to any governmental agency, the media or the public," even though J&J has been aware of those studies for decades. ***Id.* at 12-13 ¶¶ 33-34**. J&J's mere failure to communicate that materially important information to consumers, purchasers, government agencies, or the public while marketing the Talc Products as safe constituted misrepresentations violating, *inter alia*, the New Mexico False Advertising Act. Relying on the lack of meaningful regulation of cosmetics under the Food and Drug Administration Act, J&J "ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos, asbestiform talc, and other carcinogens." ***Id.* at 13-14 ¶ 37**. J&J's deliberate omission of information regarding asbestos contamination exposes the irrelevance of the Debtor's argument that "[t]he States cannot prove their claims without first proving that the Talc Products were contaminated with asbestos." ***See* Adv. Dkt. No. 2 at 12**.

The NM Action details dozens of studies conducted over decades showing that talc contained asbestos, fibrous talc, and other carcinogens. Despite these findings, J&J refused to place warnings on its Talc Products. ***See* Adv. Dkt. No. 2-2 at 21-23 ¶¶ 56-60**. Worse still, J&J represented "that their testing method was adequate" and "that they were ensuring that talcum powder products were safe." ***Id.* at 21-22 ¶ 57**. Adding to the confusion, the NM Action contends that J&J "controlled the level of knowledge and information available to the public . . . regarding the hazards of exposure to carcinogens, including Asbestos." ***Id.* at 24 ¶ 66**; ***see also id.* at 30 ¶ 89** ("Despite the potential catastrophic health consequences, the companies that manufacture and

sell talc products have concealed and failed to warn consumers about the dangers associated with their Talc Products.").

Further, the NM Action points to dozens of epidemiological studies finding a statistically significant "increased risk of ovarian cancer" in women using J&J's talcum powder products in their genital area, products J&J continued to sell, promote, and advertise "without [sharing] any knowledge of the danger" with consumers. *Id.* **at 30-33 ¶¶ 90-103**. Despite this knowledge, J&J continued to sell, market, and advertise its products as "safe" and to "persist in denying the danger[s]." *Id.* **at 36 ¶ 110**. New Mexico accordingly brought its causes of action against the Defendants based on the Defendants' representations to consumers that its products "were safe and effective [] when such representations were untrue, false and misleading." *See id.* **at 39 ¶ 123(b)**.

### B.     The Mississippi State Action

On August 22, 2014, the State of Mississippi filed its *Complaint*, seeking, among other things, injunctive relief and civil penalties against the Defendants and against various Bausch entities[5] (the "MS Action").[6] *See* **Adv. Dkt. No. 2-3 at 2**. The MS Action alleges violations of the Mississippi Consumer Protection Act, specifically that the "Defendants engaged in misrepresentations and omissions in connection with the labeling, advertisements, promotion, marketing, and sale of their Talc Products. *Id.* **at 3 ¶¶ 1, 5**. The MS Action is explicit that it brought claims exclusively under the laws of the State of Mississippi. *Id.* **¶ 6**. Mississippi

---

[5]As the Debtor acknowledges in its Motion, the "Bausch Defendants named in the MS State Action . . . settled the claims against them . . . and accordingly are no longer parties to that action." **Motion at 3 n.6**.

[6]The MS Action, having been pending since 2014, illustrates J&J's endlessly deployed delay tactics. J&J sought interlocutory appeals and related stays *three times*, with the Mississippi Supreme Court granting the third request and staying the MS Action for more than two years before ruling in Mississippi's favor. Now, with Mississippi on the precipice of having its day in court, the Debtor (via J&J) insists on another indefinite stay. The Court should put a stop to such gamesmanship.

moreover expressly "disclaims any federal remedies and does not assert any [federal] claim for relief," which "are brought solely by the State and are wholly independent of any claims that individual users of the Talc Products may have against Defendants." *Id.* **¶¶ 7-8**; *see also id.* **at 5 ¶ 10** ("This is a matter of grave public concern in which the State, as representative of the public, has an interest apart from that of the individuals affected.").

The MS Action alleges that, while "Defendants promote and market the Talc products as a means to maintain freshness and cleanliness," "numerous studies" have revealed a possible "link" between talcum powder and cancer. *Id.* **at 8 ¶ 24**. Yet, "[d]espite the potential catastrophic health consequences, Defendants have hidden and failed to warn consumers" about the "risk" associated with Talc Products. *Id.* **¶ 25**. Rather, "Defendants expressly and impliedly represented . . . that the Talc Products were safe," and thus "the State's residents have used the Talc Products in a potentially lethal way without any knowledge of the danger." *Id.* **at 9 ¶ 27**. For example, "Defendants have not and do not warn . . . that the use of their Talc Products in the genital area increases the risk of contracting ovarian cancer or even that there are certain studies that demonstrate the association." *Id.* **at 10 ¶¶ 30-31** ("To the contrary, Defendants have marketed their products as safe for human use.").

The MS Action further indicates "numerous studies" showing the "increased risk of ovarian cancer" with "frequent use of talcum powder in the genital area." *Id.* **at 11 ¶¶ 34-36**. Instead, Defendants "released false information to the public about the safety of talc" and outright denied any "possible human carcinogen." *Id.* **at 12 ¶ 37, 40**. Despite all the studies raising red flags about regular use of the Talc Products, Defendants "resisted making the public aware of the relationship between talc and cancer." *Id.* **at 16 ¶ 46**. Indeed, J&J persists to this day in denying that the science demonstrates such a causal link, its voluntary withdrawal of the Talc Products

from the US and Canadian markets notwithstanding.  As is clear, the MS Action's claims are not rooted in needing to "prov[e] the disputed allegations that are also at the heart of the Talc Claims," *see* **Motion at 42**, but rather need only demonstrate that "Defendants purposefully procured and disseminated false, misleading, and deceptive information regarding the safety of the Talc Products," **Adv. Dkt. No. 2-3 at 31 ¶ 93**.  Mississippi accordingly brought its causes of action against the Defendants based on the Defendants' "misrepresent[ing] their goods as having uses and/or benefits that they do not" and "as having qualities and/or standards that they did not." ***Id.* at 31 ¶ 96(a)-(b)**.

## LEGAL ARGUMENT

I.    **THE DEBTOR HAS FAILED TO MEET ITS BURDEN OF DEMONSTRATING ENTITLEMENTS TO THE EXTENSION OF THE AUTOMATIC STAY TO GOVERNMENTAL UNITS UNDER SECTION 105(A) OF THE BANKRUPTCY CODE**

In deciding whether to issue a preliminary injunction extending the protections of section 362(a) of the Bankruptcy Code to non-debtor third parties, courts in the Third Circuit employ a three-step process.  First, the court determines whether it has jurisdiction to issue the injunction. Second, the court determines whether to extend the section 362(a) stay to non-debtors.[7]  Third, the court determines whether to issue an injunction pursuant to section 105(a) of the Bankruptcy Code, enjoining suit against non-debtors.  *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009) (holding that although courts "have often conflated the analysis," each step of the "inquiry is distinct, independently necessary, and implicates different interests").  As set forth herein, the Debtor has not met its burden of demonstrating that it is entitled to issuance of a

---

[7]This Opposition does not address the second prong of the test – whether to extend the stay to non-debtors – as the Court has already ruled affirmatively in this regard.  *See, e.g.*, 3032 Adv. Dkt. Nos. 184 & 187.

preliminary injunction extending the automatic stay to governmental units enforcing their police and regulatory powers.

