FOR PUBLICATION

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

<br><br>

LTL Management, LLC,
             Debtor.

LTL Management, LLC,

         Plaintiff,

   v.

State of New Mexico, ex rel. Hector H. Balderas,
Attorney General; and State of Mississippi, ex rel. Jim
Hood, Attorney General

       Defendants.

</td></tr>
</table>

Case No. 21-30589 (MBK)

Adv. Pro. No. 22-01231 (MBK)

Chapter 11

Hearing Date:  September 14, 2022

*All Counsel of Record*

## MEMORANDUM OPINION

      This matter comes before the Court by way Debtor's bankruptcy case (Case No. 21-30589)

and subsequent adversary proceeding (Adv. Pro. No. 22-01231) and motion  ("Motion") (ECF No.

2 in Adv. Pro. No. 22-01231)[1] filed by Plaintiff LTL Management, LLC ("LTL" or "Debtor")

seeking an Order (I) Preliminarily Enjoining the Prosecution of the New Mexico and Mississippi

State Actions and (II) Granting a Temporary Restraining Order Pending a Final Hearing.  The

---

[1] Unless otherwise specified, all ECF Nos. will refer to docket entries in the instant adversary proceeding (the "Consumer Protection Adversary Proceeding"), Adv. Pro. No. 22-01231.

Court has fully considered the submissions of the parties and the arguments set forth on the record at a hearing held on September 14, 2022. The Court also takes judicial notice of prior rulings and documents filed in the underlying bankruptcy case (Case No. 21-30589) and the related adversary proceedings, including sworn statements and exhibits attached thereto, and prior testimony.[2] For the reasons set forth below, the Court grants Debtor's Motion and resolves the adversary proceeding in favor of Debtor without prejudice to revisiting the continuation of the preliminary injunction at a later date as discussed herein. The Court issues the following findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.[3]

## I.      Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court. As explained in detail below, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (G). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.     Background

On October 14, 2021, LTL filed a voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Western District of North Carolina (the "North Carolina

---

[2] *See In re Davis*, 597 B.R. 770, 773 (Bankr. M.D. Pa. 2019) ("Federal Rule of Evidence 201 allows a federal court to take judicial notice of facts that are not subject to reasonable dispute. A bankruptcy court may take judicial notice of the docket entries in a case and the contents of the bankruptcy schedules to determine the timing and status of case events, as well as facts not reasonably in dispute."); *see also In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n.1 (3d Cir. 2018) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) and taking judicial notice of documents, "including matters of public record and judicial opinions").

[3] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

bankruptcy court"). *Petition*, ECF No. 1 in Case No. 21-30589. LTL is an indirect subsidiary of Johnson & Johnson ("J&J") and traces its roots back to Johnson & Johnson Baby Products, Company, a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J. *Declaration of John K. Kim in Support of First Day Pleadings* ("*Kim Decl.*") ¶¶ 9-10, ECF No. 5 in Case No. 21-30589. A thorough discussion of the history of J&J and its talc products can be found in this Court's February 25, 2022 Opinion Denying the Motions to Dismiss and the Court will limit its recitation of the factual background here. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022). In relevant part, in 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby Products Company (the "1979 Agreement"). Thereafter, as the result of intercompany transactions, one of J&J's corporate subsidiaries, Johnson & Johnson Consumer Inc. ("Old JJCI") assumed responsibility for all claims alleging that J&J's talc-containing products caused ovarian cancer and mesothelioma. *Kim Decl.* ¶¶ 10-14, 15, 32, ECF No. 5 in Case No. 21-30589.

On October 12, 2021, Old JJCI engaged in a series of transactions pursuant to the Texas divisional merger statute, *See* Tex. Bus. Orgs. Code Ann. §§ 10.001 *et seq.* (the "2021 Corporate Restructuring") through which it ceased to exist and two new companies, LTL and Johnson & Johnson Consumer Inc. ("New JJCI"), were formed. *Kim Decl.* ¶ 16, 22-23, ECF No. 5 in Case No. 21-30589. The alleged purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Id.* at ¶ 21. As a result of the restructuring, LTL assumed responsibility for all of Old JJCI's talc-related liabilities. *Id.* at ¶¶ 16, 24. Through the restructuring, LTL also

received Old JJCI's rights under a funding agreement (the "Funding Agreement"). *Id.* at ¶ 24. Under the Funding Agreement, J&J and New JJCI are obligated to pay, *inter alia*, the "Payee's Talc-Related Liabilities", as well as "any and all costs and expenses" LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case" to the extent necessary. *Funding Agreement* 6*, Annex 2 to Declaration of John K. Kim in Support of First Day Pleadings*, ECF No. 5 in Case No. 21-30589.

One week after the chapter 11 filing, Debtor initiated an adversary proceeding (the "Talc Adversary Proceeding"), seeking declaratory and injunctive relief against plaintiffs who had filed federal and state actions against Debtor's affiliates and other entities for talc-related claims (the "Talc Actions"). *Complaint*, ECF No. 1 in Adv. Pro. No. 21-03032.  By way of the Talc Adversary Proceeding, the Debtor sought an order declaring that the automatic stay applies to those actions against nondebtors or, in the alternative, to enjoin such actions and grant a temporary restraining order pending a final hearing. Debtor simultaneously filed a motion requesting a preliminary injunction enjoining the prosecution of actions outside of the chapter 11 case on account of the same talc claims that exist against the Debtor in the chapter 11 case. *Motion*, ECF No. 2 in Adv. Pro. No. 21-03032.   Ultimately, the chapter 11 and related adversary proceeding case were transferred to the District of New Jersey, and Debtor supplemented its initial brief and amended and restated its arguments in support of the relief sought to reflect Third Circuit precedent.  Several interested parties opposed the motion.  Additionally, two separate parties filed motions to dismiss the underlying bankruptcy, alleging it had been filed in bad faith. *See* ECF Nos. 632 & 766 in Case No. 21-30589.  The Court heard arguments on the motion for preliminary injunction in the Talc

Adversary Proceeding contemporaneously with arguments on pending motions to dismiss the bankruptcy during evidentiary hearings held on February 14-18, 2022.  Shortly thereafter, on February 25, 2022, the Court denied the motions to dismiss in the underlying bankruptcy case and granted the motion for preliminary injunction in the Talc Adversary Proceeding. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022) (denying motions to dismiss); *In re LTL Management, LLC*, 638 B.R. 291, 297 (Bankr. D.N.J. 2022) (granting preliminary injunction).

Debtor then commenced an adversary proceeding (the "Securities Adversary Proceeding") on March 7, 2022 against San Diego County Employees Retirement Association ("SDCERA"). *Complaint*, ECF No. 1, Case No. 22-01073.  Simultaneously therewith, Debtor filed a motion requesting injunctive relief. *Motion*, ECF No. 2 in Adv. Pro. No. 22-010733.  The Securities Adversary Proceeding and accompanying motion sought to enjoin the continued prosecution of a securities action (the "Securities Action") pending in the United States District Court for the District of New Jersey against certain non-debtor individuals and affiliates of the Debtor. *See Hall v. Johnson & Johnson*, No. 3:18-cv-01833 (D.N.J.).  On April 29, 2022, this Court granted the motion for preliminary injunction in the Securities Adversary Proceeding and extended the automatic stay to nondebtor defendants in the Securities Action.  *See In re LTL Mgmt., LLC*, No. 22-01073, 640 B.R. 322 (Bankr. D.N.J. 2022).

On July 14, 2022, Debtor commenced the instant adversary proceeding ("Consumer Protection Adversary Proceeding"), against the State of New Mexico, ex rel. Hector H. Balderas, Attorney General and State of Mississippi, ex rel., Jim Hood, Attorney General. *Complaint*, ECF No. 1.  Simultaneously therewith, Debtor filed a motion (the "Motion") (ECF No. 2) requesting

injunctive relief.  The Consumer Protection Adversary Proceeding and Motion seek to enjoin temporarily the continued prosecution of certain state actions (the "State Actions").[4]  The defendants in the Consumer Protection Adversary Proceeding are states (the "States") that filed claims in state court seeking, among other things, injunctive relief and civil penalties against various defendants, including J&J (the "Consumer Protection Defendants").  Debtor argues that the claims asserted in the State Actions are "inherently intertwined" with the claims being resolved in the bankruptcy proceeding (the "Talc Claims").  Accordingly, Debtor asserts that continuation of the State Action will impair its ability to resolve the Talc Claims in the chapter 11 bankruptcy case.  Debtor also contends that continued litigation of the State Actions will jeopardize its ability to successfully reorganize.

The States oppose the Motion and assert that they are sovereign entities exercising their police and regulatory powers and, thus, should be permitted to proceed with the State Actions. *See States' Opp'n*, ECF No. 18.  In addition to the States' Opposition, objections to the Motion were filed by the Ad Hoc Committee of States Holding Consumer Protection Claims (ECF No. 21), the TCC (ECF No. 22), and Maune Raichle Hartley French & Mudd, LLC (ECF No. 23).