###    A.    The Debtor Has Failed to Demonstrate That This Court Has Subject Matter Jurisdiction to Issue the Injunction

At the outset, the Debtor's Motion invokes only section 105(a) of the Bankruptcy Code as a basis for the requested relief. However, because a request for an injunction under section 105(a) of the Bankruptcy Code cannot, by itself, create jurisdiction, this Court lacks subject matter jurisdiction to enjoin the State Actions. *See In re W.R. Grace & Co.*, 591 F.3d 164, 170-71 (3d Cir. 2009) (court must establish it has subject matter jurisdiction before issuing an injunction under § 105(a)). There are "four types of chapter 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). The first three categories constitute "core" proceedings, whereas "related to" constitutes "non-core." *In re E. Orange Gen Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018). A bankruptcy court has power to hear, decide, and enter final judgments in core proceedings.[8]  28 U.S.C. § 157(b)(1).

The Court does not have "under," "arising under," "arising in," or "related to" jurisdiction over the States' state-law-specific claims, or the Debtor's efforts to enjoin them, because the automatic stay is inapplicable to these police power actions, the State Actions would exist outside the Bankruptcy Court, and the outcome of the State Actions (against J&J and JJCI) have no relation to, and thus will have no impact on, the Debtor's estate being administered in bankruptcy.

---

[8] For the avoidance of any doubt, the States do not consent to have the State Actions tried in the Bankruptcy Court.

First, the State Actions are undeniably non-core proceedings—to which the States have

rights to jury trials[9]—and thus unequivocally do not "arise under" the Bankruptcy Code or "arise

in" the bankruptcy case. *See generally In re Marshall*, 600 F.3d 1037 (9th Cir. 2010). The

Debtor's Motion is replete with citation after citation to "the states' consumer protection claims."

But the Motion does not (because it cannot) explain how the Bankruptcy Code creates the cause

of action or provides the substantive right being invoked by any of the state law consumer

protection statutes such that the state law consumer protection claims would "arise under" the

Bankruptcy Code. *See Stoe*, 436 F.3d at 216. Similarly, the Debtor does not (because it cannot)

explain how any of the state law consumer protection claims could arise only in the context of a

bankruptcy case or could "have no existence outside of the bankruptcy." *See United States Trustee

v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999). Indeed, such an assertion

would be absurd because the States brought claims under their consumer fraud and deceptive trade

practices statutes *in order to enforce their consumer protection regimes*.

The States have obligations to their citizens to enforce consumer protection laws and effect

change in corporations to prevent and deter wrongdoing such as that perpetrated by J&J, and its

affiliates, in falsely marketing, advertising, and selling Talc Products as undeniably safe (in the

face of medical and scientific studies to the contrary). This Court recently appointed Ken Feinberg,

Esq. pursuant to Rule 706 of the Federal Rules of Evidence as the Court's own expert with a very

defined scope to perform an initial estimation of the number of Talc Claims and the value of current

and future claims. The estimation process, however, cannot be used to address the States'

complaints, which seek to permanently enjoin J&J from producing Talc Products and to impose

---

[9]Under Mississippi state law, actions under the State's Consumer Protection Act are generally filed in chancery court
without a jury, although Mississippi could file in a circuit court (with a jury) if the State brought ancillary claims.

civil penalties.  While J&J just recently announced on August 11, 2022 that it has voluntarily ceased advertising, marketing, and selling the subject Talc Products globally, there exists no prohibition against J&J restarting production and again advertising, marketing, and selling the subject products with false claims regarding safety or other beneficial medical uses.[10]  The State Actions are scheduled for trial in early 2023 so, absent the injunction sought by the Debtor, the States will shortly be in position to enforce their police and regulatory powers and obtain injunctive relief to prevent J&J from falsely advertising, marketing, and selling its Talc Products without, at minimum, proper warnings.  The States should be permitted to continue pretrial discovery and trial preparation while this chapter 11 case plays out.

Moreover, unlike this Court's prior rulings in the two (2) other adversary proceedings (*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, Adv. Pro. No. 21-03032; and *LTL Mgmt., LLC v. San Diego Cty. Emps. Ret. Ass'n*, Adv. Pro. No. 22-01073), the Debtor in this adversary proceeding is not requesting a stay of the State Actions to "preserve and effectuate the automatic stay."  **1073 Adv. Dkt. No. 52**.  To the contrary, the States, as "governmental units" exercising their "police and regulatory powers," are carved out of the automatic stay provisions. 11 U.S.C. § 362(b)(4); **Bankr. Dkt. No. 1635 ¶ 6**.

The Debtor attempts to manufacture core jurisdiction by invoking its ***claim for extension of the automatic stay*** – the fact that sections 362 and 105 are Bankruptcy Code provisions – while ignoring the ***state consumer fraud and deceptive trade practices bases for the State Actions sought to be enjoined***.  The Third Circuit rejected that approach in *In re W.R. Grace*, 591 F.3d at 174, and this Court should follow this precedent established in this Circuit.  In *Grace*, the debtor

---

[10]It bears noting, moreover, that J&J, in its August 11, 2022 statements to the media, reiterated its unwavering position that its "talc-based JOHNSON'S BABY POWDER is safe, does not contain asbestos, and does not cause cancer."  *See* Media Press Release, attached to the Declaration of Robert K. Malone as Exhibit 6.

argued that "the Bankruptcy Court does not need related-to jurisdiction over the [state court] Actions in order to enjoin them, because the Court's jurisdiction over the adversary proceeding in [Grace's] Chapter 11 case is sufficient to provide it with a basis for expanding the § 105(a) injunction" to non-debtors. *Id.* The Third Circuit rebuffed that argument because it would give "a bankruptcy court . . . power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding." *Id.* That is exactly what is happening here. In short, the question is not the statutory basis for the requested ***bankruptcy relief***. The question is the nature of this Court's ***subject matter jurisdiction over the State Actions***, which does not exist. Plainly stated, this Court has no core jurisdiction over the instant matter.

At the inception of this bankruptcy proceeding, Judge Whitley recognized as much before the Debtor's Chapter 11 bankruptcy case was transferred from the United States Bankruptcy Court for the Western District of North Carolina to this Court. Judge Whitley granted the Debtor's motion for a preliminary injunction—substantially similar to the one sought before this Court—against the prosecution of Talc Claims. In the Order granting the Debtor's motion, however, Judge Whitley expressly exempted "governmental units" from its scope.[11] To that end, Paragraph 7 of that Order provides:

> Notwithstanding anything to the contrary in this Order, govern-
> mental units (as defined under section 101 of the Bankruptcy Code)
> are not Defendants in this proceeding. The relief granted herein,
> including any relief granted under this Order under section 105 of
> the Bankruptcy Code, shall not apply to restrict or enlarge the rights

---

[11]"The term 'governmental unit' means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government. 11 U.S.C. § 101(27).

of the Debtor or any governmental unit under applicable bankruptcy
law and all such rights are hereby preserved.