---

[4] Specifically, Debtor seeks to enjoin continued prosecution of litigation in the First Judicial District Court for the County of Santa Fe, New Mexico ("New Mexico State Action") against certain non-debtor individuals and affiliates of the Debtor; and the pending action in the Chancery Court of the First Judicial District of Hinds County, Mississippi ("Mississippi State Action") (collectively referred to as the "State Actions"). *See State of New Mexico, ex rel. Hector H. Balderas, Attorney General v. Johnson & Johnson, Et. al.*, No. D-101-CV-2020-00013, (N.M. Dist.); *The State of Mississippi, Ex rel. Jim Hood, Attorney General v. Johnson & Johnson, Et. al.*, Civil Action No. 25CH1:14-cv001207. Copies of the respective state complaints are attached to Debtor's Complaint and Motion. *See Appendices A and B to Complaint*, ECF Nos. 1-1, 1-2; *Exhibits 1 and 2 to Motion*, ECF Nos. 2-2, 2-3.

III.    **Discussion**

A.  **The State Actions**

Prior to addressing the merits of the Motion, a brief discussion of the State Actions is warranted to provide context to the parties' arguments.  The State of New Mexico filed its complaint against, among others, J&J and Old JJCI in 2020, alleging that Consumer Protection Defendants defrauded consumers and violated state statutes prohibiting unfair trade practices and false advertising.  In its complaint, the State of New Mexico asserts—among other things—that the Consumer Protection Defendants "possessed medical and scientific data that raised concerns regarding the presence of carcinogens" in their talc-containing products (the "Talc Products"), but nevertheless "made false statements" that represented the Talc Products as safe when, "in fact caused ovarian cancer and other cancers as well as mesothelioma and death." *Exhibit 1 - New Mexico Complaint* ¶¶ 25, 24, 157, ECF No. 2-2.  In short, the State of New Mexico claims that the Consumer Protection Defendants were aware that the products contained asbestos, fibrous talc, and other carcinogens but refused to place warnings on their Talc Products in violation of state law.  The State of New Mexico seeks damages against the Consumer Protection Defendants, in part, because they "were marketing and selling dangerous asbestos-containing talcum powder products which Defendants knew contained asbestos and knew would be used as designed on a daily basis all over the consumer's body, including the genital area." *Id.* at ¶ 220.

The State of Mississippi filed its complaint against the Consumer Protection Defendants in 2014 (the "Mississippi Complaint").  The Mississippi Complaint similarly alleges that the Consumer Protection Defendants were aware of "numerous studies" demonstrating that "women

7

who repeatedly use talc-based powders in the genital area have an increased risk of ovarian cancer." *Exhibit 2 - Mississpi Complaint* ¶¶ 24, ECF No. 2-3.  The Mississippi Complaint further alleges that, despite this knowledge, the Consumer Protection Defendants did not make the public aware of this information and continue to deny a causal link between its products and ovarian cancer.  As a result, the Mississippi Complaint contends the Consumer Protection Defendants "failed to inform the Public of the known catastrophic health consequences associated with the use of [their] Talc Products" and "purposely procured and disseminated false, misleading, and deceptive information regarding the safety of the Talc Products to the public." *Id.* at ¶ 92.  The State of Mississippi seeks damages and an accounting of monies paid to the Consumer Protection Defendants "for sale of their dangerous and defective Talc Products." *Id.* at ¶ 5.

### B.  Authority and Standard for Extension of Stay to Nondebtors

The Court discussed its authority to stay litigation against nondebtor third parties in its Opinion granting a preliminary injunction in the Talc Adversary Proceeding. *See In re LTL Management, LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022).  The Court will not repeat that lengthy discussion and, instead, incorporates it by reference.  In sum, the Court concludes that § 362(a), §105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties.  Nevertheless, because certain courts in this circuit still view the source of authority to extend the automatic stay as an open-ended question, this Court will utilize the same three-step inquiry outlined in its prior decision to address the instant Motion.  Namely, in determining whether to extend the automatic stay to nondebtor third parties, the Court considers: (1) whether it has jurisdiction to issue the injunction; (2) whether extension of the automatic stay

under § 362(a) to the nondebtors is appropriate; and (3) whether the Court should, in its discretion,

issue the injunction. *In re LTL Mgmt., LLC*, 638 B.R. at 301 (citing *In re Philadelphia Newspapers,*

*LLC*, 423 B.R. 98, 102 (E.D. Pa. 2010)) (other citations omitted)*.*

### 1. Subject Matter Jurisdiction

The State Defendants contend that the Debtor has failed to establish that this Court has

subject matter jurisdiction to enjoin the State Actions. *See States' Opp'n* 9, ECF No. 18.  Debtor's

moving brief cites only § 105(a) as a basis for the requested relief. *Motion*, ECF No. 2.  Indeed, as

the States point out, a request for an injunction under § 105(a) cannot—by itself—create

jurisdiction. *See In re W.R. Grace & Co.,* 591 F.3d 164, 170–71 (3d Cir. 2009) (quoting *In re*

*Combustion Eng'g, Inc.,* 391 F.3d 190, 225 (3d Cir. 2004)) (holding that, because § 105(a) does

not provide an independent source of federal subject matter jurisdiction, a court must establish that

it has subject matter jurisdiction prior to issuing an injunction under § 105(a)).  Here, the States

contend that "the outcome of the State Actions (against J&J and JJCI) have no relation to, and thus

will have no impact on, the Debtor's estate being administered in bankruptcy." *States' Opp'n* 9,

ECF No. 18.  The Court disagrees and finds that the States' position fails to appreciate the practical

implications of continued litigation in the State Actions and fails to consider this Court's

incontrovertible authority to examine and determine the scope of a substantive right afforded under

the Bankruptcy Code.

"Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11;

(2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4)

proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006),

as amended (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391 F.3d at 225 (citations omitted)).  "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)).  A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings. 28 U.S.C. §157(b)(1); *In re Roggio*, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020).

A proceeding "arise[s] under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d at 217. A proceeding "arise[s] in" a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Id.* at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) and explaining that a proceeding arises in a bankruptcy case if it has "no existence outside of the bankruptcy").  Finally, "a claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted); *see also In re W.R. Grace & Co.*, 591 F.3d 164.  "What will or will not be sufficiently related to a bankruptcy to warrant the exercise of subject matter jurisdiction is a matter that must be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d at 174 n.9.

### a)  "Arising Under" and "Arising In" Jurisdiction

In its moving brief, the Debtor explicitly "maintains that the State Actions are subject to section 362's **automatic stay**[.]" *Debtor's Brief* 7, ECF No. 2 (emphasis added).[5]  The automatic stay is codified in § 362(a) of the Bankruptcy Code and, thus, is "a substantive right provided by the Bankruptcy Code." *In re Roggio*, 612 B.R. at 660.  Indeed, in making its jurisdictional determination in a separate adversary proceeding related to Debtor's underlying bankruptcy, the "Securities Adversary Proceeding," this Court previously held that—because the adversary proceeding invoked a substantive right under the Bankruptcy Code and was a proceeding that, by its nature, could arise only in the context of a bankruptcy case—it was a core proceeding over which this Court could exercise jurisdiction. *In Re LTL Mgmt., LLC*, 640 B.R. at 332.  The ruling in the Securities Adversary Proceeding was consistent with the district court's ruling on the motion to withdraw the reference of the bankruptcy, as well as with the holdings of several other courts to have encountered this issue. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, No. CV 21-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (collecting cases stating that "motions to extend an automatic stay and injunction to non-debtor third parties pursuant to sections 362 and 105 qualify as 'core' proceedings").

In their Opposition to the instant Motion, however, the States present a challenge to "core" jurisdiction predicated on the Third Circuit's ruling in *In re W.R. Grace & Co.*, 591 F.3d 164, 175

---

[5] Debtor does not elaborate on this argument, instead asserting that "the Court need not address that issue in this adversary proceeding because the State Actions can and should be enjoined pursuant to section 105 of the Bankruptcy Code." *Id. Debtor's Brief* 7-8, ECF No. 2.  Nevertheless, this Court considers all bases for the requested relief. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, 111 S. Ct. 1711, 1718, 114 L. Ed. 2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.") (citations omitted); *see also McFarland v. Cnty.*, No. 3:13-CV-01102, 2016 WL 213617, at *4 (M.D. Pa. Jan. 19, 2016).

(3d Cir. 2009).   Specifically, the States assert that "the State Actions are undeniably non-core proceedings . . . and thus unequivocally do not 'arise under' the Bankruptcy Code or 'arise in' the bankruptcy case." *States' Opp'n* 10, ECF No. 18.   The States focus on the fact that the underlying actions Debtor seeks to enjoin—the State Actions—are state law consumer protection claims.   The States argue that these claims do not arise under or arise in the Code and exist decidedly *outside* the bankruptcy.   Moreover, the States contend that "the question is not the statutory basis for the requested **bankruptcy relief**. The question is the nature of this Court's **subject matter jurisdiction** over the State Actions[.]" *Id.* (emphasis in original).   Essentially, the States argue that—because this Court does not have subject matter jurisdiction over the underlying State Actions—"this Court has no core jurisdiction over the instant matter." *Id.*   The States' argument— and its reliance on *In re W.R. Grace*—are misplaced.