"Order Granting the Debtor's Request for Preliminary Judgment, LTL Management, LLC," *LTL*

*Management LLC v. Those Parties Listed on Appendix A to Complaint and John and Jane Does*

*1-1000 (In re LTL Management, LLC)*, Adv. Pro. No. 21-3032 (Bankr. W.D.N.C.), ECF No. 102

("NC Injunction Order").

Second, even "related to" jurisdiction is lacking because the State Actions could not

"conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar*

*Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009). It is worth reiterating that the Debtor's Motion

relies solely on Section 105(a) as its basis for the requested relief—which, of course, "does not

provide an independent source of federal subject matter jurisdiction." *In re Combustion Eng'g,*

*Inc.*, 391 F.3d 190, 224-25 (3d Cir. 2004) ("'Related to' jurisdiction must therefore exist

independently of any plan provision purporting to involve or enjoin claims against non-debtors.").

"An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities,

options, or freedom of action (either positively or negatively) and which in any way impacts upon

the handling and administration of the bankrupt estate." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994

(3d Cir. 1984), *overruled on other grounds in part by Things Remembered, Inc. v. Petrarca*, 516

U.S. 124 (1995). In the NM Action, the claims concern J&J's "so-called scientific research,"

which allowed J&J to promote Talc Products that "were essentially worthless, lacking medical

value." *See* **Adv. Dkt. No. 2-2 ¶¶ 156-57**. Similarly, in the MS Action, the claims concern J&J's

"unfair methods of competition," where J&J "misrepresented their goods as having uses and/or

benefits that they do not have in violation of Miss. Code Ann. § 75-24-5(2)(e)," including

"focusing on certain minority communities." *See* **Adv. Dkt. No. 2-3 ¶ 96**. In other words, the

State Actions allege that J&J's "***deceptive trade practices***" represented to consumers that they

were purchasing and using a safe and beneficial product when, in fact, J&J knowingly withheld information about the dangers inherent in the Talc Products.  Specifically, J&J advertised, marketed, and sold as safe products that, in fact, contained carcinogens exposing the user to, *inter alia*, ovarian cancer and mesothelioma.  The Debtor's far-fetched position that the State Actions' state-specific and marketing-based claims could "conceivably" impact the Debtor's personal injury-centric claims valuations, estimation, insurance, or stalling mediation efforts requires too many illogical leaps.

The Court accordingly lacks subject matter jurisdiction to exercise its general equity powers under section 105(a) of the Bankruptcy Code to enjoin the State Actions.

## B.   The Debtor Has Failed to Demonstrate That It Is Entitled to Relief Under Section 105(a) of the Bankruptcy Code

In order to obtain a preliminary injunction extending the automatic stay under section 105(a) of the Bankruptcy Code, a debtor must demonstrate that (i) there is a reasonable likelihood of a successful reorganization; (ii) there is danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize; (iii) the balance of harms favors the debtor, and (iv) the balance of the public interest of a successful bankruptcy reorganization of the debtor versus other competing societal interests also weighs in favor of issuance of an injunction.  *In re Philadelphia Newspapers*, 407 B.R. at 617.  In the case at bar, the Debtor has failed to meet its burden of proof on all four of these factors.

### i.   *The Debtor Has Failed to Demonstrate a Likelihood of a Successful Reorganization*

The Debtor's reorganization remains speculative at this point and, when stacked against the immediate, concrete, and indisputable harm that will befall the States if their policing powers are stripped by this Court, the Court should not enter a preliminary injunction against the States under section 105 of the Bankruptcy Code.  It goes without saying that such relief is

"extraordinary" and should be granted "only sparingly and in limited circumstances." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The Debtor must make "a clear showing" that it is likely to succeed with facilitating a successful reorganization. *Compare id.*, *with In re G-I Holdings, Inc.*, 420 B.R. 216, 281 (Bankr. D.N.J. 2009).

Instead, in the five (5) months since the Court extended the automatic stay to non-debtors, **Bankr. Dkt. No. 1635**, mediation has not been successful, and there does not appear to be any realistic prospect of resolution to this bankruptcy case. Although the Court previously ruled that "there is nothing in the record to suggest that Debtor does not have a reasonable likelihood of reorganization," **3032 Adv. Dkt. No. 184 at 47**, at this juncture, the record has been supplemented with the Debtor's obstinate and hardline stance that "the central issue in this case [is] the extent of the Debtor's liability for talc-related claims," **Bankr. Dkt. No. 2473 at 19**. Of course, the Debtor and J&J appear to be adamantly fused to the position that the claimants are entitled to ***nothing*** because all claims are based on "junk science" and alleged outright manipulation from the plaintiffs' bar. *See* **Bankr. Dkt. No. 3 at 90**. Thus, the Debtor's record additions set the tone and make clear that obtaining a super-majority of creditors to vote in favor of confirming a plan of reorganization is becoming a fleeting impracticality.

### ii.    *The Debtor Has Failed to Demonstrate Imminent, Irreparable Harm*

The Debtor contends that it will be irreparably harmed if the Motion is denied because "[t]he Talc Claims and the State Claims are intimately intertwined" (although they are not), and "the Debtor would be forced to engage in litigation of issues critical to this Chapter 11 Case." **Motion at 12**. These assertions are unavailing because the State Actions are not "Enjoined Talc Claims," are against one of the most solvent and profitable corporations in the world (J&J), and the Debtor fails to address how its funding commitment to J&J requires the Debtor to refund J&J for its past consumer/advertising transgressions. Thus, the harm that would befall the States if

prevented from carrying out their police and regulatory powers to ensure the protection, health, and safety of their own citizens is both more real and more immediate than the Debtor's theoretical indemnification harm. *See In re Johns-Manville Corp.*, 26 B.R. 420, 431 (Bankr. S.D.N.Y. 1983) (finding failure to demonstrate irreparable harm where debtor "maintains no obligation to indemnify or pay for [such] costs"), *vacated on other grounds by In re Johns-Manville Corp.*, 41 B.R. 926 (S.D.N.Y. 1984).