Ordinarily, the test for whether a bankruptcy court has jurisdiction does *not* turn on whether it has jurisdiction over an underlying lawsuit referenced in an adversary proceeding.   Indeed, if that were the case, bankruptcy courts would have neither jurisdiction to address nor authority to enter final judgment over a host of matters that impact claim allowance, exemptions, estate property, or dischargeability.   Rather, the focus for jurisdictional purposes is on the **adversary proceeding** itself and the relief sought therein. *See, e.g.*, *Halper v. Halper*, 164 F.3d 830, 837 (3d Cir. 1999) (instructing courts to conduct a claim-by-claim analysis *of the action presented to the bankruptcy court* to determine the extent of the bankruptcy court's jurisdiction).   The Third Circuit has "adopted a two step process to determine whether a claim is a core proceeding." *In re Winstar*

*Commc'ns, Inc.*, 554 F.3d at 405 (citing *Halper* 164 F.3d at 836) (directing parties first to the illustrative list of core proceedings in 28 U.S.C. § 157(b) and then asking whether the adversary proceeding invokes a substantive right under the Code or could arise only in the context of a bankruptcy case).

Admittedly, where an adversary proceeding seeks to enjoin a third-party action, the focus of the jurisdictional inquiry becomes convoluted.  The analysis is further complicated due to the lack of certainty regarding the proper basis—§ 105(a), § 362(a), or a court's inherent powers—for issuing a preliminary injunction that extends the protection of § 362(a) to nondebtors.  However, Debtor's Motion unquestionably implicates § 362(a), which is a substantive right under the Code. This Court certainly has jurisdiction to determine § 362(a)'s applicability and scope in this bankruptcy case, and—more specifically—whether it is appropriate to extend the substantive rights afforded under § 362(a) to nondebtors. *See, e.g.*, *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1100 (9th Cir. 2005) (holding that lower court had jurisdiction to determine whether the automatic stay of the Texas bankruptcy court applied to the Attorney General's suit).

The States' emphasis on the underlying State Actions and its reliance on *In re W.R. Grace* do not change this analysis.  Significantly, *In re W.R. Grace* and the cases cited therein do not discuss § 362(a).  Rather, they address solely a bankruptcy court's jurisdiction to issue an injunction under § 105(a). *See In re W.R. Grace & Co.,* 591 F.3d at 173-75; *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995).  Those decisions stand for the proposition that a bankruptcy court's jurisdiction over an adversary proceeding is, by itself, insufficient to confer jurisdiction to enjoin third parties under § 105(a).  The Court agrees and will

13

address its jurisdiction to issue an injunction under § 105(a) in a subsequent section. For now, however, this Court addresses § 362(a)—specifically, its applicability and scope in this bankruptcy case and the appropriateness of an extension of the automatic stay to nondebtor Consumer Protection Defendants. This is decidedly a proceeding over which this Court has "core" jurisdiction. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, , 2022 WL 190673, at *4 (collecting cases).

Further, even the States' Opposition explicitly invokes a substantive right under the Bankruptcy Code. *See States' Opp'n* 27-32, ECF No. 18. The States argue that under § 362(b)(4), "the State Actions are expressly exempt from any automatic stay." *Id.* at 28. During oral argument, the States doubled down on this argument, citing to the Supreme Court's decision in *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 112 S. Ct. 459, 116 L. Ed. 2d 358 (1991). In that case, the Supreme Court addressed the district court's authority to enjoin actions in light of the governmental unit police and regulatory power exception under § 362(b)(4).[6] This Court inquired during the September 22, 2022 hearing whether the Court should look to §362(b)(4) at all given the States' simultaneous assertion the State Actions were enforcement proceedings against nondebtors. The States responded that the Court should indeed look to §362(b)(4) because, if the automatic stay does not apply to the Debtor, then surely it cannot be extended to nondebtors.

---

[6] The States contend that this Court should be guided by the teaching of *MCorp*—in which the Supreme Court held that § 1334's grant of bankruptcy jurisdiction did not trump an explicit jurisdictional bar on federal or state court injunctions of certain nonfinal administrative proceedings. *MCorp Fin., Inc.*, 502 U.S. at 41. Indeed, the provision at issue in *MCorp* could not have been more express, stating that "no court shall have jurisdiction to affect by injunction or otherwise." 12 U.S.C. § 1818(i)(1). There is no such provision or statutory bar at issue in this matter and, thus, *MCorp* offers the States little assistance. Rather, the Supreme Court in *MCorp* acknowledges that once the administrative proceeding has concluded and judicial action commenced, the bankruptcy court may exercise concurrent jurisdiction under 28 U.S.C. § 1334(b). *MCorp Fin., Inc.*, 502 U.S. at 41.

Thus, the States impliedly argue that an analysis of a substantive Code provision is required in the first instance. This lends further support to the conclusion that this Court has "core" jurisdiction.

### b) "Related To" Jurisdiction

Having found "core" jurisdiction over the instant Adversary Proceeding, there is no need for a secondary source of jurisdiction. *See In re Essar Steel Minnesota, LLC*, 47 F.4th 193 (3d Cir. 2022) (discussing *In re Shenango Group, Inc.*, 501 F.3d 338, 342–44 (3d Cir. 2007), and holding that where a court finds one type of jurisdiction, it need not go further in its jurisdictional inquiry). Nevertheless, given the lack of clarity regarding the appropriate authority to enjoin third party actions, the Court offers the following analysis and determines that, at a minimum, it has "related to" jurisdiction.

In conducting this inquiry, the Court looks to Third Circuit precedent involving injunctive relief and "related to" jurisdiction. As the States point out, § 105(a) "does not provide an independent source of federal subject matter jurisdiction." *In re Combustion Eng'g, Inc.*, 391 F.3d at 225. Thus, Debtor's mere request for injunctive relief under § 105(a) does not confer jurisdiction on this Court to grant said relief. This is especially true where, as here, the requested injunctive relief seeks to enjoin prosecution of nondebtor litigation. In such circumstances, the Supreme Court directs that a bankruptcy court's "jurisdiction to enjoin [a nondebtor] proceeding . . . must be based on the 'arising under,' 'arising in,' or 'related to' language of §§ 1334(b) and 157(a)." *Celotex Corp. v. Edwards*, 514 U.S. at 307; *see also In re W.R. Grace & Co.*, 591 F.3d 164. In this case, the Court finds that continued prosecution of the claims asserted in the State Actions could conceivably impact the administration of the bankruptcy case. *See In re Winstar Commc'ns,*

15

*Inc.*, 554 F.3d at 405.  Thus, to the extent this Court is required to use § 105(a) to extend the protections of § 362(a) or otherwise enjoin the State Actions, this Court has subject matter jurisdiction to issue such injunctive relief under § 105(a).[7]

As an initial matter, the State Actions may impact available coverage under Debtor's insurance policies.  The State Actions allege—among other things—that the Consumer Protection Defendants knew of the unsafe existence of asbestos in their products and took actions to conceal that information.  In other words, the State Actions allege a "knowing and intentional" element to the Consumer Protection Defendants' conduct. It is difficult to conceive of how such allegations, if proven, would *not* impact the expected and intended benefit of insurance policies, which policies the Court previously determined were property of the bankruptcy estate.   The Court pressed Counsel for the TCC regarding this issue during the September 14, 2022 hearing and inquired whether the TCC was concerned that the insurers could use the States' proven "knowing and intentional" allegations to deny coverage under "expected and intended" exceptions to coverage. The TCC responded, in part, that it was not concerned because the insurers will raise—or have already raised—the "expected and intended" defense irrespective of the States' allegations. However, that the insurers raised—or will raise—this defense on their own accord does not change

---

[7] To be clear, case law does not require—and this Court does not find—that this Court has subject matter jurisdiction over the *claims* asserted in the State Actions.  In other words, the question is not whether this Court has jurisdiction *to adjudicate the claims* in the State Actions on their merits; but whether this Court has jurisdiction *to issue an injunction* under § 105(a). *See, e.g., Celotex*, 514 U.S. 300; *In re Combustion Eng'g, Inc.*, 391 F.3d at 229; *In re Philadelphia Newspapers, LLC*, 423 at 102 (other citations omitted).  That inquiry, in turn, focuses on whether continued prosecution of the action seeking to be enjoined impacts the bankruptcy case such that a bankruptcy court has "related to" jurisdiction.  This holding is consistent with the rationale underlying *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 137–38 (3d Cir. 2019), wherein the Third Circuit held that the bankruptcy court had authority to enjoin and release fraud claims in a confirmation order—although those claims did not stem from the bankruptcy itself—because those claims were integral to restructuring.

the fact that the States' allegations, if proven, could bolster this defense.  Thus, the State Actions

have a conceivable effect on estate property.

Moreover, Debtor has indemnification obligations for any talc-related liability under the

2021 Corporate Restructuring and the 1979 Agreement.   Per the language of the 1979

Agreement—and consistent with this Court's ruling in the Talc Adversary Proceeding—Old JJCI

"assumed all liabilities of every kind and description associated with the Baby Products division

and indemnified J&J for such liabilities." *In re LTL Management, LLC*, 638 B.R. at 308.