The Debtor simply offers no concrete or particularized imminent harm.  The Debtor disingenuously claims that the State Actions "***could*** negatively impact the Debtor's efforts to reach consensus with the forty other states and the District of Columbia," **Motion at 13** (emphasis added), yet provides nothing in the way of specifics.  Of course, that is because the Debtor itself has railroaded its own "mediation and negotiation efforts in this case."  **Motion at 13**; *see also* **Motion at 55** (regarding "Debtor's efforts to resolve all claims in a global and consistent manner").  For example, the Debtor's recent Status Report unabashedly estimates certain claims "at zero" and devalues others at "about a one-in-four chance of winning" at trial.  *See* **Bankr. Dkt. No. 2473 at 7 & n.2**.  Moreover, during the July 26, 2022 hearing held before this Court, counsel for the Ad Hoc Committee of States Attorneys General pointed out that, although the states "still believe in the mediation process," "[t]o date, the states haven't participated in any in-person mediation." **Bankr. Dkt. No. 2784 at 81-82** (adding that "mediation needs to have some teeth" before the parties can even begin negotiating—"the status quo isn't currently working and [] there needs to be some assistance in breaking the log jam"); *see also id.* **at 83** ("Currently, [the State Actions are] scheduled to go forward in early 2023 and they could serve as test cases for liability with respect to consumer protection claims.").  Even when moving for estimation, the Debtor underscored its position regarding "the highly disputed nature of the Talc Claims."  **Bankr. Dkt. No. 2726 at 8**.

And now, the Debtor has moved for a third extension of its exclusive period to file and solicit a chapter 11 plan, which was adjourned to November 16, 2022 by the Court by Order dated August 12, 2022. *See* **Bankr. Dkt. No. 2813 & 2870**. It is, therefore, obvious that the Debtor itself is placing major obstacles in the way of achieving any consensual plan of reorganization or finding any success in its "mediation and negotiation efforts in this case," when the Debtor fervently and stubbornly denies the validity of almost every single creditor's claim. This stance is especially galling considering that the Debtor's entire raison d'être is to resolve liability associated with the very claims the Debtor continues to insist are meritless.

Additionally, the Debtor claims that it faces the risk of "collateral estoppel" against J&J being used to bind the Debtor in the future. **Motion at 47**; *see also* **Motion at 46, 50** (throwing in "record taint" and "evidentiary prejudice" based on the same arguments). However, the alleged risk of collateral estoppel or evidentiary prejudice, in and of itself, is insufficient to justify extension of the automatic stay. As the Second Circuit held in *Queenie, Ltd. v. Nygard, Int'l*, if the possibility of "later use against the debtor . . . of an adverse decision" "could support application of the stay, there would be vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants." 321 F.3d 282, 288 (2d Cir. 2003); *Forcine Concrete & Constr. Co., Inc. v. Manning Equip. Sales & Serv.*, 426 B.R. 520, 525-26 (E.D. Pa. 2010) ("Nor does the possibility that a finding of liability against [the employees] might facilitate a later suit against [the debtor] suffice to constitute such 'unusual circumstances,' even assuming *arguendo* that [debtor] would be collaterally estopped from relitigating any issues decided in prior proceedings concerning the individual defendants."); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 564 B.R. 192, 195 (S.D.N.Y. 2016) ("The Court is not persuaded that collateral estoppel . . . is even arguably implicated here, given that

17

Debtor Defendants' bankruptcy has deprived them of a full and fair opportunity to litigate the claims against them in this forum at this time.").

The Debtor supports its collateral estoppel argument by citing to *In re Purdue Pharmaceuticals L.P.*, 619 B.R. 38 (S.D.N.Y. 2020). However, the district court there noted that the bankruptcy court previously "considered" any possible collateral estoppel but ultimately ruled, under irreparable harm, that "'litigating the merits [of the separate action] . . . would take years,' and, as a result, the reorganization 'would be disastrously diverted.'" *Id.* at 59 (alterations in original) (adding, moreover, that "the police powers exception is irrelevant to this appeal, because the Preliminary Injunction was not entered pursuant to the automatic stay provision"). At any rate, Purdue's bankruptcy shares zero similarity with the Debtor's bankruptcy here because (i) the claims in the Purdue bankruptcy were directly against Purdue, as the debtor; (ii) the parties there consented to bankruptcy court jurisdiction; and (iii) Purdue involved allegations of criminal wrongdoing. Conversely, there can be no collateral estoppel here, where the claims concern J&J's sales, advertising, and marketing, which are not Enjoined Talc Claims, and which therefore cannot bind the Debtor with respect to the Talc Claims and/or indemnification obligations. ***See* Motion at 48-49**. Given that the State Actions do not contain overlapping legal inquiries, no risk of collateral estoppel exists as to findings made against J&J under consumer protection statutes in the State Actions.

The keystone piece to the Debtor's irreparable harm position is that it has indemnity obligations for J&J's and JJCI's "talc-related claims." **Motion at 53**. But, to be applicable, the indemnity obligation must be to "a third-party who is ***entitled to absolute indemnity*** by the debtor." *A.H. Robbins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (emphasis added); *see also In re W.R. Grace*, 412 B.R. at 667 (finding no jurisdiction exists where parties need

intervening lawsuit to vindicate indemnity rights).    Moreover, J&J and JJCI specifically orchestrated these specious indemnity obligations so that the Debtor could make the irreparable harm argument, an absurd result that starkly outlines the abuse of the bankruptcy system taking place in this chapter 11 case.    The Debtor, as it must, tacitly admits that that its indemnity obligations "***could*** make judgments [in the State Actions] tantamount to judgments against the Debtor"—not that it is "absolute."    **Motion at 53** (emphasis added).

As a result, the Debtor has not identified any imminent, irreparable harm to their liquidation efforts that would result from continuation of the State Actions against J&J and JJCI.

### iii.    *The Balance of Harms and Public Policy Weigh in Favor of the States*

Finally, the balance of equities tips in the States' favor precisely because the public policy implicated herein is so significant—i.e., the ability of the individual States to protect the health and safety of their own citizens, including the ability to enforce their police and regulatory powers in that regard.    Any hypothetical prejudice to the Debtor based on what "could" happen (although unlikely to happen) is far outweighed by the non-theoretical prejudice to the States.    Simply put, enjoining the States from pursuing non-Talc Claims against non-debtors will result in "total frustration of their opportunity for a day in court." *In re Johns-Manville*, 26 B.R. at 417 (refusing to enjoin continuation of numerous tort actions against debtors' co-defendants).    The Motion also fails to set any temporal limitations on the pendency of the preliminary injunction and is, in effect, a permanent injunction that is set to last indefinitely; and such delay is "not costless." *In re Related Asbestos Cases*, 23 B.R. 523, 531-32 (N.D. Cal. 1982).

Notwithstanding that courts have recognized a general public interest in promoting a successful reorganization, *see* **Motion at 58**, the public interest here weighs heavily in favor of allowing the State Actions to go forward.    As set forth more fully below, there is a very strong and vital public interest in allowing governmental units to enforce police and regulatory power.    The

Third Circuit previously held, after reviewing "the legislative history . . . in describing the intended effect of the police and regulatory exemption," that "where a governmental unit [like the States] is suing a debtor to prevent or stop violation of fraud, environmental protection, *consumer protection*, safety, or similar regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay."  *United States v. Nicolet, Inc.*, 857 F.2d 202, 208 (3d Cir. 1988) (citing and quoting Senate and House Committee Reports). This is much more than "mere delay," **Motion at 57**, but rather is an affront to the Bankruptcy Code and "an effort to frustrate necessary governmental function," *Nicolet*, 857 F.2d at 207. Although the Debtor works hard to spin the public interest considerations in its favor as "strongly favor[ing] uniform treatment of claims," **Motion at 60**, it is decidedly not in the public interest to invoke section 105(a) to override section 362(b)(4) of the Bankruptcy Code and simply lump the States' non-Talc Claims in with all the other general Enjoined Talc Claims.