> The 1979 Agreement also provides [Old JJCI] with an irrevocable power of
> attorney to substitute itself "for J&J and in its [J&J's] name and stead . . . on behalf
> of and for the benefit of the Subsidiary" to, among other things, "defend and
> compromise any and all actions, suits or proceedings in respect of any said
> Properties"—defined as the Baby Products division's "businesses, franchises,
> properties and asset." *1979 Agreement § 2*, Movants' Ex. 600.02. Thus, in 1979,
> J&J Baby Products became the real party in interest for all actions, suits or
> proceedings relating to the talc previously sold by J&J or in any way arising out of
> the talc business that was being transferred. And, as the result of a series of
> transactions culminating in the 2021 Corporate Restructuring, Debtor assumed that
> liability and substituted in as the real party in interest.

*Id.* at 311.

Here, the claims asserted in the State Actions are among the liabilities assumed in 1979.

The State Actions expressly involve products for which the Baby Products division had assumed

liability or agreed to indemnify J&J. *See, e.g. Exhibit 1 - New Mexico Complaint* ¶ 1, ECF No. 2-

2 ("This action arises out of Defendants' wrongful marketing, sale and promotion of Defendants'

asbestos-containing *talcum powder products, Johnson's Baby Powder ("JBP"), Johnson's*

*Medicated Powder ("JMP"), and Shower to Shower ("S+S") . . . .*" (emphasis added); *Exhibit 2*

*– Mississippi Complaint* ¶ 3, ECF No. 2-3. ("This action seeks redress from Defendants Johnson

& Johnson, Johnson & Johnson Consumer Companies, Inc., . . . as a result of Defendants' unlawful, unfair, and deceptive business practices related to the manufacturing, sale, and marketing of *their talc-containing products, namely Johnson's Baby Power® [sic] and Shower to Shower® . . . .*") (emphasis added).  The 1979 Agreement does not specify the *type* of claims for which Old JJCI assumed liability and, instead, left the assumed liabilities broad and open-ended in terms of scope.  Given the language of the 1979 Agreement, the States' focus on talc-containing products in the State Actions, and the series of transactions culminating in the 2021 Corporate Restructuring, Debtor is ultimately responsible for the talc-related liability alleged in the State Actions.  Debtor is obligated to indemnify other named Consumer Protection Defendants in the State Actions; thus, the bankruptcy estate is affected and "related to" jurisdiction surely exists. The Court further notes that, pursuant to the terms of the Funding Agreement, all indemnification allegations related to talc liabilities are to be satisfied through the Funding Agreement, thereby potentially reducing funds available for all other obligations under a plan of reorganization.

In arguing against "related to" jurisdiction, the States contend that "the outcome of the State Actions (against J&J and [Old] JJCI) have no relation to, and thus will have no impact on, the Debtor's estate being administered in bankruptcy." *States' Opp'n* 9, ECF No. 18.  Again, the Court disagrees.  The States focus solely on the claims alleging improper methods of marketing, deceptive trade practices, and withholding of information—ultimately concluding that "[t]he Debtor's far-fetched position that the State Actions' state-specific and marketing-based claims could 'conceivably' impact the Debtor's personal injury-centric claims valuations, estimation, insurance, or stalling mediation efforts requires too many illogical leaps." *Id*. at 13-14.  However,

this position ignores the allegations in the State Actions that directly overlap with the allegations in the Talc Actions. The Court cites the following non-exhaustive list of allegations from the State Actions:

- "This action arises out of Defendants' wrongful marketing, sale and promotion of Defendants' **asbestos-containing talcum powder products** . . . Plaintiff seeks to recover the costs of Defendants' Talc Products as well as the cost of treating **asbestos-related cancers caused by those products**." *Exhibit 1 - New Mexico Complaint* ¶ 1, ECF No. 2-2 in Adv. Pro. No. 22-1231 (emphasis added).

- "Defendants irresponsibly marketed and sold **asbestos-containing talcum powder**." *Id.* at ¶ 122 (emphasis added).

- Instead, the products were essentially worthless, lacking medical value, and **in fact caused ovarian cancer and other cancers as well as mesothelioma and death**. *Id.* at ¶ 157 (emphasis added).

- Here, Defendants were marketing and selling **dangerous asbestos-containing talcum powder products which Defendants knew contained asbestos** and knew would be used as designed on a daily basis all over the consumer's body, including the genital area. Defendants chose profit over people, and over the safety of the community, and an award of punitive damages is appropriate, as punishment and as deterrence. *Id.* at ¶ 220 (emphasis added).

- Defendants have failed and continue to fail to inform the Public of the **known catastrophic health consequences** associated with the use of their Talc Products. *Exhibit 2 – Mississippi Complaint* ¶ 92, ECF No. 2-3 in Adv. Pro. No. 22-1231. (emphasis added).

Although the States place emphasis upon the Consumer Protection Defendants' "misrepresentation" or "failure to warn" conduct in their Opposition, the allegations of the State Complaints go far beyond mere allegations of an improper marketing scheme. The State Actions presume both the known and confirmed presence of asbestos in the Talc Products and a direct and proven causal link between that asbestos and certain cancers. In their Opposition, the States go so far as to assert that "J&J advertised, marketed, and sold as safe products that, **in fact, contained**

19

**carcinogens exposing the user to *inter alia*, ovarian cancer and mesothelioma.**" *States' Opp'n 14*, ECF No. 18 (emphasis added).  These are the very allegations underlying the Talc Claims. Thus, as Debtor asserts, the States' claims are "inextricably intertwined" with the Talc Claims, and continued litigation in the State Actions could potentially have adverse impacts on valuation and negotiation of the Talc Claims in the bankruptcy, as well create the possibility of prejudicial record taint.

Moreover, the Court notes that many similarly-situated entities (i.e., other states asserting consumer protection claims) have formed an Ad Hoc Committee of States Holding Consumer Protection Claims and are parties to ongoing negotiations in the underlying bankruptcy case. Mississippi—one of the defendants in the instant adversary proceeding—was previously a member of this Ad Hoc Committee.[8]  Thus, continued litigation in the State Actions would certainly impact valuation and negotiation of the state-consumer claims in the bankruptcy proceeding.  The Ad Hoc Committee and the TCC concede that continued litigation of the State Actions would impact the chapter 11 case, although they argue that this impact would be beneficial. *See Obj. of Ad Hoc Committee* ¶¶ 2, 10, 18, ECF No. 21; *Statement of TCC in Opp'n* ¶¶ 3, 4, ECF No. 22.  They assert that continuation of the State Actions would spur further discussion and improve negotiations by providing the parties with information—particularly, a basis for valuation of the consumer claims—that is necessary to mediation and, ultimately, confirmation.  Indeed, the Court-appointed expert is not undertaking a valuation of the state consumer protection claims.  In response, the Debtor asserts—without elaboration—that the State Actions would hinder discussions and

---

[8] An amended Rule 2019 Statement was recently filed on September 20, 2022, reflecting that Mississippi officially withdrew from the Ad Hoc Committee of States. *See Notice of Modification*, ECF No. 3062.

mediation efforts with the Ad Hoc Committee. *Debtor's Reply* 15, ECF No. 24.   The Court acknowledges that allowing the State Actions to proceed to judgment could offer some minimal information to the parties, and the Court, for valuation purposes.[9]   However, the Court must weigh this potential benefit against the associated prejudicial effects of continued litigation.   In doing so, the Court concludes that the possible benefits of continued litigation are far outweighed by the anticipated harms.

    In sum, the allegations in the State Actions concern what the Consumer Protection Defendants knew about asbestos in its talc products, when they knew this information, and what actions they took in the wake of learning this information.   Further, the State Actions allege that the talc products definitively contained asbestos and, in fact, caused cancer.   Any findings regarding these allegations will certainly impact claims valuation, estimation, and resolution by addressing matters that go to the basis and size of the awards—both compensatory and punitive. Continued prosecution of the State Actions could also conceivably strengthen defenses to insurance coverage for the Talc Claims.   Debtor's insurance claims are property of the estate and, if the States are successful in establishing Debtor's knowledge and intent, the insurers' defenses to those insurance coverage claims may well be enhanced.   Additionally, continued litigation would certainly impair ongoing mediation efforts and negotiations within this bankruptcy case. Finally, continuation of the State Actions would further drain resources and divert attention away from the bankruptcy.   Indeed, Debtor—as successor to Old JJCI—maintains a material interest in

---

[9] The Court questions the value to the overall case in having two isolated courts/juries fixing the amount of fines and/or penalties under state-specific consumer protection statutes, which efforts will take months—if not years—to conclude after probable appeals.

participating in the State Actions.  Likewise, J&J is both a defendant in the State Actions and an

obligor under the Funding Agreement that is critical to the bankruptcy case.  Thus, continuation

of the State Actions would potentially disrupt the flow of funds and resources—including time and

energy—that could otherwise be devoted to the reorganization effort. *See, e.g. In re MCSi, Inc.*,

371 B.R. 270, 271–72 (S.D. Ohio 2004) (*quoting Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y.

1999)).  These considerations, taken together, provide an adequate basis for this Court to find that

continued prosecution of the State Actions is sufficiently "related to" the underlying bankruptcy

to confer subject matter jurisdiction to issue an injunction enjoining the States Actions under

§105(a).