Thus, the Debtor cannot satisfy its burden to demonstrate that the balance of hardships and public policy weigh distinctly in its favor.

## II.   THE TEXAS TWO-STEP

J&J currently makes a mockery of the Bankruptcy Code and is now seeking a further extension of the Bankruptcy Code's automatic stay, after a brazen series of corporate maneuvers (the "Texas Two-Step"), to apply to the States and against non-debtors.  J&J's Texas Two-Step "restructuring" likely constitutes an "actual intent to hinder, delay, or defraud" creditors under 11 U.S.C. § 548(a)(1)(A) all by itself and should not have been permitted in the first instance.  The States understand that the Court does not share that sentiment and discarded the arguments against the Texas Two-Step in its opinion denying the motions to dismiss.  *See* **Bankr. Dkt. No. 1572 at 51-52**.  The Court, however, specifically noted that it "does not find that the rights of the talc

claimants and holders of future demands are materially affected by the divisional merger." *Id.* **at**

**51**. Here, the Court is now faced with quite a different beast.

Enjoining the prosecution of States' consumer protection lawsuits would have vast implications for all states' ability to regulate corporate activity, while preventing states from exercising their police and regulatory powers. This is "an affront to the purpose . . . and the integrity of the bankruptcy system," and the Court should draw a dividing line in the sand between the Talc Claims and the State Actions. *See In re Patriot Coal Corp.*, 482 B.R. 718, 744 (Bankr. S.D.N.Y. 2012). Setting up a company for the sole purpose of filing bankruptcy may have been green lit by the Court, but it should <u>not</u> be extended further to undermine state sovereignty and police powers. *See, e.g.*, *In re LTL Mgmt. LLC*, 2021 WL 5343945, at \*6 (Bankr. W.D.N.C. Nov. 16, 2021) ("Even without any evidence of bad faith, courts are not required to 'condone every strategy devised by clever lawyers to outsmart statutory purpose.'" (quoting *Patriot Coal*, 482 B.R. at 745)).

This Motion has drifted from "a neutral impact upon creditors," *see* **Bankr. Dkt. No. 1572 at 52**, to an outright abuse of the bankruptcy system. It cannot fairly be said that "the legislative intent" behind the Texas Two-Step permits a stay against state actions to enforce police and regulatory powers—especially concerning, as is the case in the State Actions, injunctive relief and civil penalties associated with consumer protection and fraud statutes to protect public health. Moreover, the defendants in the State Actions are J&J and JJCI—non-debtors—and those entities are the real tortfeasors on non-Talc Claims. In other words, not only are the State Actions <u>not</u> "Enjoined Talc Claims" (discussed more below) but also, for that reason, Debtor indemnification is inapplicable. Debtor is merely a shell created just to shoulder the burden of the talc plaintiffs'

claims and, if the States get judgments in the consumer protection actions, J&J will be required to adhere to the injunctive relief and will pay those civil penalties—not the Debtor.

Therefore, it would be antithetical to the Bankruptcy Code, the bankruptcy system, and contrary to the interests of justice, to permit the Debtor's Texas Two-Step gamesmanship to double as an additional exception to section 362(b)(4) of the Bankruptcy Code.  The Motion should be dismissed for this equitable reason, as well.

## III.    THE STATES ARE SOVEREIGN ENTITIES, AND THE STATE ACTIONS ARE WELL-PROTECTED EXERCISES OF THEIR POLICE AND REGULATORY POWERS

### A.    States Are Sovereign Entities

States "maintain certain attributes of sovereignty, including sovereign immunity."  *In re Venoco LLC*, 998 F.3d 94, 101 (3d Cir. 2021) (quoting *In re PennEast Pipeline Co., LLC*., 938 F.3d 96, 103 (3d Cir. 2019), *rev'd and remanded on other grounds, PennEast Pipeline Co., LLC v. New Jersey*, 141 S.Ct. 2244, 2258 (2021) ("When 'the States entered the federal system,'" they did so 'with their sovereignty intact.'"  (citation omitted))).  However, the exercise of *in rem* jurisdiction "does not implicate a State's sovereignty to nearly the same degree as other kinds of jurisdiction."  *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 378 (2006) (citing *Tennessee Student Assistance Corp. v. Hood*, 546 U.S. 356, 450-51 (2005)).  Bankruptcy jurisdiction is, at its core, *in rem*.  *Katz*, 546 U.S. at 362 (citing *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947) ("The whole process of proof allowance and distribution is, shortly, an adjudication of interests claimed in a *res*.").  The Supreme Court has held, that, by ratifying the Bankruptcy Clause of the United States Constitution, the states waived their sovereign immunity to proceedings that further a bankruptcy court's exercise of its *in rem* jurisdiction over property of the debtor and its estate. *Venoco,* 998 F.3d at 99 (citing *Katz*, 546 at 378).

However, the Bankruptcy Clause authorizes only a "*limited subordination* of state sovereign immunity in the bankruptcy arena." *Katz*, 546 U.S. at 362, 377 (emphasis added); *see also Venoco*, 998 F.3d at 104 (Bankruptcy Clause waives state sovereign immunity "in some but not all bankruptcy proceedings"). The Supreme Court has explained that the bankruptcy court's *in rem* jurisdiction does not override sovereign immunity; nor can it be said "that every exercise of a bankruptcy court's jurisdiction will not offend the sovereign immunity of the State." *Venoco*, 998 F.3d at 102-03 (quoting *Hood*, 541 U.S. at 451 n. 5). For the reasons set forth below, therefore, the injunctive relief the Debtor seeks by the Complaint and the Motion is precluded by the sovereign immunity enjoyed by the States.

The contemporary legal context in which the Bankruptcy Clause was ratified underscores the limited scope of its waiver of states' sovereign immunity. The Framers of the Constitution (including those who voted to ratify it) can be presumed to have been familiar with that legal context. *Katz*, 546 U.S. at 362. "Foremost on the minds of [the Framers] were the intractable problems created by one State's imprisoning of debtors who had been discharged (from prison and of their debts) in and by another State." *Id.* at 363. They would also have known the "critical features" of a bankruptcy proceeding to be: (i) the bankruptcy court's exercise of exclusive jurisdiction over the debtor's assets; (ii) the equitable distribution of that property; and (iii) the discharge of the debtor. *Id.* at 363-64 (citations omitted); *Venoco*, 998 F.3d at 105. Such an understanding of bankruptcy would have included a recognition that states were bound by a debtor's discharge. *Katz*, 546 at 364 (quoting *Hood*, 541 U.S. at 448).