The Court, thus, satisfies the jurisdictional analysis set forth in *In re W.R. Grace & Co.* and

*Celotex*. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 311, 115 S. Ct. 1493, 1500, 131 L. Ed. 2d

403 (1995) (collecting cases and holding that a bankruptcy court's injunctive powers under §105(a)

allow it to enjoin suits that are "related to" the bankruptcy proceeding); *In re W.R. Grace & Co.*

591 F.3d 164, 175 (3d Cir. 2009) (explaining that "a bankruptcy court may not enjoin proceedings

between third parties unless those proceedings arise in or under or are related to the underlying

bankruptcy").  To the extent this Court does not have "core" jurisdiction to extend the stay based

on § 362(a), alone, it certainly has "related to" jurisdiction to issue injunctive relief under § 105(a)

to extend the protections of § 362(a) or otherwise enjoin the State Actions. *See, e.g.*, *In re Purdue*

*Pharms. L.P.*, 619 B.R. 38 (S.D.N.Y. 2020) (affirming bankruptcy court's finding of "related to"

jurisdiction to enjoin third-party action because of debtor's indemnification obligations and

because the action sought to be enjoined relied on many of the same facts to establish the liability

as actions against debtor).

### 2.  The Automatic Stay Under § 362(a)

The Court must next examine whether extension of the stay to nondebtors is appropriate

given the circumstances.  Section 362(a) provides that

> a petition filed under section 301, 302, or 303 of this title . . . operates as a stay applicable
> to all entities, of—
>
> > (1) the commencement or continuation, . . . of a judicial, administrative, or other
> > action or proceeding against the debtor that was or could have been commenced
> > before the commencement of the case under this title, or to recover a claim against
> > the debtor that arose before the commencement of the case under this title;
> >
> > . . .
> >
> > (3) any act to obtain possession of property of the estate or of property from the
> > estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a)(1), (3).

### (a) § 362(a)(1)

The Court finds that the States' claims against Old JJCI are, fundamentally, an attempt to

liquidate and recover claims against the Debtor.  The State Actions are directed against Old JJCI,

which no longer exists as a result of the 2021 Corporate Restructuring.[10]  By virtue of the 1979

Agreement and the 2021 Corporate Restructuring, Debtor is responsible for any and all liabilities

associated with the talc products.  Accepting the premise that Debtor is a true defendant in the

State Actions—as opposed to nonexistent Old JJCI—then the claims in the State Actions constitute

---

[10] The State Actions incorrectly identify Old JJCI as "Johnson & Johnson Consumer Companies, Inc." *See Exhibit 1 - New Mexico Complaint* ¶ 8, ECF No. 2-2 in Adv. Pro. No. 22-1231; *Exhibit 2 - Mississpi Complaint* ¶ 12, ECF No. 2-3 in Adv. Pro. No. 22-1231.

"action[s] or proceeding[s] against the debtor," for which the Debtor is entitled to protection under § 362(a)(1).[11]

### (b) § 362(a)(3)

"It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (collecting cases); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 148–49 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).  Here, it is undisputed that the Consumer Protection Defendants and Debtor share insurance policies, which policies may be impacted by any judgment obtained by the States against the Consumer Protection Defendants. In resolving the Talc Adversary Proceeding and the Securities Adversary Proceeding, this Court likewise considered shared insurance policies and found them to be a basis for extending the automatic stay to nondebtor parties.  The same circumstances are present in the instant case, warranting an extension of the automatic stay under § 362(a)(3).

---

[11] The States continually assert that "the defendants in the State Actions are J&J and JJCI—non-debtors—and those entities are the real tortfeasors on non-Talc Claims." *States' Opp'n* 21, ECF No. 18.  However, much of the States' argument against Debtor's involvement in the underlying State Actions is bottomed on the States' disagreement with the 2021 Corporate Restructuring and Debtor's subsequent bankruptcy filing—a strategy known colloquially as the "Texas Two-Step."  This Court addressed similar bad faith arguments in its Opinion Denying Motion to Dismiss and will not repeat its findings here except to reiterate that the restructuring was done in accordance and compliance with valid state law, and that the bankruptcy petition was filed with a proper bankruptcy purpose. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  The States' continued distaste for the corporate maneuvers undertaken by Old JJCI does not alter their legal effect.  Old JJCI ceases to exist and, thus, cannot be a defendant in the State Actions as the States allege.  Debtor, as successor to Old JJCI's talc liability, is a proper defendant and, pursuant to the 1979 Agreement, can and should be substituted for Old JJCI and J&J.

### (c) "Unusual Circumstances"

The Third Circuit has recognized that § 362(a)'s protection is applicable to nondebtors where "unusual circumstances" exist. *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997) (citing *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876, 107 S. Ct. 251, 93 L.Ed.2d 177 (1986); *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 104.   Neither the States nor Debtor address with particularity the "unusual circumstances" that the Third Circuit discussed in *McCartney*.   Nevertheless, when deciding to extend the stay to nondebtors, the Court will follow the Third Circuit's guidance and consider the "unusual circumstances" present in the instant case—namely, the identity of interests between Debtor and the Consumer Protection Defendants, the identity of issues between the claims in the State Actions and the claims in the Talc Actions, and the potential prejudicial impact of continued litigation of the State Actions on Debtor's reorganizational efforts. *See In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that unusual circumstances exist warranting extension of the stay to nondebtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization"); *see also In re LTL Management, LLC*, No. 21-30589, 2022 WL 586161, at *9 (explaining that "a critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate and prospect of reorganization").

The Court's analysis of the potential harm to the bankruptcy estate from continued prosecution of the State Actions mirrors the jurisdictional analysis previously discussed—

particularly, the Court's findings regarding "related to" jurisdiction.  Those same considerations

supporting subject matter jurisdiction also support the conclusion that "unusual circumstances"

exist warranting extension of § 362(a)'s automatic stay protection to the nondebtor defendants in

the State Actions.

The Court starts with consideration of Debtor's potential indemnity obligations.  Debtor

contends that its indemnity obligations could make "judgments against the [Consumer] Protected

Parties on the State Claims tantamount to judgments against the Debtor." *Mot.* 53, ECF No. 2.  The

States counter that an indemnity obligation must be "absolute" before it results in the type of harm

sufficient to warrant extension of the automatic stay to nondebtors.[12]  The Court addresses this

dispute in its decision extending the automatic stay to nondebtor third parties in the Talc Actions

and was "unpersuaded that 'absolute' indemnity is a prerequisite for extension of the automatic

stay." *In re LTL Management, LLC*, 638 B.R. at 312.  The Court remains unconvinced and, in any

event, can find no evidence in the record to reflect that Debtor's indemnification obligations are

anything but absolute.

In examining whether there is cause to extend the automatic stay, the Court is guided by

its previous decision extending the stay to nondebtor defendants in the Talc Actions, where this

Court ruled—as did Judge Whitley in North Carolina—that there was an identity of interest

between the Talc Defendants and Debtor within the meaning of the *Robins* case. *In re LTL*

*Management, LLC*, 638 B.R. at 305–06 (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.

---

[12] The parties discuss this concept in the context of the "irreparable harm" required for an injunction under § 105 to issue.  The analysis is equally applicable in determining whether § 362(a)(1) is implicated.  Until such time as the Third Circuit clarifies or limits the proper basis for extension of the automatic stay to nondebtor third parties, the Court will engage in a comprehensive analysis and discuss the argument under each possible basis.

1986)). Additionally, this Court held that the Talc Claims against the third parties in the Talc Actions "involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor." *Id.* at 306. The results are no different under the facts and circumstances presented here. The States' consumer protection claims against the nondebtor Consumer Protection Defendants involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor. There can be no denying the palpable risks and harm facing the Debtor and its reorganization efforts should the pending consumer protection claims be liquidated at this juncture outside of the chapter 11 case. *See, e.g.*, *In re Dow Corning Corp.*, 86 F.3d 482, 494 (6th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (June 3, 1996) ("The potential for Dow Corning's being held liable to the nondebtors in claims for contribution and indemnification, or vice versa, suffices to establish a conceivable impact on the estate in bankruptcy.").

Continued litigation against the nondebtor Consumer Protection Defendants would also divert funds and resources toward defense costs and potentially disrupt the flow of funds and resources to Debtor's trust pursuant to the Funding Agreement. *See, e.g. In re MCSi, Inc.*, 371 B.R. at 271–72 (quoting *Gray v. Hirsch,* 230 B.R. at 243 and collecting cases in which courts "stayed actions against non-debtor co-defendants 'where they have found that the bankrupt estate would be adversely affected because the creditor's action would prevent the non-debtor from contributing funds to the reorganization, or would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort' "). Further, as discussed, continued litigation

against the nondebtor Consumer Protection Defendants in the State Actions would impair mediation efforts and ongoing negotiations taking place within this bankruptcy.