The Framers would have understood that the Bankruptcy Clause covered the "entire 'subject of Bankruptcies'" and provided "*in certain limited respects*, for more than simple adjudication of the rights in the *res*." *Id.* at 370 (emphasis added). The scope of any waiver of

sovereign immunity contained in the Bankruptcy Clause would, therefore, have been understood

to include the issuance of orders ancillary to *in rem* adjudications, such as: (i) orders imprisoning

recalcitrant third parties in possession of assets of the debtor; (ii) orders directing turnover of a

debtor's assets; (iii) avoidance and recovery of fraudulent or preferential transfers;[12] and (iv) the

issuance of writs of habeas corpus releasing debtors from prison. *Id.* at 370-74 (citations omitted).

Indeed, such understanding of bankruptcy seems to have informed the formulation of the

Bankruptcy Act of 1800, which limited bankruptcy relief to involuntary cases against merchants.

The Act provided for: (i) the collection and liquidation of the debtor's assets; (ii) the investigation

of the debtor and any third parties possibly in possession of assets of the debtor; (iii) the liquidation

of those assets and the distribution of the liquidation proceeds to creditors; and (iv) the discharge

of debtor upon consent of two-thirds of creditors. *Id.* at 374 (summarizing the Act). In sum, the

Framers' understanding of bankruptcy would have been limited to liquidation proceedings not

unlike the current Chapter 7.

Wholly lacking from such an understanding of bankruptcy is the concept of reorganizing

and restructuring a business entity. Such an omission should come as no surprise. Congress did

not enact a permanent bankruptcy law until the enactment of the Bankruptcy Act of 1898, which

provided as an option to liquidation for an agreed composition or arrangement of debts requiring

approval by creditors. Bradley Hansen, "Bankruptcy Law in the United States," *Economic History

Services*, EH.net (last visited Aug. 3, 2022). Only in 1938 did Congress amend the Bankruptcy

Reform Act to provide for corporate and real estate restructurings like those for which the

Bankruptcy Reform Act of 1978 provides. *Id.* The complex reorganizations of the last forty years

---

[12]In *Katz*, the Supreme Court concluded that a state agency had waived its sovereign immunity with respect to a
preference avoidance proceeding brought by the Chapter 11 trustee.

would, therefore, have been far outside the Framers' understanding of bankruptcy, as would many of the proceedings arising in those complex reorganizations, including injunctions of litigation between non-debtors like the relief sought in this Adversary Proceeding.

It follows, therefore, that many of the proceedings brought within or related to Chapter 11 cases, if brought against states, would not fit within the limited waiver of sovereign immunity *Katz* and *Venoco* find in the Bankruptcy Clause. Among those proceedings, no doubt, would be actions to enjoin states from enforcing their consumer fraud and related laws against non-debtors. *See, e.g.*, *Village of Rosemont v. Jaffe*, 482 F.3d 926, 937 (7th Cir. 2007) (finding "nothing in either *Katz* or [*Hood*] that undermines the state's sovereign immunity" from actions to enjoin the state from exercising its regulatory authority over a gaming license). The limited scope of the Bankruptcy Clause's waiver of sovereign immunity is underscored by the fact that research has uncovered no cases decided post-*Katz* (including *Venoco*), in which a court determined that the Bankruptcy Clause had waived a state's sovereign immunity in proceedings that were not actions to: (i) avoid and recover fraudulent or preferential transfers; (ii) determine the existence, extent or priority of interests claimed in estate assets; (iii) avoid liens on estate or exempt property; (iv) sanction violations of the automatic stay or discharge injunction; (v) determine the dischargeability of a debt; (vi) determine a debtor's tax liability pursuant to 11 U.S.C. §505; or (vii) determine the scope of a debtor's insurance coverage.

Whether the instant Adversary Proceeding fits within the narrow waiver of sovereign immunity identified by *Katz* and *Venoco* requires a consideration of its connection to the bankruptcy court's *in rem* jurisdiction or, in other words, its impact on one of the three basic critical bankruptcy features identified above. *Katz*, 546 U.S. at 371 (orders ancillary to the bankruptcy court's exercise of its *in rem* jurisdiction, even if they are not themselves *in rem* in nature, may not

be barred by sovereign immunity); *Venoco*, 998 F.3d at 104 (the impact of the proceeding, not its form, is determinative). The factors to be applied in such a consideration are: (i) whether the proceeding decides and affects an interest in the *res*, the debtor's assets; (ii) whether the proceeding impacts the equitable distribution of the debtor's property; and (iii) whether the proceeding interferes with the debtor's discharge. *Id.* at 105. There is no "one-size-fits-all test, because claims and proceedings in bankruptcy are varied and fact-specific." *Id.* at 105-06.[13]

The States have not named the Debtor as a party to the State Actions. They do not seek possession or control of any of the Debtor's assets; nor do they assert claims to or interests in any of the Debtor's assets. They simply seek to enforce consumer fraud and related claims against two non-debtors in an exercise of their state police powers (discussed more fully below). As such, continued prosecution of those Actions will not interfere with the first critical bankruptcy feature— the Court's exercise of exclusive jurisdiction over the Debtor's assets. *See In re Philadelphia Entm't & Dev. Partners LP*, 860 Fed. App'x. 25, 28 (3d Cir. 2021) (debtor's action to avoid state's pre-petition revocation of a gaming license as a fraudulent transfer was barred by sovereign immunity because the debtor could not show that it had a property interest in the license and, for that reason, the action did not further the bankruptcy court's *in rem* bankruptcy jurisdiction).

For similar reasons, continued prosecution of the State Actions will not interfere with the equitable distribution of the Debtor's assets—the second critical bankruptcy feature. *Venoco* is particularly instructive on this point. Acknowledging that the second function "captures proceedings where the connection to a specific piece of property may be lacking," the Third Circuit nevertheless grounds this critical feature in the debtor's assets and notes that there is "significant

---

[13]In *Venoco*, a state agency had waived its sovereign immunity as to the liquidating trustee's action for inverse condemnation with respect to estate property the agency was operating without compensating the estate.

overlap" between the first and second critical bankruptcy feature. *Venoco*, 998 F.3d at 105. Underscoring the overlap between the first and second critical bankruptcy features and their shared focus on the assets of the bankruptcy estate, the only example *Venoco* offers as interference with the second critical bankruptcy feature is the violation of the automatic stay of actions for possession of or control over estate assets. *Id.* The State Actions do not seek to either obtain possession or exercise control over the Debtor's assets but merely seek declaratory and injunctive relief and civil penalties against non-debtors.

The Debtor here cannot obtain a discharge in its Chapter 11 case. It appears that the Debtor plans an orderly liquidation and will not operate post-confirmation and, therefore, will not obtain a discharge. 11 U.S.C. § 1141(d)(3). Accordingly, the State Actions do not run afoul of the third critical bankruptcy feature and function.[14] Because the State Actions do not run afoul of any the three critical bankruptcy features and functions, the reasoning in *Katz* and *Venoco* permit the States to assert their sovereign immunity in this Adversary Proceeding.

For this reason alone, the Motion must be denied and the Complaint dismissed.