The Court also must account for the possibility of collateral estoppel and "record taint" in deciding whether to extend the automatic stay. The States assert that the "risk of collateral estoppel or evidentiary prejudice, in and of itself, is insufficient to justify extension of the automatic stay." *States' Opp'n* 17, ECF No. 18. The States cite to *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003) in support of this position; yet, this Court finds *Queenie* distinguishable. In *Queenie*, the request to extend the automatic stay to nondebtor third parties was premised "solely" on the apprehension of later use of offensive collateral estoppel against the debtor or the precedential effect of an adverse decision. Here, the basis for extending the stay does not rest "solely" on collateral estoppel concerns. Moreover, *Queenie* is a decision out of the Second Circuit and is not binding upon this Court. Instead, this Court is counseld by the Third Circuit's decision in *In re W.R. Grace*, which cautions against testing, at the debtor's peril, the theory that collateral estoppel will not later apply. *See In re W.R. Grace & Co.*, 115 F. App'x 565, 569 (3d Cir. 2004). Thus, the States' assertion that "there can be no collateral estoppel here," *States' Opp'n* 18, ECF No. 18, will remain untested.

The Third Circuit also incorporates the concept of "record taint" as part of its "broad[ ] view of the potential impact on the debtor." *See, e.g.*, *In re W.R. Grace & Co.*, 115 F. App'x at 569 n.4 (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) and acknowledging a risk that the evidentiary record created in a case against a nondebtor could later be used in a case against the debtor); *In re Mallinckrodt PLC*, Adv. Pro. No. 20-50850-JTD, 2021 WL 5275781, at

*2 (D. Del. Nov. 10, 2021) (denying leave to file interlocutory appeal of order extending preliminary injunction because bankruptcy court appropriately performed "unusual circumstances" test and held that continued proceedings created "significant risk" of, among other thing, record taint); *In re W.R. Grace & Co.*, 386 B.R. 17, 35 (Bankr. D. Del. 2008) ("Under this 'broader view of the potential impact on the debtor,' this court takes into account the risks of collateral estoppel and record taint."); *In re LTL Management, LLC*, 638 B.R. at 317.   As previously discussed, the talc-related consumer claims against the Debtor and the nondebtor Consumer Protection Defendants implicate the same products, the same time periods, the same alleged defects, and the same alleged harms.  Thus, the possibility exists that the evidentiary record developed in continued litigation against the Consumer Protection Defendants in the State Actions could prejudice Debtor—especially considering Debtor's possible absence as a litigant from the continued litigation.  The risk that litigation against the Consumer Protection Defendants possibly could result in adverse consequences for Debtor—such as record taint—weighs in favor of extending the automatic stay.[13]

### (d) § 362(b)(4)

Notwithstanding the Court's determination that the automatic stay applies to the State Actions, the Court must examine if there are any applicable statutory exceptions.  Indeed, unlike the Court's prior examination of these issues in the Talc Adversary Proceeding and Securities

---

[13] These same factors undercut the Ad Hoc Committee's argument that the State Actions should proceed because the potential pool of plaintiff-states is finite. *See Obj. of Ad Hoc Committee of States Holding Consumer Protection Claims* ¶ 11, ECF No. 21.  During oral argument, counsel reiterated this argument and minimized the impact of allowing cases to proceed given the limited number of comparable actions.  This ignores, however, that even one case that produces record taint and hinders negotiations in this chapter 11 bankruptcy may be too many.

Adversary Proceeding, the present proceeding invites consideration of whether any of the exceptions delineated in § 362(b) prevent operation of the automatic stay. The Court and the parties focus on 11 U.S.C. § 362(b)(4). In relevant part, that subsection provides that:

> The filing of a petition . . . does not operate as a stay—
>
> (4) . . . of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power[.]

11 U.S.C. § 362(b)(4).

The States contend that they, "as 'governmental units' exercising their 'police and regulatory powers,' are carved out of the automatic stay provisions." *States' Opp'n* 11, ECF No. 18. It is undisputed that the States are "governmental units." Thus, the question for this Court is whether the State Actions constitute efforts to enforce police or regulatory power that are excepted from the automatic stay under § 362(b)(4). The advisory committee notes to the statute instruct that this statutory exception "is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." 11 U.S.C. § 362(b)(4) advisory committee's note. Accordingly, the Third Circuit employs two tests—the pecuniary purpose and public policy tests—to determine whether proceedings fall within the police power exception to the automatic stay:

> The pecuniary purpose test asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health. The public policy test asks whether the government is effectuating public policy rather than adjudicating private rights. If the purpose of

30

the law is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay applies. If, on the other hand, the purpose of the law is to protect the government's pecuniary interest in the debtor's property or primarily to adjudicate private rights, then the exception is inapplicable.

*In re Nortel Networks, Inc.*, 669 F.3d 128, 139–40 (3d Cir. 2011).

Courts in this circuit have analyzed case law and the legislative history and concluded that, where the government proceedings are related to matters of public safety and welfare, "efforts to fix a penalty constitute a permissible exception to the automatic stay." *In re W.R. Grace & Co.*, 412 B.R. 657, 664 (D. Del. 2009) (collecting cases); *see also In re Nortel Networks, Inc.*, 669 F.3d at 140 (instructing that where a governmental unit is exercising its power for the purpose of protecting the health, safety, and welfare of the public, a broad construction of § 362(b)(4) is appropriate); *Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*, 733 F.2d 267 (3d Cir. 1984); *In re Iezzi*, 504 B.R. 777, 785 (Bankr. E.D. Pa. 2014) (collecting cases and explaining "that courts will find the § 362(b)(4) exception applicable when the governmental litigation (or other action) was triggered by the debtor's failure to comply with a regulatory obligation affecting public health, safety or welfare").

Although the State Actions at issue in this case ultimately seek monetary compensation, they are also proceedings related to public safety and welfare. Accordingly, the State Actions are excepted from the automatic stay under § 362(b)(4) for the purpose of fixing—but not collecting—civil penalties. *See, e.g., In re W.R. Grace & Co.*, 412 B.R. at 664. This conclusion does not end this Court's inquiry—namely, whether the State Actions should be stayed or enjoined as to the nondebtor Consumer Protection Defendants. While the statute makes clear that the "**filing** of a petition . . . does not operate as a stay" to the State Actions, nothing in the statute prevents a court

31

from imposing or extending the stay under § 362(a) subsequent to the filing. 11 U.S.C. § 362(b)

(emphasis added).  Likewise, nothing in the statute precludes a bankruptcy court from issuing

injunctive relief under § 105(a) enjoining the governmental unit's proceedings where

circumstances so warrant. *See, e.g.*, *Penn Terra Ltd.*, 733 F.2d 267; *In re W.R. Grace & Co.*, 412

B.R. 657 (finding that the proceedings at issue were excepted from the automatic stay under

§362(b)(4) but nevertheless finding that an injunction of those proceedings under § 105(a) was

warranted); *In re Purdue Pharms. L.P.*, 619 B.R. at 57 (holding that "nothing in § 362(b)(4)

constrained [the bankruptcy judge] from entering such an injunction" under § 105(a)).

> The [Third Circuit in *Penn Terra*] indicated that even where state action is excepted
> from the automatic stay pursuant to 11 U.S.C. § 362(b)(4), the bankruptcy court
> may, in its discretion, issue an injunction under 11 U.S.C. § 105. The court noted
> that Congress explicitly considered 11 U.S.C. § 105 when it excepted government
> regulation from the automatic stay.

*In re Elsinore Shore Assocs.*, 66 B.R. 723, 735 (Bankr. D.N.J. 1986) (citing *Penn Terra Ltd.*, 733

F.2d at 273).  Indeed, the Third Circuit in *Penn Terra* quoted the Senate Report, which discusses

the seven exceptions to the automatic stay delineated in subsection (b) of § 362 and explicitly

states that "the effect of an exception is not to make the action immune from injunction." S. REP.

95-989, 51, 1978 U.S.C.C.A.N. 5787, 5837.  Accordingly, in those "limited situations" where a

bankruptcy court has determined there is a "serious conflict" between a governmental unit's

exercise of state police power and the policy of the bankruptcy code, and where "a § 105 injunction

would carry out the policies of the bankruptcy code[,] . . . the bankruptcy court [can] proceed to

apply the four-pronged test for injunctive relief." *Matter of Brennan*, 198 B.R. 445, 450 (D.N.J.

1996) (citing *Penn Terra Ltd.*, 733 F.2d 267).

32

In the case at hand, the Court finds that the exercise of the States' police power seriously conflicts with the policies underlying the Bankruptcy Code. Therefore, § 362(b)(4)'s prevention of an "automatic" stay upon the filing of the bankruptcy does not bar this Court from imposing or extending the stay under § 362(a), or otherwise restrict this Court's ability to issue injunctive relief under § 105(a). Once again, the States' reliance on *MCorp* does not compel a different result. *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 112 S. Ct. 459, 116 L. Ed. 2d 358 (1991). In *MCorp*, the Supreme Court held that the Bankruptcy Code did not authorize the district court to enjoin prosecution of certain administrative proceedings. However, as discussed *supra*, *MCorp* dealt with an entirely different statute—one that includes "specific preclusive language." *Id.* at 42 (discussing 12 U.S.C. § 1818(i)(1)). The Supreme Court explained that the statute at issue in *MCorp* provided "clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the Board's ongoing administrative proceedings." *Id.* at 44. In marked contrast, the statutes at issue here contain no such preclusive language and—unlike the circumstances in *MCorp*—the stay under § 362(a) is implicated in this case because the State Actions seek relief against Debtor directly and impact property of the bankruptcy estate.