**B.     The States' "Police and Regulatory Powers"**

The starting point in examining the breadth of States' "police and regulatory powers" begins with the well-established principle that "the automatic stay provision contained in subsections 362(b)(4)-(5) ***should itself be construed broadly***," and "the automatic stay provision should, whenever possible, ***be read in favor of the States***." *Penn Terra Ltd. v. Dep't of Envtl. Res., Commonwealth of Pennsylvania*, 733 F.2d 267, 273 (3d Cir. 1984) (emphases added) ("No more obvious exercise of the State's power to protect the health, safety, and welfare of the public

---

[14]In *Hood*, by contrast, the debtor brought an action against a state agency to discharge her student loan debt in bankruptcy. In ruling for the debtor, the Court characterized the action for discharge as an *in rem* proceeding. 541 U.S. at 447.

can be imagined."). The Bankruptcy Code is explicit and clear that automatic stays simply do not apply to government regulatory actions like this one. 11 U.S.C. § 362(b)(4) (excluding "an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power"); *Nicolet*, 857 F.2d at 208 (excepting, *inter alia*, "consumer protection" actions under "the police and regulatory exemption"); *In re Halo Wireless, Inc.*, 684 F.3d 581, 587 (5th Cir. 2012) ("This exception discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety and welfare.").[15]  This case is a paradigmatic example of government enforcement of its police and regulatory power, intended to deter similar future conduct, and to protect the public health and safety.  *See In re Gandy*, 327 B.R. at 806 (excepting from automatic stay, under Section 362(b)(4), state lawsuit to enforce consumer protection law seeking injunctive and monetary relief).  Therefore, the State Actions are expressly exempt from any automatic stay.

The Debtor asserts that the "preliminary injunction order . . . does not expressly address the claims of governmental entities because such entities were not parties to the adversary proceeding." **Motion at 26**.  But, contrary to the Debtor's suggestion, the preliminary injunction order does indeed state that "[t]he relief granted herein, including any relief granted under this Order under section 105 of the Bankruptcy Code, shall not apply to restrict or enlarge the rights of the Debtor or any governmental unit under applicable bankruptcy law and all such rights are hereby preserved." **Bankr. Dkt. No. 1635 ¶ 6**; **Adv. Dkt. No. 187 ¶ 6**.  That language is virtually identical

---

[15]It is irrelevant that J&J purportedly recently stopped selling its Talc Products in the US and Canada, as such voluntary action does not moot the States' requested injunctive relief.  *See In re Gandy*, 327 B.R. 796, 806 (Bankr. S.D. Tex. 2005) ("Simply because a defendant has ceased the alleged offensive conduct does not remove a governmental unit's ability to prosecute under its police and regulatory power.").  Absent an injunction, J&J could at any time decide to resume selling Talc Products in the United States, including in New Mexico and Mississippi.

28

to the language included by Judge Whitley in decretal paragraph 7 of the NC Injunction Order, which language implicitly, at least, recognizes the protections afforded government entities by Section 362(b)(4).

The Debtor cites a handful of cases where governmental action was stayed, but each case is either distinguishable, inapplicable, or (as in the opioid cases) wildly irrelevant.  For example, in *In re W.R. Grace*, the court analyzed the Third Circuit's decision in *Nicolet*, pointed out that the governmental action in *Nicolet* "provided a 'deterrence element . . . ensuring that responsible parties will be held accountable for their [] misdeeds,'" and added that "at times bankruptcy policy must yield to higher priorities . . . and the Third Circuit has recognized that fixing civil penalties, up to the point of collection, is one such exemption."  412 B.R. at 663-64.  The district court ultimately upheld the injunctions, in the face of the bankruptcy court's flawed interpretation of section 362(b)(4), because, *inter alia*, "the underlying bankruptcy litigation was initiated eight years ago," and "New Jersey, due to its failure to timely file a claim, will recover no funds directly from [the debtor]" anyway."  *Id.* at 666.  It was only in this unique scenario where the court found that "this situation is one of those rare instances where the 'exercise of State power, even for the protection of public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted.'"  *Id.*

Moreover, in *In re TK Holdings, Inc.*, No. 17-11375, Adv. Pro. No. 17-50880 (BLS) (Bankr. D. Del. Aug. 16, 2017), ECF No. 64 at 22-23, attached to the Declaration of Robert K. Malone as <u>Exhibit 1</u>, the court entered a "brief" 90-day preliminary injunction against "the state actions,"[16] noting that "the debtors bear a heavy burden to demonstrate entitlement to such relief .

---

[16]The debtors in the *TK Holdings* matter asked for a 6-month stay, but the court determined a "brief" 90-day stay of the state actions was more appropriate, as it provided "a breathing spell for the debtors" to "have a plan and a disclosure statement and relevant deal documents on file."  Not only is the Debtor here apparently requesting an indefinitely long stay of the State Actions, but the Court's recent granting of the Debtor's estimation motion, in conjunction with the

. . interfering with the exercise of a sovereign entity's police and regulatory power," which the court found satisfied under "circumstances that are specific to the case before [the court]." Specifically, the court highlighted that, first and foremost, "these debtors are operating under the strict review and oversight of a federal agency, the National Highway Traffic Safety Administration, and they are conducting under federal direction and compulsion a massive recall." *Id.* at 23. Ultimately, because all the claims were identical nationwide, the court held that "the state actions represent the proverbial race to the courthouse. Each of the plaintiffs is identically situated to every other non-moving state and territory. And any relief obtained by those entities in the state actions will necessarily be to the detriment of the citizens of other states." *Id.* at 24. Not so here. Not only are the State Actions unequivocally *not* races to the courthouse (the NM Action has been pending since 2020—the MS Action since 2014), but the consumer protection statutes at issue in the State Actions are not "identically situated" to the talc claimants nationwide and are against non-debtors. Thus, as the court in the *TK Holdings* matter points out, that injunctive relief is "specific to [that] case," and inapplicable here.

In *In re Mallinckrodt, PLC*, No. 20-12522, Adv. Pro. No. 20-50850 (JTD) (Bankr. D. Del. Nov. 25, 2020), ECF No. 170 at 3, attached to the Declaration of Robert K. Malone as <u>Exhibit 2</u>, the court enjoined only "Covered Actions . . . against the Debtors for 270 days." The "Covered Actions" consisted of many hundreds of lawsuits—with just the case names and captions spanning 402 pages long—asserting "opioid-related liability." *Id.*, ECF No. 15-1. The court also found that adversary case to be "a core proceeding pursuant to 28 U.S.C. § 157(b)(2)," *id.*, ECF No. 170 at 2. Moreover, the injunction there expressly carved out that "nothing in this Order shall prohibit,

---

Debtor's additional request to extend the exclusivity period, renders the need for yet another "breathing spell" inapplicable. *Id.* at 25-26.

enjoin, restrict, or otherwise limit the commencement or continued prosecution of any Covered Action against non-Debtors." *Id.* at 6. The Court is presented with very different facts and circumstances here, where the State Actions are against non-debtors, are for non-Talc Claims, and this adversary proceeding is non-core. Furthermore, there is little about the much more nefarious opioid cases that share sufficient similarity with J&J's marketing, advertising, and campaign strategies to warrant likening the opioid bankruptcies (and the Sackler family) to this Debtor's bankruptcy. *See also In re Purdue Pharma L.P.*, No. 19-23649, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Oct. 18, 2019), ECF No. 89 (enjoining 435 state actions). The opioid cases provide no guidance to this Court, as they were primarily centered on adjudicating private rights and/or pecuniary interests in the Sacklers' property.