### 3.  § 105(a) Injunction

The Court next turns to address the parties' competing positions as to whether an injunction under § 105(a) is appropriate. Pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "The issuance of an injunction under section 105(a)

is governed by the standards generally applicable to the issuance of injunctive relief in non-

bankruptcy contexts." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 105.  In determining

whether a preliminary injunction is appropriate, the Court considers the following factors:

> (1) whether the movant has shown a reasonable probability of success on the merits;
> (2) whether the movant will be irreparably injured by denial of the relief; (3)
> whether granting preliminary relief will result in even greater harm to the
> nonmoving party; and (4) whether granting the preliminary relief will be in the
> public interest.

*McTernan v. City of York, Pa.,* 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell,*

414 F.3d 474, 478 n.4 (3d Cir. 2005)); *see also ADP, Inc. v. Levin*, No. 21-2187, 2022 WL

1184202, at *1 (3d Cir. Apr. 21, 2022) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 176

(3d Cir. 2017), as amended (June 26, 2017)).  "A preliminary injunction is an 'extraordinary

remedy, which should be granted only in limited circumstances.' " *Kos Pharmaceuticals Inc. v.*

*Andrex Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Instant Air Freight Co. v. C.F. Air*

*Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)).

### a.  Success on the Merits

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's

ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D.

Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986)

(explaining reasonable likelihood of success in terms of a successful reorganization)).  The States

contend that the Debtor's reorganization remains speculative.[14] *States Opp'n* 14, ECF No. 18.

---

[14] The States urge the Court to weigh the prospect of reorganization against the alleged harms "that will befall the
States if their policing powers are stripped by this Court[.]" *States' Opp'n* 14, ECF No. 18.  The Court considers this
argument in the subsection addressing the potential harms to the nonmovant.

Indeed, they point to the fact that mediation has been unsuccessful after five months and contend there is no realistic prospect of reorganization, asserting that obtaining a super-majority of creditors to vote in favor of a confirmed plan is "a fleeting impracticality." *Id.*  However, the TCC—which influences, by far, the greatest number of votes—has suggested repeatedly on the record that it could propose a plan that would receive the requisite super-majority of votes to be confirmed.  The TCC's contention undermines the States' morose perspective on the prospect of reorganization.  Moreover, in point of fact, this case has progressed:  the parties are continuing mediation efforts; the Third Circuit will rule imminently on the pending appeals; and an independent expert has been appointed under FED. R. EVID. 706 to expedite the claims valuation process.  To demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty. *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377 (3d Cir. 2013) (Jordan, J., dissenting) *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (collecting cases).  At this juncture, Debtor has met its burden.

### b.  Irreparable Injury

The Court next assesses whether Debtor is likely to suffer irreparable injury without the requested relief.  In its Opinion addressing the extension of the automatic stay to nondebtor defendants in the Securities Action, the Court discussed in detail the considerations central to the irreparable injury inquiry, summarizing as follows:

> In sum, the Court recognizes that the alleged irreparable harm cannot be too remote—in terms of time—or too speculative—in terms of likeliness to occur.  As

> stated previously, to hold otherwise would contradict developed case law and the
> Third Circuit's instruction that preliminary injunctions should be granted only in
> limited circumstances. Nevertheless, this Court concludes that the test for whether
> irreparable harm has been demonstrated in the context of a bankruptcy case should
> encompass a broader view of the impact on the debtor and can take into account
> risks of negative consequences.

*In Re LTL Mgmt., LLC*, 640 B.R. 322, 341 (Bankr. D.N.J. 2022). The Court incorporates the

framework utilized in the Securities Action by reference and employs the same analysis here. For

reasons previously explained, the Court concludes that continued litigation in the State Actions

will have an adverse impact on the bankruptcy estate by hindering mediation efforts, impacting

the claims liquidation and estimation processes, and possibly strengthening insurance defenses

against coverage—all of which will impair reorganization efforts and drain resources and time.

The States assert that Debtor has failed to demonstrate imminent, irreparable harm because

"Debtor fails to address how its funding commitment to J&J requires the Debtor to refund J&J for

its past consumer/advertising transgressions." *States' Opp'n* 15, ECF No. 18. However, as

discussed, the allegations of the State Actions make clear that the claims asserted therein stem

from the injuries allegedly caused by the manufacturing, distribution, and marketing of the

Consumer Protection Defendants' talc-related products. And, as noted, Debtor is responsible—

either directly or through indemnification—for all talc-related liabilities. Further, the States do

not dispute that continued litigation in the State Actions could impact Debtor's ongoing

negotiations with the Ad Hoc Committee of States Holding Consumer Protection Claims. Rather,

the States assert that Debtor has not shown any "concrete or particularized" harm. However, the

States cite no case law indicating the level of specificity with which the irreparable harm must be

alleged. As discussed, this Court has held that the harm alleged cannot be too remote or

speculative.  Additionally, this Court's own research reveals that other courts have held that, where a movant seeks to enjoin police or regulatory action, the movant must make a "clear showing" of the irreparable harm that would be suffered without such relief. *Matter of Brennan*, 198 B.R. 445, 453 (D.N.J. 1996).  For all of the reasons previously discussed, the Court determines that Debtor has made a clear showing of irreparable harm that is sufficiently specific to weigh in favor of a §105(a) injunction. *See, e.g.*, *Debtor's Reply* 13-19, ECF No. 24; *see also In re Purdue Pharms. L.P.*, 619 B.R. at 59 (finding that allegations that continued litigation would "embarrass, burden, delay or otherwise impede the debtor's estate and reorganization prospects" sufficient to warrant injunction temporarily halting law enforcement and regulatory actions).

During oral argument, Counsel for the States insisted that Debtor in this case is not the "typical debtor" because it has no operations.  Thus, the States argued that there is no true harm to Debtor, and the extension of the automatic stay is sought, instead, for the benefit of J&J.  The Court accepts that the extension of the automatic stay through a § 105(a) injunction provides some benefit to J&J, and other nondebtor defendants.  Nevertheless, incidental benefits to a nondebtor do not negate the potential harms that could befall Debtor as the result of continued litigation.

The States remaining arguments against irreparable harm are: (1) that the Debtor, itself, is stalling and placing obstacles in the way of a successful reorganization; (2) that no risk of "collateral estoppel" or "record taint" exists; and (3) that Debtor's indemnity obligations are not absolute.  The Court has addressed the latter two arguments and will not repeat its rulings here. As to the States' contention that Debtor is not harmed because Debtor, itself, is the party responsible for failed mediation and delays—the Court finds this contention to be meritless.

37

Admittedly, ultimate resolution has not yet been reached; however, as explained, the parties are

moving forward with mediation and the case is progressing through the claims estimation process.

Moreover, Debtor alone is not responsible for delays.  In point of fact, the most recent adjournment

of Debtor's motion for extension of the exclusivity period—which the States cite in their

Opposition as an example of Debtor's delay—was consensual. *See Order Adjourning Exclusivity*

*Motions*, ECF No. 2870.

### c.  Harm to Nonmoving Party

The Court must also consider whether granting preliminary relief will result in even greater

harm to the nonmoving party—here, the States.  Simply put, the Court finds there is minimal harm

or prejudice to the States by a temporary stay of litigation.  The only harm that will come to the

States is a short-term delay in prosecution of their "marketing-based" claims.  When challenged at

oral argument that the State Actions are directed primarily at securing monetary recoveries, which

may well benefit state coffers at the expense of the talc personal injury victims, counsel for the

States countered that—while the States are within their rights to assess fines and penalties—the

delays caused by an injunction will impair efforts to provide consumers with adequate notice of

the risks and possibly may compel a recall of the talc products.   This Court remains skeptical, to

say the least.   The Court notes the omnipresent advertisements by the plaintiffs' bar, alerting

consumers of the risks associated with continued use of talc products.  Those ads pervade all types

of social media and media outlets, including television, radio, newspapers, magazines, blogs,

Twitter, and websites.  Notwithstanding, the States do not need litigation to provide their residents

with notice of the potential harms; they are free to provide such notice now.  Moreover, as to

achieving a voluntary recall of products, it is highly improbably that there will be such a recall of products which the Consumer Protection Defendants contend carry no harm.

The States argue that because the Motion "fails to set any temporal limitations on the pendency of the preliminary injunction," it is, "in effect, a permanent injunction that is set to last indefinitely[.]" *States' Opp'n* 19, ECF No. 18.  This Court disagrees.  When resolving the Talc Adversary Proceeding and the Securities Action, this Court concluded that taking measures in small steps was prudent and the Court committed itself to revisiting continuation of each preliminary injunction at regular intervals.  The preliminary injunction entered by way of this Opinion and Order will likewise be revisited and, thus, is far from permanent.  Thus, the States have not established a harm to them aside from delay.  Instead, the States rely heavily on the general public interest in permitting governmental units to enforce police and regulatory power.