On the other hand, the State Actions seek to "protect the public safety and health as those terms have been applied in the context of the police power exception." *In re Nortel Networks, Inc.*, 669 F.3d 128, 141 (3d Cir. 2011). The Third Circuit has adopted "both the pecuniary purpose test and the public policy test," which collectively ask whether a pecuniary/private right is being adjudicated (which does not fall within the police power exception), or whether the purpose "is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay applies." *Id.* at 139-40. The State Actions are primarily <u>not</u> pecuniary in nature— the States seek to enforce their consumer protection laws on behalf of the public (not private parties). *See, e.g.*, *In re Gandy*, 327 B.R. at 803 ("pecuniary interest" is, for example, collecting "a debt arising from a normal commercial transaction to purchase goods or services"). As in *In re Gandy*, the State Actions to enforce consumer protection laws through both injunctive relief and civil penalties is a classic example of a government exercising its police and regulatory power. Also, although J&J has since voluntarily halted talc sales, that is a "red herring" because the State

31

Actions are not Talc Claims but rather seek to deter similar future misleading marketing conduct. *See* **Adv. Dkt. No. 2-2 ¶¶ 156-57**; *see also W.R. Grace*, 412 B.R. at 663-64 (recognizing that deterrence and "fixing civil penalties" fall within the police power exemption). In essence, the Debtor argues that because J&J voluntarily stopped marketing and selling its Talc Products, the States' continued prosecution *ipso facto* transforms itself from "a matter of public interest" to merely one of "pecuniary interest." The Debtor is wrong because, as discussed above, J&J's unilateral decision to stop selling talc, ***which it could reverse at any time***, in no way forestalls the public purposes of the States' continued pursuit of injunctive relief and civil penalties; after all, the purpose of an injunction is to prevent *future* violations. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct."); *In re First Alliance Mortg. Co.*, 263 B.R. 99, 113 (BAP 9th Cir. 2001) ("[T]he focus of the Commonwealth's action is to enjoin illegal conduct and achieve penalties and restitution as a deterrent to future unlawful activity.").

The States therefore have a protected interest in guarding their consumers from future wrongdoers manipulating the States' local marketplaces to their detriments.

## IV.    THE STATE ACTIONS ARE NOT SUBJECT TO THE PRELIMINARY INJUNCTION ORDER

Pursuant to this Court's Preliminary Injunction Order, "the commencement or continued prosecution of any ***Enjoined Talc Claims*** by any Defendant against any of the Protected Parties . . . is prohibited." **Bankr. Dkt. No. 1635 ¶ 3** (emphasis added). The Court defined "Enjoined Talc Claim" to mean:

> any talc-related claims against the Debtor, including all claims relating in any way to talc or talc-containing materials that were asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer Inc. ("Old JJCI") on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). For the avoidance of doubt,

32

> Enjoined Talc Claims include, without limitation, all talc personal
> injury claims and other talc-related claims allocated to the Debtor
> from Old JJCI in the documents implementing the 2021 Corporate
> Restructuring.

*Id.* **at 2 n.2**.

In the same Order defining Enjoined Talc Claims, the Court specifically noted that actions

by governmental entities were not stayed, supporting the fact that State Actions are not considered

Enjoined Talc Claims.  *Id.* **at 5 ¶ 6** ("[G]overnmental units (as defined under section 101 of the

Bankruptcy Code) are not Defendants in this proceeding.  The relief granted herein, including any

relief granted under this Order under section 105 of the Bankruptcy Code, shall not apply to restrict

or enlarge the rights of the Debtor or any governmental unit under applicable bankruptcy law and

all such rights are hereby preserved.").  Plainly, then, the State Actions do not fall within the

definition of "Enjoined Talc Claims," as they are not talc personal injury claims, and the claims

underlying the State Actions were not allocated to the Debtor in the 2021 Corporate Restructuring

documents.  As the Debtor itself readily acknowledges, the NM Action concerns violation of the

New Mexico Unfair Practices Act, violation of the New Mexico False Advertising Act, fraud and

negligent misrepresentation, negligence, and unjust enrichment; and, New Mexico did not assert a

claim under the New Mexico False Advertising Act against the Bausch Defendants.  **Motion at

27**.  The Debtor also recognizes that the MS Action similarly concerns allegations of unfair and

deceptive trade practices in violation of the Mississippi Consumer Protection Act, and that the two

Bausch Defendants originally named in the Mississippi State Action have settled and were

dismissed from the case.  **Motion at 28 & n.18**.  The States' consumer protection claims are

entirely distinct from the tort claims in the Enjoined Talc Claims brought by individuals.

Contrary to the Debtor's multiple smokescreens that the State Actions include some of the

"same counsel that represents talc claimants," that "a key issue . . . will be adjudicated outside of

this Court," and that the State Actions "would undermine the ongoing mediation with an ad hoc group of states," **Motion at 2**, the State Actions are not derivative of the Talc Claims.  The State Actions accordingly do not "create substantial factual overlap with the Talc Claims," *see* **Motion at 3**, because they relate only to each State's enforcement of its own consumer protection statutes. Ultimately, the States could prove their claims under New Mexico and/or Mississippi state-specific law, but the consumer claims in those states lack a sufficient nexus to the Talc Claims.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny the Debtor's motion for injunctive relief in its entirety.

Dated: August 12, 2022
      Newark, NJ

      **GIBBONS P.C.**

      By: /s/ *Robert K. Malone*
          Robert K. Malone, Esq.
          Dale E. Barney, Esq.
          David N. Crapo, Esq.
          Michael A. Conforti, Esq.
          One Gateway Center
          Newark, New Jersey 07102
          (973) 596-4500
          rmalone@gibbonslaw.com
          dbarney@gibbonslaw.com
          dcrapo@gibbonslaw.com
          mconforti@gibbonslaw.com
          *Attorneys for State of New Mexico and State of Mississippi*

       -and-

          **HECTOR H. BALDERAS**
          **NEW MEXICO ATTORNEY GENERAL**
          Brian L. Moore, Assistant Attorney General
          Brian E. McMath, Civil Chief Counsel
          200 Third St. NW, Suite 300
          Albuquerque, New Mexico 87102
          (505) 717-3511
          bmoore@nmag.gov

bmcmath@nmag.gov
*Attorneys for State of New Mexico*

and-

**LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205
(601) 359-4213
Crystal.Utley@ago.ms.gov
*Attorneys for State of Mississippi*