### d.  Public Interest

As to the fourth factor, the Court has weighed all competing factors and concludes that granting the preliminary injunction would be in the public interest.  The States devote a substantial portion of their Opposition to discussing their sovereignty. *States' Opp'n* 22-32, ECF No. 18.  The Ad Hoc Committee likewise cites state sovereignty and principles of federalism in opposition to the Motion. *See Obj. of the Ad Hoc Committee of States Holding Consumer Protection Claims* ¶¶ 24-28, ECF No. 21.  The States rely on the Supreme Court's decision in *Katz* and the Third Circuit's ruling in *In re Venoco* for the proposition that state waiver of sovereign immunity is limited in the bankruptcy context. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006); *In re Venoco LLC*, 998 F.3d 94, 102 (3d Cir.), *cert. denied sub*

*nom. California State Lands Comm'n v. Davis*, 211 L. Ed. 2d 102, 142 S. Ct. 231 (2021). The States conclude that the State Actions do not fit "within the narrow waiver of sovereign immunity identified by *Katz* and *Venoco*." *States' Opp'n* 25, ECF No. 18. In so arguing, the States urge this Court to undertake an analysis of the State Actions' impact on the three "critical features" of a bankruptcy proceeding: "[1] the exercise of exclusive jurisdiction over all of the debtor's property, [2] the equitable distribution of that property among the debtor's creditors, and [3] the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *In re Venoco LLC*, 998 F.3d at 104 (quoting *In re Diaz*, 647 F.3d 1073, 1084 (11th Cir. 2011) (quoting *Katz*, 546 U.S. at 363–64))). No such analysis is necessary.

Section 106(a) of Title 11 addresses abrogation of governmental sovereign immunity. It states, in relevant part, "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following: Sections 105 . . . [and] 362." 11 U.S.C. § 106(a)(1). Thus, § 106(a) of the Bankruptcy Code explicitly abrogates governmental sovereign immunity with respect to the Code provisions at issue in this Consumer Protection Adversary Proceeding. The Court need not delve further into the Framer's intent and understanding—as advocated by the States—because Congress settled the issue through statute. Principles are federalism are not at risk. Here, the States' sovereign immunity is clearly inapplicable under § 106(a).

This conclusion is buttressed by the decisions affirming bankruptcy courts' authority to enjoin governmental actions notwithstanding the fact that those proceedings were excepted from the automatic stay under § 362(b)(4). *See, e.g.*, *Penn Terra Ltd.*, 733 F.2d 267; *In re W.R. Grace*

*& Co.*, 412 B.R. 657; *In re Bankr. Appeal of Allegheny Health, Educ. & Rsch. Found.*, 252 B.R. 309 (W.D. Pa. 1999).  In support of their public policy argument, the States cite the "vital public interest in allowing governmental units to enforce police and regulatory power." *States' Opp'n* 19, ECF No. 18.   Indeed, Congress recognized this important function and the State Actions are precisely the type of governmental-unit-proceedings related to public safety and health that are excepted from the automatic stay under § 362(b)(4).   Nevertheless, this Court retains the authority to enjoin proceedings that are not automatically stayed by § 362(a). *See, e.g.*, *Penn Terra Ltd.*, 733 F.2d at 273 ("The bankruptcy court, in its discretion, may issue an appropriate injunction, even if the automatic stay is not operative.").   In doing so, the Court must carefully weigh the factors for issuing an injunction. *See In re Bankr. Appeal of Allegheny Health, Educ. & Rsch. Found.*, 252 B.R. at 331–32 (collecting cases) ("Some courts have taken the position that even more caution than usual should be exercised when entertaining the prospect of enjoining a proceeding which Congress has exempted from operation of section 362(a)'s automatic stay.").

Here, the States argue that the impact of a preliminary injunction in this case will be much more than "mere delay . . . but rather is an affront to the Bankruptcy Code and 'an effort to frustrate necessary governmental function[.]" *States' Opp'n* 20, ECF No. 18 (quoting *United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir. 1988)).   Indeed, the Third Circuit in *Nicolet* explained that Congress enacted the police and regulatory power exception to the automatic stay specifically to combat the risk that debtors would file bankruptcy in order to evade government proceedings and "frustrate necessary government function." *Nicolet*, 857 F.2d. at 207.   That is not the situation

41

presented to this Court. From the outset, the Debtor's stated purpose has been to equitably and efficiently resolve the claims it faces—particularly the Talc Claims.

In their Opposition, the States discuss public policy being affected in terms of a potential injunction's "frustration of their opportunity for a day in court." *States' Opp'n* 19, ECF No. 18 (citing *Matter of Johns-Manville Corp.*, 26 B.R. 405, 417 (Bankr. S.D.N.Y. 1983), *aff'd sub nom. In re Johns-Manville Corp.*, 40 B.R. 219 (S.D.N.Y. 1984)). For reasons observed, the Court finds that a temporary delay in resolution of the consumer protection claims is far outweighed by the potential adverse impact on administration of this bankruptcy. Moreover, this Court focuses on a broader public policy concern; namely, the health and safety of the public, in general. Although the Consumer Protection Defendants have ceased selling talc-related products in the United States, the States point out that this decision was unilateral and could be reversed at the whim of the Consumer Protection Defendants. Debtor counters that such a reversal in course is mere speculation. The Court deems any return of talc-based products to the marketplace as being far-fetched and undermined by recent actions—specifically the cessation of selling talc-containing products globally.[15]

During oral argument at the hearing on September 14, 2022, the States explained to the Court that, although Debtor has stopped selling and manufacturing the product, talc-containing products nevertheless remain on store shelves and in consumer households. The States argued that—to the extent they are successful in the State Actions—they can obtain injunctive relief that would aid them in their goal of informing the public and removing talc-containing products from

---

[15] Moreover, this Court would treat the resumption in sales of talc-containing products as a substantial factor in deciding whether to continue or modify the injunction issued by way of this Opinion.

circulation.  As noted, the States concede that the plaintiffs' bar has engaged in large-scale, similar efforts to warn and inform the public.  Nevertheless, the States contend that comparable warnings regarding the potential dangers of talc-containing products issued by the plaintiffs' bar may not reach the entirety of the population and do not carry the same weight as warnings issued by the States.  These are valid public safety concerns that weigh against the injunctive relief sought in the instant Adversary Proceeding.  However, the Court must consider these potential harms in context.  The possibility that a limited segment of the public remains unaware of the studies advanced in the State Actions for a limited period of time during the temporary injunction does not outweigh the larger goal of resolving claims efficiently and fairly for the tens of thousands of Talc Claimants in this chapter 11 case.  Likewise, the potential delay in the States' desired relief that will "deter similar future misleading marketing conduct"—again, which relief is contingent upon the States' success in the States Actions—does not outweigh the benefits of global resolution of claims through the reorganization process.  *States' Opp'n* 32, ECF No. 18.

As detailed in this Court's Opinion Denying the Motions to Dismiss, this Court holds no doubts that claim resolution through the bankruptcy process is in the public interest. *See In re LTL Mgmt., LLC*, 637 B.R. 396.  A settlement trust benefits claimants—whose time is valuable and may be limited due to their illness—by streamlining the claim recovery process.  Additionally, a bankruptcy trust protects the needs of future talc claimants.  Certainly, the chapter 11 bankruptcy and resolution of Talc Claims are of paramount public import.  While the States' interests in informing their citizens and deterring misrepresentative marketing are likewise important, those

considerations are not paramount to the interests of the public in addressing the needs of the talc claimants at this juncture.

In conducting this analysis, the Court considers the public policy concerns that underlie every decision made in this case and balances the equities on all sides.  Indeed, as explained above and emphasized in this Court's prior opinions, the Debtor's reorganization and the uniform, timely, and equitable resolution of the Talc Claims for the benefit of injured parties—existing and future— are at the forefront of this Court's mind.  The State Actions seek to liquidate claims against Debtor, itself, and against Debtor's affiliates.  This Court enjoined other parties from pursuing litigation against Debtor and Debtor's affiliates in the Talc Adversary Proceeding and Securities Adversary Proceeding.  It seems patently unfair to permit the States to proceed while others—particularly those who allege more direct, personal harm—must wait.  Judge Bucki in the Bankruptcy Court for the Western District of New York encountered an analogous issue when considering a request to extend the automatic stay in the Diocese of Buffalo, N.Y. bankruptcy case.  Judge Bucki reasoned:

> [T]he Court finds good cause to enjoin 49 non-consenting claimants from the prosecution of litigation against parishes and affiliates. Fairness demands, however, that similar creditors experience similar impact from any injunctive relief. All should share equal opportunity for access to state court, if and when such access is allowed.

*In re Diocese of Buffalo, N.Y.*, 642 B.R. 350 (Bankr. W.D.N.Y. 2022).  Given the circumstances of the instant case, fairness demands that—for the time being—the States experience a similar impact from injunctive relief as other creditors.

44

IV.    **Conclusion**

For the reasons set forth above, the Court concludes that "unusual circumstances" are present warranting an extension of the automatic stay to the nondebtor Consumer Protection Defendants under § 362(a).  To the extent § 362(a) does not serve as an independent basis for extension of the stay to nondebtor parties, the Court determines that a preliminary injunction under § 105(a) extending the stay is appropriate.  The Court, thus, grants Debtor's Motion and resolves the instant adversary proceeding in Debtor's favor.  However, as with the resolution of the Talc Adversary Proceeding and the Securities Action, the Court concludes that taking measures in smaller steps is prudent.  Accordingly, the Court will revisit continuation of the automatic stay during the December 2022 Omnibus Hearing Date, which date has not yet been selected.  Debtor is directed to submit a proposed form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: October 4, 2022